UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

KARU GENE WHITE,

     Petitioner,

V.

RANDY WHITE, Warden,

     Respondent.

Civil No. 5: 02-492-KKC

**MEMORANDUM OPINION
AND ORDER**

\*\*\*   \*\*\*   \*\*\*   \*\*\*

     In 1980, Karu Gene White was convicted of the robbery and murder of three elderly shopkeepers in Powell County, Kentucky and sentenced to death.  White seeks habeas relief in this Court, contending that his counsel labored under a conflict of interest and was ineffective; that the prosecutor engaged in misconduct; and that his trial was fundamentally unfair.  [R. 14]  The Court has evaluated these claims in light of the Kentucky Supreme Court's prior decision and with the assistance of further briefing by the parties.  [R. 84, 90]  As explained more fully below, the Court finds no grounds warranting federal habeas relief.

<u>I - BACKGROUND</u>

     In the late 1970s, Charles Gross (age 75), his wife Lula Gross (age 74), and her brother Sam Chaney (age 79) operated a small grocery store in rural Haddix, Kentucky.[1]  The trio also resided in the store.  In 1978, White (age 20 at the time) had long heard local rumors that the shopkeepers had hidden something like $50,000 to $70,000 cash in the store.  In the fall of 1978 White was dating Donna Jones, and told her during a conversation that he wanted to rob the store.  By December 1978, White began trying to convince two of his friends – his half-brother Tommy Bowling (then age 17) and Chuck Fisher (then age 15) – to help him do so.  At some point in January

---

[1] The following description of the essential facts in this case is derived from the Kentucky Supreme Court's opinion in White's direct appeal, *White v. Commonwealth*, 671 S.W.2d 241 (Ky.), *cert. denied*, 469 U.S. 963 (1984), the state court record, and the briefs of the parties.

1

1979, the three young men, along with friends Butch Napier and Henry White, went to the store together to buy some food and sodas. After they left, White told his friends that the store would be easy to rob. White brought up the idea of robbing the victims several times in the following months, and Fisher and Bowling ultimately agreed. A plan was formulated to have Fisher come through the front door to distract the victims while White and Bowling would enter through the back of the store and knock them out.[2]

The robbery took place in the evening hours of February 12, 1979. Several hours earlier that day, some of the young men had smoked marijuana and/or taken LSD. As evening approached, the trio hitched a ride from Elishamere Noble, who dropped them off near the store in Haddix. Noble, who knew Fisher, would later recall that Fisher was wearing a toboggan cap with the words "4-Wheel Drive" on it and a green and grey CPO jacket. To knock the victims out, Fisher brought an adjustable wrench with him; White found a crowbar in a truck near the store and took it; and Bowling broke off a 2½-foot limb from a tree. The young men waited about 15 minutes for it to get darker before proceeding towards the store. White and Bowling walked to a side door to wait for Fisher's signal to enter, on the way donning gloves or socks on their hands so as not to leave fingerprints, and pulling nylons over their faces so that they could not be identified.[3]

Before they could enter the store, around 6:30 p.m. eleven-year-old Bobby McIntosh approached the store to buy a soda and candy. After he had made his purchases and walked out of the store, he encountered Fisher. He would later testify that as he left he saw a man at the side porch pushing against the side door with his shoulder, and that the young man he encountered outside in front of the store was wearing a toboggan with the words "4-Wheel Drive" on it. Bobby was suspicious, and proceeded home to tell his father about the man he saw.[4]

Fisher then went in the front door, picked up a soda and set it down loudly on the counter, signaling White and Bowling to enter. They broke in through the side door, encountering Lula who was in the back room. One of the men (forensic evidence would later suggest it was likely Bowling)

---

[2]  [Trial transcript (hereinafter "Trial") at 1065-67; 1110-1118; 1157-1159; 1432-36; 1475; 1484]

[3]  [Trial at 1224-1229; 1437-46; 1478]

[4]  [Trial at 1235-44; 1446-47]

clubbed Lula over the head and she fell to the floor.  When Charlie and Sam heard a commotion from the back of the store where the living quarters were located, they headed in that direction. Fisher hit Charlie in the forehead with his wrench, knocking him down.  Bowling and White, wearing nylons over their faces, came from the back of the store.  Bowling hit Sam with his tree limb, sending him to the ground as well.  When Sam started to move, Bowling hit him again.  According to Fisher, Sam then begged for his life; Bowling, unwilling to strike Sam again, set his stick up on the counter.  Undeterred, White hit Sam another time with his crowbar.  When Charlie started to stand up, Fisher called out "Gene!" (White's first name).  White then hit Charlie with his lug wrench, and he hit Sam another time.  White was furious that Fisher had spoken his first name in front of the victims (whom he had known since childhood), and Bowling had to convince White not to hit Fisher.  There were likely additional blows to the victims, some of them very severe: Charlie's nose was broken, one of his eyes was pushed entirely out of his head, and his skull was completely beaten in; Sam's brain was leaking out of a breach in his skull; blood carpeted the floor and walls of the shop; and their bodies were so broken that the victims had to be buried in "disaster pouches."[5]

Once the victims were no longer moving or making any noise, the three young men turned off the lights and began to ransack the store and living quarters in search of the money.  They found and took a blue 0.38 revolver and a wallet with $7,000 in it, and then gathered up their weapons and left through the side door.  As they fled through woods and fields they threw away each of the weapons they had used, as well as the nylons, socks, and gloves White and Bowling had worn.  Police would later recover these items nearby, along with Fisher's green and grey CPO jacket.  The three would be picked up later that night by a friend who drove them to a dorm at nearby Lees College. Later that evening White divided up the cash equally between them.  Days later when they heard that the police had collected foot prints from the crime scene, White told Fisher and Bowling to get rid of their shoes.[6]

---

[5]  [Trial at 1093, 1097; 1409-16; 1447-53; 1491-92]

[6]  [Trial at 1454-1464]

In the days following, Kentucky State Police detective Pat Simpson interviewed White, Bowling, and Fisher, and each told him that they had not been in Haddix that night but were instead at Lees College visiting a friend.  Later, as the detective uncovered more details about the crimes, each of the young men would change his story, admitting that the group did go to Haddix, allegedly to buy marijuana.  Butch Napier told police that after the robbery White had offered to sell him a brand new 0.38 Smith & Wesson pistol.  Napier also said that on another occasion he had driven White to a place near the woods where White retrieved a muddy coffee can that had money in it. Henry White told police that White, Fisher, and Bowling had acknowledged that they had had some role in the crimes.  Henry also said that Gene told him that he had gotten two guns (one of them blue) from the store; and he saw a blue pistol in the glove compartment of White's car.  The three young men were arrested and charged in July 1979.[7]

After the arrests, Fisher's family hired attorney Kevin Charters to defend him in the case. The family of White and Bowling hired Jim Early – a lawyer who shared office space with Charters in Lexington, Kentucky – to represent the two young men.  At that time, all three of the defendants professed their innocence, so the attorneys worked together to prepare a joint alibi defense contending that White, Bowling and Fisher were elsewhere and that the circumstantial evidence was simply insufficient to demonstrate that they were present at the store or had committed the crimes.[8] In December 1979, the prosecution conveyed to defense counsel offers of immunity for Fisher and Bowling in exchange for their testimony incriminating White, but those offers were declined.[9]

The prosecution indicted each of the three defendants in a separate criminal proceeding.  In December 1979 discussions were had regarding a consolidated trial for all three of the defendants, but the court never ordered all of the cases consolidated, and White's case was scheduled for trial first.  At a hearing in January 1980, the court engaged in an extended discussion with the

---

[7]  [Trial at 1110-1118; 1128-32; 1161-64]

[8]  *Cf.* [December 12, 1979 hearing transcript at 72-73 ("Judge, the evidence in this case against my client is only circumstantial. ... The lab tests show that in spite of all of the fingerprints that were taken, the footprints that were taken, not one piece of evidence suggests, mind you, forget whether it proves it, suggests that Tommy Bowling had anything to do with this crime.")]

[9]  [RCr 11.42 hearing transcript (hereinafter "RCr 11.42") at 543; 885-87; 1165, 1167]

prosecutors, defense counsel and their clients (including Fisher's father) explaining various scenarios under which a possible conflict of interest might arise because defense counsel were cooperating in their defense of the three defendants.   During that hearing White, Bowling, and Fisher each indicated that they understood the risk that counsel "may have to do something for them at your expense" during White's trial and orally waived any claim based upon a conflict of interest.   At the beginning of White's trial on February 11, 1980, the trial court granted a motion permitting the joint representation, and White, Bowling, and Fisher executed a written waiver of any conflict of interest.[10]

Three days after *voir dire* had commenced, Fisher agreed to testify against White and Bowling in exchange for complete immunity from prosecution.   Clyde Simmons was appointed to represent Fisher the next day.   Early and Charters then advised the court that the nature of White's defense had changed to not guilty by reason of intoxication and/or insanity; moved for a mistrial and to obtain a psychiatric evaluation in support of White's new defense; and moved to dismiss all of the jurors previously qualified and start *voir dire* anew in light of the change in their theory of the case. The request for a mistrial was denied, but a competency examination was ordered.

Dr. Robert Granacher examined White over the weekend, but advised Judge Graham that in his opinion White was competent to stand trial.   A competency hearing was held on February 18-19, 1980.   During the two-day hearing White's family members testified that when he was growing up he had "behaved bizarrely, had nightmares, wet the bed, engaged in bestiality, abused animals, made sexual advances toward his sisters and was violent toward family and friends."   The trial judge found White competent to stand trial.   White's motion for a new venire was denied, but counsel was permitted to query the already-qualified panel members with respect to the new insanity defense. The beginning of trial was delayed to permit a psychological evaluation of White to support the insanity defense.   Defense counsel retained Dr. Paul Evensen to conduct an evaluation of White. Evensen concluded that White was not criminally insane, but provided an assessment for possible use as mitigation evidence.[11]

---

[10]  [Pretrial hearing transcript (hereinafter "Pretrial") at 179-206; Trial at 2, 7-8]

[11]  [Trial at 473, 506-08; 863-67; 1017-1018; Evensen Depo. (June 8, 1999), Exh. #2 (Feb. 26, 1980 report)]

The trial began in earnest on February 25, 1980.  During the prosecution's case in chief Donna Jones, White's ex-girlfriend, testified that she had rejected his efforts to recruit her assistance in robbing the store.  Once the robbery was committed, White made inculpatory statements to her, testimony corroborated by two other women.  Butch Napier and Henry White testified that before the robbery was committed White had expressed interest in robbing the store, and detailed his subsequent efforts to sell the blue pistol stolen from it and White's acknowledgement that he was involved in the crime.  Elishamere Noble testified to giving the three young men a ride to an area close by the store shortly before the robbery, and Bobby McIntosh testified to seeing a young man wearing a toboggan cap matching the one worn by Fisher that evening.[12]

Paul Collins was an inmate detained in the same jail where White, Fisher, and Bowling were held before trial.  Collins testified that White had talked with Fisher and Bowling about "getting their story straight" before trial, and about contriving an alibi by convincing friends to testify that they were together with the three young men that evening.  He also testified that Fisher cried frequently and was wracked with guilt over the deaths of the shopkeepers.[13]

Charles Fisher was the last witness for the prosecution.  He explained that White brought up the idea of robbing the victims several times before the robbery was committed, and had come up with the plan on how to conduct the robbery.  Fisher also corroborated much of the testimony given by other prosecution witnesses.  Fisher testified that he had reflexively called out White's first name "Gene" during the robbery when Charlie started to get up from the floor, and that White became furious with him and concerned that Fisher had revealed White's identity to the victims, whom White had known since his childhood.  Fisher confirmed that the trio had stolen a blue 0.38 revolver and a wallet with about $7,000 in it from the store, and had discarded their weapons, socks, and gloves as they fled through the nearby woods and fields.  When they later heard that footprints had been collected from the store, White told Fisher and Bowling to get rid of their shoes.[14]

---

[12]  [Trial at 1065-69; 1110-1118; 1157-1159; 1224-1229; 1235-44]

[13]  [Trial at 1376-1383]

[14]  [Trial at 1432-84]

The witnesses called by the defense consisted almost entirely of White's family members. Nancy Bowling testified that she had become pregnant with White when she was thirteen years old after her step-father Karu Neace had beaten and raped her. While living in Chicago, Nancy had tried to put the baby up for adoption, but her mother Kitty Neace intervened and adopted White instead, then returning to Kentucky. Nancy is also the mother of White's co-defendant Tommy Bowling. White was raised with Karu Neace as his father, and Kitty did not tell White that she was not his biological mother until he was fourteen years old.[15]

Kitty Neace testified that as a child White had a temper and was willful, and there were times when he would be cruel towards dogs, cats, and horses. Kitty also testified that when White was five years old he had witnessed Ossie White (Kitty's brother) kill Karu Neace (White's father) in the family home and then threaten to kill all of the children as well. Kitty testified that Nancy would beat or abuse White, and that he had a problem with wetting his bed which began in his childhood years but persisted into his adulthood. Mary Ann Neace, Louise Evans, and Mildred Neace (each a half-sister or step-sister to White) testified that on separate occasions when White was a teenager he had come into their bedroom late at night and made sexually inappropriate advances toward them. Louise and Mildred indicated that White's mother Nancy would discipline him harshly with a belt and that he struggled at school. Mildred had taken three psychology courses in college, and defense counsel was permitted to solicit her testimony that White could not "conform his conduct to what was expected of him" and needed psychological help.[16]

White concluded the defense case by testifying in his own defense. On direct examination he confirmed some of the events of his childhood about which his family had testified, although he frequently downplayed their significance. He declined to affirm that he was particularly traumatized by seeing his father murdered, and rejected the allegation that he had ever been intentionally cruel to animals. White indicated that his childhood was difficult in many respects, but his testimony rebutted the notion that he was insane or not possessed of his faculties during the robbery and murders. He did, however, assert that the blame for the crimes belonged primarily to Fisher and

---

[15] [Trial at 1520-1523, 1539, 1556-1557]

[16] [Trial at 1627-1735]

Bowling, claiming that he hadn't been serious about the robbery but that they "kept badgering" him to do it. White further claimed that when he entered the store the victims had already been beaten by Bowling and/or Fisher. He also confirmed that he took a blue 0.38 pistol from the store.[17]

On March 10, 1980, the jury returned a guilty verdict on all counts. During the penalty phase, both sides presented argument based upon the psychological evidence that had been presented in the days immediately preceding, and the jury was instructed on aggravating and mitigating circumstances. The jury recommended a sentence of death on March 13, 1980 on the murder counts, a sentence imposed by the trial court following a sentencing hearing on March 29, 1980. During a later separate trial, Tommy Bowling was convicted and sentenced to seven concurrent terms of twenty years imprisonment for his role in these crimes.

On direct appeal, White challenged his conviction on numerous grounds related to his counsel's asserted conflict of interest and efficacy, alleged misconduct by the prosecution, and the trial judge's handling of jury selection, evidentiary matters, and courtroom management. The Supreme Court of Kentucky affirmed White's convictions and sentences in May 1984. *White v. Commonwealth*, 671 S. W. 2d 241 (Ky.), *cert. denied*, 469 U.S. 963 (1984). White collaterally attacked his conviction and sentence by motion filed pursuant to Rule 11.42 of the Kentucky Rules of Criminal Procedure on December 14, 1984. Nearly fifteen years later in May 1999, the trial court conducted a five-day evidentiary hearing in the RCr 11.42 proceedings. The trial court denied relief in January 2000. White appealed, but the Kentucky Supreme Court affirmed in May 2002. *White v. Kentucky*, 1994-SC-0326-MR (Ky. May 16, 2002) (unpublished).

White commenced federal habeas proceedings in this Court in November 2002 by seeking the appointment of counsel. [R. 1] White filed his habeas corpus petition in October 2003. [R. 14] At White's request, in January 2004 this Court denied his newly-asserted intellectual disability claim under *Atkins v. Virginia*, 304 U.S. 536 (2002) without prejudice so that he could exhaust it in the state courts, while holding the balance of his claims in abeyance pending the outcome of those proceedings. [R. 18, 20] When more than three years passed without any update, the Court ordered White to file status reports every six months. [R. 27] Four years later, White filed several motions asking to be excused from exhausting his *Atkins* claim because the state would not provide him with

---

[17]  [Trial at 1789-2019]

funds to pay for a privately-retained expert in order to establish an evidentiary foundation for it. The Court denied those requests, but in light of the continued delay in the state proceedings returned this case to the active docket in early 2013 for briefing and resolution of the remaining federal habeas claims. [R. 36-58] Filing of the state court record, substantive briefing of the merits by the parties, and White's motions for funding and discovery consumed nearly four years, and this matter became ripe for decision in September 2016.[18] [R. 65-103]

## II - GENERAL PRINCIPLES

Before asserting a claim seeking federal habeas relief, a petitioner must clear two hurdles. First, at the time the petition is filed the petitioner must have fully utilized, or "exhausted," all available opportunities to present a particular claim to the state courts for consideration. 28 U.S.C. § 2254(b)(1)(A). This rule is intended to serve the interests of comity and federalism and promote respect for state court judgments by giving state courts the first opportunity to consider and correct any asserted error of federal constitutional dimension. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citing *Rose v. Lundy*, 455 U.S. 509, 518 (1982)).

To exhaust a claim, the petitioner must "fairly present" it to the state courts by clearly indicating both its factual basis and the federal legal grounds upon which it is predicated. *Hanna v. Ishee*, 694 F. 3d 596, 609 (6th Cir. 2012) (citing *Williams v. Taylor*, 529 U.S. 420, 437 (2000)); *Hicks v. Straub*, 377 F. 3d 538, 552-53 (6th Cir. 2004) ("[T]he exhaustion doctrine requires the petitioner to present the same claim under the same theory to the state courts before raising it on federal habeas review.") (internal quotation marks omitted).

Fair presentation of a federal constitutional claim requires the petitioner to make the federal basis of the claim explicit to the state court, either by citing to federal law or to the decisions of federal courts. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."). Citation only to state statutes and state court decisions generally fails to adequately assert that federal civil rights have been violated. *Baldwin v. Reese*, 541 U.S. 27, 33 (2004) (holding that a petitioner's failure

---

[18] White waived a number of claims during the course of briefing, including Claims B(5), C(6, 7), D(1), E(1-4), F(3), G(2), H(1-3, 5), I(1-2), J(1), and K(1). [R. 81, 91] The Court therefore does not address them.

9

to identify a federal claim or to cite case law which might alert the state court to the federal nature of a claim is not fair presentation); *Gray v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court.").

Exhaustion is an affirmative defense, and the respondent may waive it if is not affirmatively asserted. *Smith v. Moore*, 415 F. App'x 624, 628 (6th Cir. 2011) ("A respondent failing to raise his procedural default challenge waives it. 'The state may waive a defense,' including procedural default, 'by not asserting it.'") (citing *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004)). But even where the petitioner has not exhausted a claim, the federal court may nonetheless deny relief if the claim is without merit. 28 U.S.C. § 2254(b)(2).

The second hurdle requires the petitioner to comply with state procedural rules when presenting federal claims to the state courts for consideration. Failure to do so results in "procedural default" of the claim, and it may not be considered on federal habeas review. *Gerth v. Warden, Allen Oakwood Corr. Instit.*, 938 F.3d 821, 826-27 (6th Cir. 2019). This may occur in two ways. In the first, the petitioner asserts the claim in the state courts but the last state court judgment addressing the claim refuses to consider its merits because the petitioner did not comply with a state procedural rule that is (1) independent of the federal claim and (2) adequate to support the judgment. *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (citing *Coleman v. Thompson*, 501 U.S. 722, 729-32 (1991)); *Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011). In the second, the petitioner did not previously present the federal claim to the state court for consideration during its ordinary appellate or collateral review process, and state procedures no longer permit the claim to be raised when the petition is filed. In that circumstance, the claim is technically "exhausted" (because no state procedure is available to assert it at the time the habeas petition is filed) but procedurally defaulted (because state procedures were not followed to assert the claim). *Williams v. Burt*, 949 F.3d 966, 972-73 (6th Cir. 2020); *Williams v. Anderson*, 460 F.3d 789, 805-06 (6th Cir. 2006); *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).

Having traversed available avenues for relief from the state courts, the petitioner bears the burden of demonstrating any right to habeas relief in the federal courts. *Garner v. Mitchell*, 557 F. 3d 257, 261 (6th Cir. 2009) (citing *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003)). White's

10

petition was filed in 2003, and is thus governed by 28 U.S.C. § 2254(d). *England v. Hart*, 970 F. 3d 698, 705 (6th Cir. 2020).

When a petitioner has presented the claim to the state courts for consideration but those courts did not address the merits of the claim in any manner, the federal habeas court evaluates the merits of the claim *de novo*. *Van v. Jones*, 475 F. 3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 340 F. 3d 433, 436 (6th Cir. 2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 531 (2003)). But *de novo* review is only appropriate if the petitioner affirmatively demonstrates that the state court's decision "did not involve a determination of the merits of his claim," such as where the state court expressly states that it is denying the claim exclusively on procedural grounds. *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011). Silence is not enough: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* (*citing Harris v. Reed*, 489 U.S. 255, 265 (1989)). *See also Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted."); *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) ("This claim was rejected on the merits by the Kentucky Supreme Court (albeit without analysis) and therefore receives deferential review under [§ 2254(d)]."); *Ballinger v. Prelesnik*, 709 F. 3d 558, 561-62 (6th Cir. 2013). *See also Cullen v. Pinholster*, 563 U.S. 170, 187-88 (2011) (where a state court summarily denies a claim, the federal habeas court "must determine what arguments or theories could have supported the state court's decision, and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision.") (cleaned up). And deference is still required "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Harrington*, 562 U.S. at 98.

Section 2254(d) precludes federal habeas relief on claims previously decided by state courts except in two circumstances: where the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[,]" 28 U.S.C.

11

§ 2254(d)(2).  *England*, 970 F. 3d at 705.  These two provisions collectively require a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal quotation marks omitted).  This deference is required even where the state court provides no explanation for its decision.  *Harrington*, 562 U.S. at 98.

To apply the deference required by § 2254(d)(1) to the state court's legal conclusions, "clearly established law" refers to both bright-line rules and legal principles set forth in the decisions of the United States Supreme Court, as of the time the state court rendered the decision under review. *Taylor v. Withrow*, 288 F. 3d 846, 850 (6th Cir. 2002); *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., opinion of the Court for Part II).  The legal principle at issue and enunciated by the Supreme Court must have been clearly established by the time the state court addressed the petitioner's federal claim, not when the conviction became final.  *Drain v. Woods*, 595 F. App'x 558, 565 (6th Cir. 2014) ("Clearly established law is the law that existed at the time of the relevant state-court decision, not the date of finality of conviction.") (citing *Greene v. Fisher*, 565 U.S. 34, 38 (2011)).  "Clearly established law" does not include holdings from the federal courts of appeal. *Williams*, 529 U.S. at 381-82; *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) ("... circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court' [under] 28 U.S.C. § 2254(d)(1).  It therefore cannot form the basis for habeas relief under AEDPA.").  And it does not include *dicta* in Supreme Court decisions.  *Williams*, 529 U.S. at 412; *Hand v. Houk*, 871 F. 3d 390, 407 (6th Cir. 2017) ("In determining what constitutes 'clearly established' federal law, we are limited strictly to the holdings of the Supreme Court, excluding any *dicta*.") (citing *White v. Woodall*, 572 U.S. 415, 419 (2014)) (citations omitted).

For a Supreme Court decision to "clearly" establish the federal law governing a habeas claim, it must "squarely address the issue in the case."  *Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (*per curiam*) (cleaned up).  In contrast, where prior Supreme Court "... cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  *Wright*, 552 U.S. at 126 (quotation marks omitted) (*citing Carey v. Musladin*, 549 U.S. 70, 77 (2006)).  Thus, Supreme Court decisions will not provide "clearly established" federal law where their holdings are ambiguous.  *Mitchell v. Esparza*,

540 U.S. 12, 17 (2003) (*per curiam*) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous."). Instead, the Supreme Court decisions must provide a fairly clear "yes-or-no" answer in the subsequent federal habeas case. *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (*per curiam*) (holding that Supreme Court decisions do not "clearly establish" the controlling law when they merely articulate an abstract constitutional principle and do not "address[], even remotely, the specific question presented by [the] case."). In the Supreme Court's words:

> Section 2254(d)(1) ... does not require state courts to *extend* [Supreme Court] precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. ...
>
> This is not to say that § 2254(d)(1) requires an identical factual pattern before a legal rule must be applied. To the contrary, state courts must reasonably apply the rules squarely established by this Court's holdings to the facts of each case. The difference between applying a rule and extending it is not always clear, but certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt. The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question.

*White v. Woodall*, 572 U.S. 415, 426-27 (2014) (citations and internal quotation marks omitted).

Once the "clearly established law" from the Supreme Court is determined, the federal habeas court must assess whether the state courts faithfully applied it to the petitioner's claims. A state court's decision is "contrary to" Supreme Court precedent if the state court reaches the opposite legal conclusion than the Supreme Court has reached in a prior case, or arrives at a different outcome when the case presents a "set of materially indistinguishable facts." *Williams*, 529 U.S. at 412. A state court's decision constitutes an "unreasonable application" of Supreme Court precedent only if the correct resolution of the issue is so plain that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 562 U.S. at 103 ("... the state court's ruling on the claim being presented in federal court [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."). *See also Shinn v. Kayer*, 141 S. Ct. 517, 523

13

(2020) (holding that to demonstrate "unreasonable application" of Supreme Court precedent the petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'") (*quoting Virginia* v. *LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (*per curiam*)); *Gagne v. Booker*, 680 F. 3d 493, 513 (6th Cir. 2012) (*en banc*) (cautioning that habeas relief is not warranted even where "the federal habeas court might conclude in its independent judgment that the state court applied clearly established federal law erroneously or incorrectly.") (quotation and editorial marks omitted); *Harris v. Haeberlin*, 526 F. 3d 903, 909 (6th Cir. 2008).

When the clearly established precedent at issue provides only a general standard, rather than a specific principle, state court applications of that rule are "reasonable" across a far broader array of determinations. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560 (2018) ("The more general the rule … the more leeway [state] courts have.") (*quoting Renico v. Lett*, 559 U.S. 766, 776 (2010). The latitude afforded to state court determinations bears an inverse relationship to the specificity of the rule to be applied:

> The term "unreasonable" is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." At the same time, the range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 663-64 (2004) (citations omitted). *Cf. Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) ("… because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.") (*quoting Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

The Supreme Court has admonished federal courts that, when reviewing state court decisions, "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law" because § 2254(d) requires that "state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). *See also Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court's collateral review of a state-court decision must be consistent with the

respect due state courts in our federal system."). Thus, for example, so long as the state court plainly expresses a correct understanding of the applicable federal standard, the periodic expression of that standard in "shorthand" does not necessarily warrant the conclusion that the state court misapplied federal law. *Holland v. Jackson*, 542 U.S. 649, 654-55 (2004).

Apart from state court legal conclusions, a state court decision is "based on an unreasonable determination of the facts" under § 2254(d)(2) only when it is "objectively unreasonable in light of the evidence presented in the state court-proceeding[.]"). *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). And state court factual findings underpinning such determinations are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1)); *Ayers v. Hudson*, 623 F. 3d 301, 308 (6th Cir. 2010).

## III - Claims

A.    **Claims B(1) to B(4) – The Performance of White's Counsel was Not Encumbered by an Actual Conflict of Interest, and His Waiver of any Conflict was Valid.**

In his petition, White contends that attorneys Charter and Early jointly represented White, Bowling, and Fisher from the outset of the case and that counsel suffered from an actual conflict of interest from the moment they were retained. White argues that the conflict adversely affected his counsels' performance, resulting in an unfair trial. He further contends that although he executed a conflict waiver prior to the commencement of trial, that waiver was not valid because he was not smart enough to execute it intelligently, and was not sufficiently informed of the possible adverse consequences of joint representation to execute it knowingly and voluntarily. [R. 14-1 at 60-92]

White claims that both Kevin Charters and Jim Early served as co-counsel for all three defendants from the very beginning of the case.[19] Gail Robinson, an attorney from the Department

---

[19] There is evidence in the record to support that narrative. *See* [Trial at 465; RCr 11.42 at 885-87] However, White disregards and omits any reference to evidence in the record which contradicts, qualifies, or provides necessary context for his narrative, a practice he repeats throughout the petition for many of the factual allegations he makes in this and other claims. The record is ambiguous as to who represented whom and when and to what degree. Early would later testify that he was hired to represent White and Bowling, who are related, while Charters was hired to represent Fisher. [RCr 11.42 at 655-56] This is consistent with counsels' conduct during proceedings held immediately before trial. *See* [December 12, 1979 hearing transcript at 41 (Charters stating that Early represents White and Bowling), 46 (Charters, on behalf of Fisher, joining in motion made by Early on behalf of his clients), 59 (Early indicating that White requests additional time before his trial but that Bowling is ready for trial), 68 (Charters indicating that he represents Fisher)]; *see also* [January 14, 1980 hearing transcript at 179-80]. At times, counsel largely (although not entirely)

of Public Advocacy, testified that she telephoned Early at the outset of the case to discuss it and expressed her concerns about a possible conflict of interest.  For his part, Early contradicts Robinson's testimony, stating that he never spoke with her about the case.[20]

White argues that during pretrial proceedings, counsel filed a motion to exclude the death penalty as a sentencing option against Fisher and Bowling, who were juveniles, but made no such motion on behalf of White, who was not.[21]  White then asserts that defense counsel "forced" an open hearing on Fisher and Bowling's motion to reduce their bond.[22]  White complains that he was called to testify during the bond hearing,[23] and that later defense counsel characterized Fisher and Bowling as "the least guilty" of the three.[24]

---

coordinated strategy with respect to the defense of their clients; at others, the two attorneys asserted conflicting positions in the interests of their particular client.  *See* [December 12, 1979 hearing transcript at 41 (Charters requesting his own peremptory strikes because he disagrees with the specialist retained by Early to assist in jury selection), 52-55, 59 (Charters insisting upon speedy trial for Fisher and seeking a change of venue to obtain it; Early waiving speedy trial for White)]; [December 14, 1979 hearing transcript at 160-61 (Early indicating that Bowling might testify on White's behalf; Charters indicating that Fisher would definitely not testify on White's behalf)].

[20]  [RCr 11.42 at 563-65]

[21]  [R. 14-1 at 62]  The record squarely refutes this contention.  On November 29, 1979, counsel filed a written "Motion to Exclude Possibility of the Death Penalty" on behalf of all three defendants, including White, asserting that because of their relative youth, imposition of the death penalty would amount to cruel and unusual punishment.  [RCr 11.42, 2013 Appeal, Trial Court Documents (Vol. I at 31-34)]  During oral argument on the motion counsel again made plain that he sought relief on behalf of all three defendants. [December 5, 1979 hearing transcript at 25-36]

[22]  [R. 14-1 at 62]  In truth, Charters stated only that he wanted the hearing held in the courtroom so that "the defendant and his family [could] be present."  And nothing in the record cited by White supports his assertion that the public and the press were present at the bond hearing.  [December 12, 1979 hearing transcript at 67-121]

[23]  Actually, all three defendants were called to testify.  *Id.* at 122-152.

[24]  [R. 14-1 at 62]  White implies in his brief that counsel was referring to the robbery and murders, but a review of the transcript cited by White makes plain that counsel was instead referring to statements made by White (but not by his co-defendants) about possibly trying to escape from jail.  [December 14, 1979 hearing transcript at 160 ("... why should [Fisher and Bowling] suffer when they are the least guilty in the case as pointed out by testimony here today regarding conversations with Mr. Collins and Mr. Johnson, as far as escape attempts ...")]

In a hearing approximately one month before trial, White, Bowling, and Fisher (as well as Fisher's father, on behalf of his minor son), were asked by the judge, prosecutor, and defense counsel whether they waived any conflict which might arise by virtue of both Early and Charters representing White at trial.[25]  The initial questions posed to the young men were broad, followed by more specific examples of the kinds of situations that might arise and how it could affect the trial.  This included extensive discussion of the independent decision each of the defendants might have to make about whether to invoke the Fifth Amendment at trial.  Charters stated that he had explained to Fisher that, with respect to whether Fisher should testify at White's trial to support the anticipated defense of alibi, his advice would differ depending on whether he was representing Fisher alone or was representing White as co-counsel at his trial.  Charters further stated that Fisher had understood and agreed during the hearing that should it become necessary, during White's trial Charters would act in White's interest even at the expense of Fisher.

The prosecution then asserted that defense counsel was in an "irreconcilable situation," and moved that Charter be barred from representing White.  Charter and Early countered that the situation posited was hypothetical and that no actual conflict then existed.  The hearing concluded upon the decision to continue the case until the question regarding the potential conflict could be certified to the Kentucky Court of Appeals.[26]  The certified question was promptly filed, but the Kentucky Court of Appeals declined to issue a ruling because the trial court had not issued a formal order deciding the matter.[27]  At the outset of the trial in February 1979, all three defendants signed a written waiver of any conflict of interest, and the waiver was read into the record.[28]

_____

[25]  At an earlier hearing, Early stated that "it may be that the Defendants have waived any conflict of counsel ..."  [December 14, 1979 hearing transcript at 162]  Early did not explain the basis for the suggestion that a waiver might have already occurred.

[26]  [January 14, 1980 hearing transcript at 179-206] Page 190 of the transcript is missing; in context, it appears to have involved discussion of more possible conflict situations.

[27]  [Trial at 1-2]

[28]  The waiver read: "The undersigned, Karen (*sic*) Gene White, Tommy Bowling, and Charles Fisher, defendants, before this court charged with the offenses of 1st degree murder, 1st degree robbery and 1st degree burglary, acknowledge that the court has explained to them and that they understand the possibility of a conflict of interests on the part of their attorneys, Hon. Jim Early and Hon. Kevin Charters, in that what may be or seem to be to the best interests of one defendant may not be to the best interests of the codefendants, who are defendants in this proceeding, but not in this trial. With that understanding, the

Three days later, Fisher accepted a prosecution offer of immunity in exchange for his testimony. Charters, who had conveyed an earlier such offer by the prosecution to Fisher, immediately advised Judge Graham that day. In an in-chambers conference the next day, Charters explained the events of the preceding 24 hours. He told the court that prior to this point all of the defendants had categorically denied involvement in the crimes. Charters indicated that in December 1979, the prosecution had made an unsolicited offer of such immunity to Fisher and/or Bowling, and asked Charters to convey that offer to those two defendants. Fisher and Bowling told Charters that they had no interest in the offer, reiterating that they were wholly innocent of the charges. Charters told the court that on February 14, 1980, the prosecution told him that the offer to Fisher was still on the table and he was asked to convey it to his client.[29] When Charters passed the offer along to Fisher, this time Fisher indicated to Charters that he could, in fact, offer incriminating testimony. At that point Charters immediately advised the court, the prosecution, and Early, and new counsel Clyde Simmons agreed to represent Fisher.[30] Before Simmons arrived, Fisher had waived the presence of counsel and told prosecutor Dale Bryant enough details about the crimes to convince him that Fisher's statements were accurate and earnest.[31]

---

undersigned nevertheless desire that their attorneys Hon. Jim Early and Kevin Charters represent them in this proceeding against Karen Gene White and have no objection to their attorneys, Hon. Jim Early and Kevin Charters continuing to act as counsel for the other defendants mentioned in this waiver as being involved in a possible conflict of interests." [Trial Exh. 1; Trial at 7-8]

[29] During collateral review proceedings there was conflicting testimony regarding whether the prosecution had, in fact, affirmatively renewed the plea offer to Fisher in February, or instead whether at that time it was Fisher who had expressed for the first time interest in the prosecution's earlier offer from December 1979.

[30] [Trial at 465-70] White contends that Charters was not merely transmitting the prosecution's offer but was "advocating" and "plea negotiating" on his behalf during the process. In support of this characterization, White notes that 20 years later prosecutor Bryant would testify that he did not convey a second immunity offer in February 1980, but instead that Charters had contacted him to let him know that Fisher wanted to accept the original immunity offer that Bryant had extended in December 1979. [RCr 11.42 at 1167-1174] *But see* [Trial at 466-76; 1499-1500] Regardless of which recollection is correct, the record does not support White's view: it does not indicate that on the eve of trial Charters solicited a new immunity offer or attempted to bargain for better or different terms on Fisher's behalf. [RCr 11.42 at 957 (Charters stating that "[i]n this case, after [in]umerable discussions and denials and explanations, I believed they were not guilty and did not try to plea bargain.")].

[31] Specifically, once Fisher accepted the deal, prosecutor Bryant took him to the crime scene and Fisher told him numerous factual details about the crimes that he could only have known if he had been present. [RCr 11.42 at 1169-71]

Charters and Early sought additional time to prepare an insanity and/or intoxication defense for trial in light of Fisher's change of heart. Judge Graham chastised counsel, stating that he and others knew – based upon comments allegedly made by Fisher to several jailers and then communicated to Judge Graham – that Fisher would likely turn state's evidence. Counsel emphatically denied knowledge of any facts indicating that any of their clients were involved.[32]

During trial Fisher was the last witness for the prosecution. Fisher testified regarding the planning of the robbery and provided specifics regarding the crimes committed, including the degree and manner of participation by each of the defendants.[33] White asserts that because of his continuing loyalty to Fisher, Charters did not "vigorously" cross-examine Fisher about his earlier statements to them that White, Bowling, and himself were not involved in the crimes. Counsel did, however, mention those very same statements of innocence by Fisher in both his opening statement and closing argument.[34]

During cross examination Charters did elicit Fisher's testimony that on one occasion when White was not present, Fisher and Bowling had visited the victims' store on their own and had considered robbing it immediately without White's participation. In response to Charters' questioning, Fisher also testified that even though the defendants intended to hit the victims to knock them out, none of the young men ever intended to "hurt anyone," and that earlier in the day before the crimes were committed, White and Bowling might have used drugs, although they appeared and acted normally. Finally, Fisher testified that while White was leading the group in the robbery, he was not ordering Fisher or Bowling around, telling them what to do, or forcing them to participate.[35]

---

[32] [Trial at 472-90]. Early would later testify that "... I didn't see any problem with it at all. Not one of them ever insinuated, suggested, hinted they were involved. They were all totally not guilty."). [RCr 11.42 at 543] In contrast, during collateral review proceedings conducted decades after the trial, Fisher and Bowling testified that they had told their lawyers before trial about their involvement in the crimes. That said, each of them gave conflicting details about the time, place, and manner of the alleged disclosure. *See* [RCr 11.42 at 26-28, 55-56].

[33] [Trial at 1430-1518]

[34] [Trial at 1023-24; 2062-64]

[35] [Trial at 1475-1500]

Early conducted the direct examination of White himself, and focused primarily on his childhood and difficult upbringing. Counsel also elicited testimony about how White flourished during the time he spent at Riverside Christian Academy, and how he particularly enjoyed the Bible class he took at the school. Early also asked White to describe his enjoyment and success running in track and cross country events while in high school. White described how after he dropped out of high school at age 16, he became increasingly involved with drug use and getting into trouble, as well as experienced a growing inability to control his emotions and actions.[36] According to White, once he mentioned the idea for the robbery, Fisher and Bowling wouldn't let the idea go and "kept badgering" him about it. Early elicited White's testimony that he and Bowling had taken LSD earlier the day of the crimes. White testified that once he entered the store, each of the victims had already been struck and was lying on the floor covered in blood. White initially denied hitting any of the victims, but then indicated that in light of other testimony, he "must have." Early, in an attempt to bolster the insanity defense, pressed White to acknowledge that he had hit each of the victims many times, to which White replied that he did not or could not remember doing so.[37]

On direct appeal, White argued that his counsel labored under an actual conflict of interest throughout the entirety of the representation, and as a result his attorneys were forced to and did take positions at his expense. He further contended that his waiver of any such conflict was invalid. The Kentucky Supreme Court addressed those claims at length:

> It appears that defense counsel Charters was employed by Fisher and defense counsel Early by White and Bowling.
>
> The incident which precipitated the conflict of interest argument occurred on the fourth day of *voir dire* of the prospective jurors when Fisher agreed to testify for the prosecution in exchange for immunity. As soon as he learned of the prospective agreement, Charters notified the trial court and withdrew as counsel for Fisher. Other counsel was then appointed to represent Fisher. The *voir dire* and trial then proceeded with Charters and Early representing White. During the course of the trial, Fisher was cross-examined by Charters.

---

[36] [Trial at 1789-1814; 1815-1819, 1833-39; 1848-52; 1860-74]

[37] [Trial at 1884; 1888; 1893-95]

\*\* \*\* \*\*

... In compliance with RCr 8.30 the trial court explained the possibility of conflict of interest to Fisher, White and Bowling.  The colloquy engaged in by the trial court in determining that each of the defendants was making an informed and intelligent waiver consumed twenty-five pages of transcript.  At the conclusion, all three signed a waiver in conformity with RCr 8.30.

Potential conflict if all three defendants were tried together was raised by the prosecution and resulted in the trial court's ordering separate trials.  One such conflict appeared to be the argument that juveniles should be treated differently in death penalty cases.

We are of the opinion from our review of the record that White made an informed and intelligent waiver of separate representation.  In considering this, we are of the further opinion that in this respect a death penalty case should not be treated any differently than any other criminal case.  As observed in *Holloway* [*v. Arkansas*, 435 U.S. 475 (1978)] in some cases certain advantages might accrue from joint representation.

We are of the further opinion that in the circumstances presented here there was no demonstrated conflict of interest.  White argues that earlier Charters engaged in plea bargaining on behalf of Fisher.  We do not see it that way.  What is called plea bargaining was some months before trial an offer of immunity transmitted to Fisher through his lawyer.  This offer was rejected and by no means could be characterized as plea bargaining.  Fisher's lawyer had a duty to convey the offer as there could be no contact initiated by the prosecution save through Fisher's lawyer.  White takes the position that throughout both Charters and Early jointly represented all three defendants.

Out of an abundance of caution, we have examined the record to determine if in fact there was an actual conflict of interest adversely affecting the performance of White's counsel. We are of the opinion, and so hold, that White has not established from the record that an actual conflict of interest adversely affected his lawyer's performance.

Here we do not have the classic conflict of interest scenario where defendants are tried together.  *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), addressed issues left unresolved in *Holloway, supra*.  The first issue is that the trial judge is not required to inquire into the propriety of multiple representation where there has been no objection, and the trial courts may assume no conflict or that the lawyer and his clients knowingly accept such risk of conflict.  This issue is resolved by RCr 8.30 and the waiver signed by White.  Next the *Cuyler* court held that in such event mere possibility of conflict was not enough[,] that an actual conflict of interest adversely affecting his lawyer's performance must be established.

As to Fisher, White made much of Fisher's appointed counsel's invoking the client/attorney privilege. In the first place, whether or not Charters remained in the trial this privilege applied. Next, Fisher was granted immunity, he can no longer be in jeopardy, he had no possible interest to advocate or to protect. Finally, on the overriding concerns in the conflict of interest situations is the possibility that the lawyer representing multiple clients might use confidential information to the detriment of one of the other clients. As to this possibility applied to Fisher, the change of defense to not guilty by reason of insanity made it highly unlikely that Charters had any such information to use even had he desired to do so. There is nothing in the record to suggest that there was any such information. After all, Fisher together with White had told their lawyers they did not commit the crimes.

Charters informed the jury during opening statement that Fisher had agreed to testify for the prosecution in exchange for immunity. Fisher was the principal witness for the prosecution, he detailed the gruesome nature of the crime and was vigorously cross-examined by Charters as to White's habits with various drugs, bizarre behavior, etc. This cross-examination and the cross-examination of other witnesses attempted to establish that the crimes showed they had been committed by a "berserk" individual.

The arguments of conflict of interest with respect to Bowling reveal trial tactics designed to show bizarre behavior on the part of White.

Charters and Early withdrew as counsel for Bowling, and Bowling was represented by other counsel in his trial. The argument that Charters and Early should have explored a defense that White was not involved is not realistic. The circumstantial evidence was strong and with Fisher testifying for the prosecution, the evidence that White committed the crimes was overwhelming.

We have decided the conflict of interest question on the record even though a conflict of interest constitutes ineffective assistance of counsel. *Holloway* and *Cuyler*, *supra*. We regard the conflict question as being outside the rule in *Cleaver v. Commonwealth*, Ky., 569 S.W.2d 166 (1978), which requires that the issue of ineffective assistance of counsel be first determined by the trial court.

*White v. Commonwealth*, 671 S.W.2d 241, 243-44 (Ky.), *cert. denied*, 469 U.S. 963 (1984).

Although the conflict issue was decided by the Kentucky Supreme Court on direct appeal, White asserted the claim a second time during collateral review proceedings. On appeal from the denial of relief, the Kentucky Supreme Court applied a state-created procedural bar to reject the substantive conflict claim. *White v. Kentucky*, 1994-SC-0326-MR (Ky. May 16, 2002) at 7 (unpublished) ("The conflict of interest contention made by White was raised and thoroughly

considered and rejected by this Court on direct appeal.  It cannot be raised again.  *See Sanborn*; *Stanford v. Commonwealth*, Ky., 854 S.W.2d 742 (1993).").[38]

White also re-asserted his claim that his conflict waiver was invalid because he was not "adequately advised" by counsel before making it.[39]  The Kentucky Supreme Court addressed and rejected that claim on the merits.  *White*, 1994-SC-0326-MR (Ky. May 16, 2002) at 8 ("The trial judge adequately explained to White any potential conflict of interest concerns before he signed the waiver. White was adequately advised on the issue and there is no prejudice arising from his allegations about inadequate advice concerning waiver of separate representations.").  White also re-asserted his claim that his youth, limited education, and limited intelligence prevented his waiver of any conflict from being "knowing, voluntary, intelligent, or voluntary."  The Court again applied its state procedural bar, noting that the claim had been rejected on direct appeal.  *Id.* at 16 ("This Court has already considered and rejected this argument. We have found in the direct appeal that White made an informed and intelligent waiver of separate representations.").[40]

White presses the same arguments in his petition.  Like the Kentucky Supreme Court, the Court concludes that it is appropriate to address the question of waiver at the outset.  In Claims B(3) and B(4), White makes related arguments that before he agreed to the waiver he was not sufficiently advised of the various ways the joint representation could work against his interests, including with specific examples, and that regardless he lacked sufficient intelligence, education, and familiarity with the legal system to knowingly and intelligently waive his rights under any circumstances.  [R. 14-1 at 89-101]  The Kentucky Supreme Court, noting the lengthy colloquy that preceded the execution of the waiver, concluded that White had "made an informed and intelligent waiver of separate representation."  *White*, 671 S.W.2d at 243.  That conclusion was not an

---

[38]  With respect to White's substantive conflict of interest claim, this means that the grounds for relief he relied upon during direct appeal to the Kentucky Supreme Court are exhausted, but any additional grounds he attempted to assert on direct appeal following RCr 11.42 proceedings are procedurally defaulted.  *Williams v. Anderson*, 460 F. 3d 789, 806 (6th Cir. 2006).

[39]  This is Claim "E" in White's appellate brief to the Kentucky Supreme Court.

[40]  This is Claim "X" in White's appellate brief to the Kentucky Supreme Court.

unreasonable determination of fact, nor was it contrary to or an unreasonable application of clearly-established Supreme Court precedent.

With respect to White's argument that he lacked the capacity to validly waive his rights no matter how thoroughly he was advised, he refers only to Supreme Court decisions which require as a general matter that the waiver of a constitutional right must be knowing and intelligent. *Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). But he points to no Supreme Court decision that requires the defendant to possess any specified quantum of intellect, education, or experience to satisfy that general standard. To the contrary, available Supreme Court precedent eschews such bright-line rules in favor of the consideration of a broad range of factors. *Cf. Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (holding that the validity of a waiver of the right to counsel "depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'") (citations omitted); *Colorado v. Connelly*, 479 U.S. 157, 165 (1986) (holding that mental disability alone does not render a confession involuntary); *see also Garner v. Mitchell*, 557 F. 3d 257, 263-64 (6th Cir. 2009) (*en banc*) (holding that voluntariness of waiver of constitutional right was to be evaluated under the totality of the circumstances, and that the defendant's "diminished mental capacity, a troubled upbringing, and a poor education" did not alone require a finding that a waiver was not voluntary); *United States v. Macklin*, 900 F. 2d 948, 952 (6th Cir. 1990) (holding that despite defendant's low IQ score, his capacity to devise a criminal scheme was evidence that he voluntarily waived his rights and confessed to devising the scheme). The Kentucky Supreme Court's decision did not contravene pertinent Supreme Court authority.

And as a factual matter, the evidence regarding White's faculties was equivocal. On the one hand, White did not finish high school, and when questioned regarding the waiver he initially expressed some uncertainty about whether he understood what was being asked of him. On the other hand, White had proved successful in other educational contexts, and later during the same hearing he expressed more certainty that he understood how a conflict might arise, indicating that he was smart enough to decide whether to waive the conflict.[41] The Kentucky Supreme Court

---

[41] *See also* [R. 84 at 62 (discussing later findings regarding White's intellectual functioning)]

resolved this conflicting testimony by holding that White understood the nature of the right he was waiving, and that factual determination was not an unreasonable one under § 2254(d)(1) in light of the evidence. White's argument that he was *per se* incapable of waiving his rights is without merit.

With respect to his argument regarding the sufficiency of the explanation he was provided about the waiver, White contends that he was not given enough clear examples of how the joint representation might conceivably have disadvantaged him. That said, White provides no clear statement as to what he believes a sufficient explanation would have entailed. The Kentucky Supreme Court noted that the discussion touched upon an array of scenarios and considerations and covered twenty-five pages of transcript. At bottom, it concluded that White's waiver was "informed and intelligent." *White*, 671 S.W.2d at 243.

White points to no Supreme Court decision clearly indicating that said conclusion was patently wrong or unreasonably applied then-established precedent. It is true, of course, that "the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be." *United States v. Ruiz*, 536 U.S. 622, 629 (2002). But the Supreme Court has never held that a defendant must be provided with an exhaustive list of all potentialities before a waiver of his rights is knowing and intelligent:

> [T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances - even though the defendant may not know the *specific detailed* consequences of invoking it. A defendant, for example, may waive his right to remain silent, his right to a jury trial, or his right to counsel even if the defendant does not know the specific questions the authorities intend to ask, who will likely serve on the jury, or the particular lawyer the State might otherwise provide.
>
> ** ** **
>
> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

*Ruiz*, 536 U.S. at 629-30 (emphasis in original).  Where the trial court engages the defendant in a meaningful discussion about the potential pitfalls of joint representation and the defendant acknowledges the risk, "'[a] defendant may make a knowing, intelligent, and voluntary waiver of [his] right to conflict-free counsel, and a defendant has a Sixth-Amendment right to counsel of [his] choice.'"  *United States v. Davis*, 490 F. 3d 541, 548 (6th Cir. 2007) (*quoting United States v. Straughter*, 950 F. 2d 1223, 1234 (6th Cir. 1991)).

Here, based upon the extensive discussion between the trial court, counsel, and the defendants, the Kentucky Supreme Court concluded that White's waiver was sufficiently informed to be "knowing, intelligent, and voluntary."  White points to no then-existing and applicable Supreme Court precedent which "squarely address[es] the issue in the case" under the same or indistinguishable circumstances, and thus the Kentucky Supreme Court's resolution of the issue was not evidently wrong or unreasonable for purposes of § 2254(d).  *Wright v. Van Patten*, 552 U.S. 120, 125, 126 (2008) (*per curiam*).  This aspect of White's claim must therefore be denied.

Notably, White does not argue that the asserted invalidity of the conflict waiver provides an independent basis for affirmative habeas relief.  Instead, his argument is in the nature of an anticipatory rebuttal of any argument by the Commonwealth that White's waiver conclusively establishes that his conflict of interest claim must fail.  Neither party has made entirely clear what role they believe the waiver plays in the conflict of interest analysis.  The Sixth Circuit has suggested, without expressly so stating, that a determination that a waiver is valid dooms a conflict of interest claim under the Sixth Amendment.  *Cf. Bray v. Cason*, 375 F. App'x 466, 471-72 (6th Cir. 2010).  Other statements on the matter are not entirely clear.  *Compare United States v. Hall*, 200 F. 3d 962, 965 (6th Cir. 2000) (noting that while "[a] defendant may waive any potential conflicts of interest and elect to continue with dual representation[, t]his waiver, however, does not bind the courts.") (citation omitted) with *Boykin v. Webb*, 541 F. 3d 638, 644 (6th Cir. 2008) (noting that where the defendant is aware of a "possible conflict when he agreed to joint representation," that knowledge "informs our analysis going forward as to the effectiveness of his trial counsel and the degree of oversight employed by the trial court.").  *See also United States v. Migliaccio*, 34 F. 3d 1517, 1526-28 (10th Cir. 1994).  On balance, Sixth Circuit authority indicates that White's conflict of interest claim necessarily fails because he validly waived potential conflicts.  *See Straughter*, 950 F. 2d at 1234 ("We conclude that Thornton made a voluntary, knowing, and intelligent waiver of her Sixth

26

Amendment right to conflict-free counsel, and she may not now invoke the constitutional right that she chose to waive."). Out of an abundance of caution, however, the Court will address White's substantive conflict claim independent of its determination regarding the validity of the conflict waiver.

In Claims B(1) and B(2), White asserts his substantive claim that defense counsel Early and Charters labored under an actual conflict of interest because they represented all three defendants from the outset of the case. The Sixth Amendment affords every defendant in a criminal trial the right to "the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right is not a *pro forma* rule merely requiring the presence of an attorney trained in the law at the defendant's side; it is designed to ensure that the defendant actually receives a fair trial. *United States v. Cronic,* 466 U.S. 648, 658 (1984). Therefore, to satisfy the Sixth Amendment's mandate, defense counsel must be "effective." *Strickland v. Washington,* 466 U.S. 668, 685-86 (1984); *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel.").

The touchstone for determining whether counsel was effective is grounded upon both the reasonableness of counsel's decisions and the effect those decisions had upon the ultimate fairness of the trial. A defendant must therefore ordinarily make two showings to establish ineffective assistance of counsel. First, he must demonstrate that his attorney's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. When evaluating counsel's performance, a reviewing court is required to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Second, the defendant must establish that his counsel's performance was so prejudicial as to deprive him of a fair trial. To demonstrate such prejudice, he must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Harvey v. United States*, 798 F. App'x 879, 883-84 (6th Cir. 2020).

There are certain exceptions to the rule that the defendant must show prejudice in the form of a probable effect on the outcome of the trial. For instance, if counsel is denied entirely during a "critical stage" of the proceedings, prejudice is presumed. *Cf. Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963). Another exception, the one White presses here, is when defense counsel represents

27

interests that are in actual conflict with one another. *Moss v. United States*, 323 F. 3d 445, 455-56 (6th Cir.), *cert. denied*, 540 U.S. 879 (2003); *Smith v. Hofbauer*, 312 F. 3d 809, 814 (6th Cir. 2002). The presumption of prejudice is appropriate under such circumstances because "joint representation of conflicting interests is inherently suspect, and because counsel's conflicting obligations to multiple defendants 'effectively sea[l] his lips on crucial matters' and make it difficult to measure the precise harm arising from counsel's errors." *Mickens v. Taylor*, 535 U.S. 162, 168 (2002) (*quoting Holloway v. Arkansas*, 435 U.S. 475, 490 (1978)).

If defense counsel timely advises the trial court that a conflict is present but is nonetheless forced by the court to represent codefendants over his objection, any ensuing conviction must automatically be reversed unless the trial court was correct when it determined that no conflict was present. *Holloway*, 435 U.S. at 488 ("[W]henever a trial court improperly requires joint representation over timely objection reversal is automatic"). Where no objection to joint representation was asserted at trial, the defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *McElrath v. Simpson*, 595 F. 3d 624, 630-31 (6th Cir. 2010). The "actual conflict of interest" and "adverse effect on performance" requirements are not two elements but one: "[T]he *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens*, 535 U.S. at 172 n.5. *See Harvey v. United States*, 798 F. App'x 879, 884 (6th Cir. 2020).

Of course, the factual contexts under which a conflict of interest might arise are numerous and varied. Counsel might represent two or more defendants at the same time or at different times. She might represent them in the same case or in different ones. If in different cases, those cases might be factually or legally related, but they might not. In *Mickens*, the Supreme Court made clear that the circumstances matter, and that *Sullivan*'s presumption of prejudice does not apply to all of them. Specifically, the Supreme Court held that *Sullivan*'s presumption of prejudice only applies where an attorney represents multiple defendants simultaneously, but that it remained an "open question" whether *Strickland's* default rule requiring the defendant to affirmatively demonstrate prejudice still applies where an attorney represents multiple defendants in matters that are tried in

succession rather than simultaneously. *Mickens*, 535 U.S. at 175-76. *See Nix v. Whiteside*, 475 U.S. 157, 176 (1986) ("Even in *Sullivan* we did not suggest that all multiple representations necessarily resulted in an active conflict rendering the representation constitutionally infirm."); *Jalowiec v. Bradshaw*, 657 F. 3d 293, 315 (6th Cir. 2011) (after *Mickens*, presumption of prejudice does not apply to cases involving successive representation).

To determine which rule – *Strickland*'s or *Sullivan*'s – applies to a particular case requires an understanding of what is meant by "joint," "concurrent," "simultaneous," "multiple," or "successive" representation. Shortly after *Mickens* was decided, in *Moss* the Sixth Circuit clarified that "joint and dual representation refer to simultaneous representation occurring in the same proceeding, while multiple representation refers to simultaneous representation in separate proceedings." *Moss*, 323 F. 3d at 456 n.15 (*citing Duncan v. Morton*, 256 F. 3d 189, 197 (3d Cir. 2001) ("Actual conflict is more likely to occur in cases of joint representation (of co-defendants at the same trial) than in cases of multiple representation (of co-defendants at separate trials).")). Thus, "joint" or "concurrent" representation implicating *Sullivan* occurs where the same attorney represents two or more co-defendants during the same trial. In contrast, "multiple" or "successive" representation can occur in situations such as where the attorney represents one defendant at trial and represented another defendant in another proceeding. For example, if an attorney represents two co-defendants during pretrial proceedings in the same case but the charges against one of them are dismissed prior to trial, as in this case, the case involves a matter of successive representation. "'Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness.' Simultaneous and successive representation differ materially because in the latter, the attorney is no longer beholden to the former client." *Gillard v. Mitchell*, 445 F. 3d 883, 890-91 (6th Cir. 2006) (*quoting Moss*, 323 F. 3d at 459)).

The question left open by *Mickens* – whether *Sullivan* and its presumption of prejudice should be applied in any context other than concurrent representation – permitted a petitioner under 28 U.S.C. § 2255 to argue that *Sullivan* should be extended to apply to cases involving successive representation. *Moss*, 323 F. 3d at 461-62. But no such latitude is available to state habeas petitioners who are constrained by § 2254: "There is no Supreme Court case that holds that the *Sullivan* standard applies to cases of closely related successive representation. Thus, application of

29

the *Sullivan* standard is inappropriate in such a case under § 2254." *Stewart v. Wolfenbarger*, 468 F. 3d 338, 351 (6th Cir. 2006), *as amended on denial of reh'g and reh'g en banc* (Feb. 15, 2007) ("... for § 2254 cases, the *Sullivan* standard does not apply to claims of conflict of interest other than multiple concurrent representation; in such cases, including successive representation, the *Strickland* standard applies."); *Smith v. Hofbauer*, 312 F. 3d 809, 816-19 (6th Cir. 2002); *Whiting v. Burt*, 395 F. 3d 602, 619 (6th Cir. 2005) ("... expanding *Sullivan* beyond its present borders of multiple concurrent representation would result in the creation of a new rule of law - one that clearly has not been dictated by prior Supreme Court precedent.").

With these principles in mind, it is plain that White's substantive conflict claim must fail. At the outset, it is predicated upon a number of factual premises that are incorrect. First, on direct appeal, White argued that "throughout [the case] both Charters and Early jointly represented all three defendants." The Kentucky Supreme Court rejected that contention, holding that before trial White was represented only by Early: "Charters was employed by Fisher and defense counsel Early by White and Bowling." Once Fisher agreed to testify for the prosecution, "Charters [] withdrew as counsel for Fisher [and] trial then proceeded with Charters and Early representing White." *White*, 671 S.W.2d at 243. Given the deference afforded to the Kentucky Supreme Court's factual determination under § 2254(d)(2), White bears the burden of demonstrating that it was "objectively unreasonable in light of the evidence presented in the state court-proceeding[.]"). *Miller-El*, 537 U.S. at 339. White fails to make that showing.

As explained at length above,[42] during pretrial hearings Early indicated that he represented White and Bowling while Charters represented only Fisher. The two attorneys coordinated the defense of their clients, as all three of them had asserted that they were not involved in the crimes. But the attorneys' respective positions and tactics diverged when circumstances required. The separate representation is also demonstrated by the course of proceedings in the prosecution. By October 1979 the parties anticipated that, although each defendant had been indicted in a separate case, all three defendants would be tried in a single trial before one jury. But after two hearings in December 1979 the court decided that each defendant would have to be tried separately, with

---

[42] See note 19.

White's trial to be conducted first. Since Early and Charters had split up the work in the case, with the numerous witnesses interviewed only by one or the other of the attorneys, Early needed Charters' assistance at White's trial. Accordingly, it was only at a hearing held on January 14, 1980 that both defense attorneys indicated that Charters would serve as co-counsel during White's trial,[43] which began one month later. Thus, and contrary to White's position, neither of his attorneys represented Fisher simultaneously with their representation of him. Early did simultaneously represent Bowling and White throughout the entire case, but Charters' representation of White only began in February 1980 once trial commenced. White has failed to adduce the clear and convincing evidence required by Section 2254(e)(1) to support his claim that both defense attorneys represented all three defendants from the outset of the case. The Kentucky Supreme Court's factual determination in this regard is entitled to deference under Section 2254(d)(2) and was amply warranted by the evidence.

Second, White suggests that the three defendants were represented in a single consolidated criminal proceeding. This too is incorrect: the defendants were not indicted in or prosecuted in a single criminal case; instead, each was indicted separately. In the original prosecutions in Breathitt County, Fisher was indicted in Case No. 79-CR-24, White in 79-CR-25, and Bowling in 79-CR-26. The cases were later transferred to Powell County.[44] During a series of hearings in December 1979, extensive discussions were had regarding the possibility of consolidating the three cases solely for the purpose of trial, but Judge Graham ultimately concluded that separate trials were necessary. Specifically, Early and Charters had sought a joint trial of all three defendants, arguing that the young men had been held in jail for too long and a joint trial could be concluded more quickly. Prosecutor Bryant stated that he did not object in theory, but suggested separate trials in practice to avoid concerns under *Bruton v. United States*, 391 U.S. 123 (1968) because he intended to introduce

---

[43]  [January 14, 1980 hearing transcript at 179-80]

[44]  In that court, court filings have inconsistent references to the case number: in some instances, the caption lists all three defendants and the separate case numbers for each; in others, all three defendants are listed but only Fisher's case number (79-CR-24) is referenced; in still others, only White is listed as a defendant and only Fisher's case number (79-CR-24) is incorrectly referenced. *See* [RCr 11.42, 2013 Appeal, Trial Court Documents (Vol. I at 2, 7, 17, 26, 47, 60)] Notwithstanding these inconsistencies, the three separate cases were never consolidated.

witness testimony that White had made inculpatory statements outside the presence of Bowling and Fisher.[45]  White asserts that the judge ordered the trials consolidated, but this is incorrect.  Instead, Judge Graham concluded that the *Bruton* concerns could not be adequately addressed by instructing the witnesses in advance to limit their testimony, and therefore that each case had to be tried separately.[46]  Because White and the other defendants were tried in entirely separate cases, *Sullivan* and its presumption of prejudice do not apply.  *Cf. Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) ("The provision of separate trials for Sullivan and his codefendants significantly reduced the potential for a divergence in their interests."); *Lordi v. Ishee*, 384 F.3d 189, 193 (6th Cir. 2004) (noting that the *Sullivan* standard has only been applied where co-defendants are tried simultaneously in the same proceeding); *McFarland v. Yukins*, 356 F.3d 688, 700-01 (6th Cir. 2004) (same).

Third, White and his co-defendants were not tried at the same time, the only circumstance where *Sullivan* indicated that its presumption of prejudice applies.  The Supreme Court would later note in *Mickens* that some "Courts of Appeals [] have applied *Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts.'"  *Mickens v. Taylor*, 535 U.S. 162, 174 (2002).  However, "the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application."  Instead, the Supreme Court emphasized that before *Sullivan*'s presumption of prejudice applies, the defendant must show "... that his counsel *actively represented* conflicting interests."  *Id.* at 175.  Accordingly, the Court explained that *Sullivan's* presumption of prejudice was warranted in cases involving the simultaneous representation of multiple defendants because the likelihood of prejudice was high under that circumstance.  It noted, however, that *successive* representation – representing separate defendants at different times – does not necessarily "present comparable difficulties," and suggested that an actual showing of prejudice (rather than *Sullivan*'s presumption of such) might be more appropriate.  *Mickens*, 535 U.S. at 174-75.

---

[45] [December 5, 1979 hearing transcript at 37-39]

[46] At various points during the hearing on December 12, 1979, defense counsel, the prosecutor, and even the judge stated that the cases had previously been ordered consolidated for purposes of trial, but this was not correct.  Defense counsel never filed a motion to consolidate the cases for trial, and nothing in the state court record jointly filed by the parties indicates that the judge ever granted such a request, either verbally from the bench or in a written order.  *See* [December 12, 1979 hearing transcript at 44-54; December 14, 1979 hearing transcript at 164-166]

The Sixth Circuit has therefore consistently held that *Sullivan* cannot provide a basis for habeas relief in cases involving successive representation. *See Leonard v. Warden*, 846 F. 3d 832, 844 (6th Cir. 2017) ("This Court has observed that in *Mickens*, the Supreme Court found that the presumed standard of *Sullivan* was clearly established only in the situation of a conflict of interest due to multiple concurrent representation, and therefore has consistently held that, for § 2254 cases, the *Sullivan* standard does not apply to claims of conflict of interest other than multiple concurrent representation; in such cases, including successive representation, the *Strickland* standard applies.") (cleaned up); *Gillard v. Mitchell*, 445 F.3d 883, 891 (6th Cir. 2006) ("Unlike *Sullivan*, which addressed joint or simultaneous representation, this case involves successive representation. 'Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness.' Simultaneous and successive representation differ materially because in the latter, the attorney is no longer beholden to the former client. Because the Supreme Court has not held that successive representation gives rise to a presumption of prejudice, the *Sullivan* presumption does not control this habeas case.") (citations omitted).

As indicated above, White was not tried alongside either of his co-defendants: Fisher turned state's evidence and was not tried at all, while Bowling's trial began only months after White's had concluded. The Kentucky Supreme Court correctly held that *Sullivan* did not apply at all because "[h]ere we do not have the classic conflict of interest scenario where defendants are tried together." *White*, 671 S.W.2d at 244. Under such circumstances, *Sullivan's* presumption of prejudice is not applicable because "[i]t is more difficult for a defendant to show that counsel actively represented conflicting interests in cases of successive rather than simultaneous representation." *Moss*, 323 F. 3d at 459; *see also Burger v. Kemp*, 483 U.S. 776, 784 (1987) ("[A]s we noted in *Cuyler*, the provision of separate murder trials for the three coindictees 'significantly reduced the potential for a divergence in their interests.'")." Because the Kentucky Supreme Court's conclusion faithfully applied *Sullivan* and its progeny, White fails to establish a viable basis for habeas relief.

Finally, the Kentucky Supreme Court concluded that even if *Sullivan* did apply under these circumstances, White failed to demonstrate that an actual conflict of interest adversely affected his counsel's performance. White points to no then-existing Supreme Court precedent which

33

establishes that its conclusion was plainly wrong.  To the contrary, White points to only hypothetical, rather than actual, conflicts.

An actual conflict of interest is one that adversely affects counsel's performance.  *Mickens*, 535 U.S. at 172 n.5.  *See Harvey v. United States*, 798 F. App'x 879, 884 (6th Cir. 2020).  But how does the Court determine whether counsel's poor performance is the consequence of a conflict of interest or instead merely garden-variety ineffective assistance?  Sixth Circuit precedent offers useful guidance.  First, "[i]n order to show that his counsel's performance was adversely affected by an actual conflict of interest, [the defendant] must show that his attorney 'made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.'"  *Boykin v. Webb*, 541 F.3d 638, 644 (6th Cir. 2008) (quoting *McFarland v. Yukins*, 356 F. 3d 688, 701 (6th Cir. 2004)).

Second, in *McFarland* the Sixth Circuit explained that when a petitioner asserts that a particular defense strategy chosen by counsel is evidence of an actual conflict of interest, the petitioner must demonstrate that counsel's decision to pursue or not to pursue the particular strategy was not a legitimate one, effectively constituting ineffective assistance of counsel and judged under the same doubly-deferential standard used to review *Strickland* claims on federal habeas review:

> There has been some difference in opinion among the Circuits about when foregoing an available defense because of a conflict of interest constitutes evidence of "adverse effect."  Some Circuits hold that whenever counsel failed to pursue a "plausible" defense "that was inherently in conflict with or not undertaken due to the attorney's other loyalties," there is sufficient evidence of adverse effect to show a Sixth Amendment violation.  Other Circuits also require that the foregone defense be "reasonable."
>
> This Circuit has been quite rigorous in demanding more than omission of a hypothetical or "potential" defense to establish adverse effect.  Under our cases, counsel's choice to forego a defense that would have been inconsistent with counsel's duty to another client is evidence of adverse effect only if it is clear that the choice was not part of a legitimate strategy, judged under the deferential review of counsel's performance prescribed in *Strickland*[].  In *United States v. Mays*, 77 F. 3d 906, 908 (6th Cir. 1996), we rejected an argument that a conflict caused a lawyer's actions where "arguably unwise questions by defense counsel of prosecution witnesses appear to have been part of a losing strategy but they were not *the result of choices made where there were clearly better alternatives*." (Emphasis added.)  In *Riggs v. United States*, 209 F. 3d 828, 833 (6th Cir. 2000), there was no proof of adverse effect where counsel failed to request an instruction to which the defendant would have had no right.  Even

> where the lawyer omitted some course of action that undoubtedly would have been advantageous to the defendant, there is no proof of adverse effect if there is some other adequate explanation for the omission.

*McFarland v. Yukins*, 356 F. 3d 688, 706-07 (6th Cir. 2004) (citations omitted). The Sixth Circuit also cited with approval the Fourth Circuit's decision holding that "... the petitioner must establish that the defense counsel's failure to pursue [the alternative] strategy or tactic was linked to the actual conflict." *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (*en banc*), *aff'd*, 535 U.S. 162 (2002). *See also United States v. Kilpatrick*, 798 F.3d 365, 375 (6th Cir. 2015) ("... the more reasonable the lawyer's choice, the less likely it was the result of actual conflict.") (citations omitted); *Moore v. Mitchell*, 708 F.3d 760, 777 (6th Cir. 2013) ("For example, if counsel fails to pursue an obvious defense that would have inculpated counsel's other client and there is no benefit from foregoing the defense or other explanation, the defendant has presented evidence of his counsel's conflict of interest.").

In his petition, White does not point to a few critical decisions by counsel as evidence of a conflict of interest, choosing instead to present a blanket attack upon nearly every action taken by defense counsel in the hope of having one or more of them labeled as evidence of a conflict of interest. White first argues that the conflict was evident when counsel moved to eliminate the death penalty as a possible punishment for Fisher and Bowling because they were juveniles, but did not so move on White's behalf because he was not. Of course, the fact that the three defendants were actually of different ages was alone sufficient to warrant making differing arguments appropriate to each of them. But as noted above, White's argument is based upon an incorrect assertion of fact: counsel *did* make this argument on behalf of all three defendants,[47] and thus there is no evidence of a conflict. White also complains that counsel demanded that a bond hearing be held in open court in front of the public and the press, during which testimony was given that White had discussed a possible escape from jail. Again, the record does not support White's contention that the public or the press were present during the hearing.[48] And the same hearing transcript he cites establishes that Fisher was a participant in the jailhouse discussion with White and did not object to or disagree

---

[47] See note 21.

[48] See note 22.

with his suggestion regarding the possibility of trying to escape.  White may now believe that his attorney's actions were inadvisable, but the facts do not support his suggestion that they were prompted by conflicting loyalties, and counsel's actions plainly do not amount to ineffective assistance.

White also complains that he was inherently prejudiced by not having his own attorney throughout the case.  This appears to be a modest variation on the claim he asserted on direct appeal that in death-eligible cases each defendant is constitutionally required to have his own attorney.  The Kentucky Supreme Court rejected that argument, and no decision of the United States Supreme Court establishes such a rule.  *See Holloway*, 435 U.S. at 482-83 ("Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel.").  Here, the evidence indicates that White, Bowling, and Fisher all told their attorneys from the outset that they were in no way involved in the robbery and murders.  The three young men entered not guilty pleas and, in full accord with their clients' wishes, counsel pursued an alibi defense.  The mutual defense is of a kind which inherently carries a risk that it will fall apart should one defendant choose to abandon it.  But if the pact holds it is a strong defense, particularly where as here the prosecution case relies heavily upon circumstantial evidence.  As the *Holloway* Court explained, "... in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation.  In Mr. Justice Frankfurter's view: 'Joint representation is a means of insuring against reciprocal recrimination.  A common defense often gives strength against a common attack.'").  435 U.S. at 482-83 (citation omitted).  *See also Burger*, 483 U.S. at 783-84 ("Particularly in smaller communities where the supply of qualified lawyers willing to accept the demanding and unrewarding work of representing capital prisoners is extremely limited, the defendants may actually benefit from the joint efforts of two partners who supplement one another in their preparation.").[49]

---

[49]  White argues that if he had been represented by his own attorney, he might have been able to make his own deal with the prosecution.  The evidence demonstrates otherwise:  prosecutor Bryant testified that while he was interested in a plea bargain with Fisher or Bowling, he had no interest in discussing such a deal with White, both because White was noticeably older and because the evidence indicated that the robbery was White's idea and that he was the most culpable of the three defendants.  [RCr 11.42 at 1163-66]  *See Moss*, 323 F. 3d at 466 (finding no adverse effect on representation where attorney did not explore plea negotiations

White next contends that Charters did not merely convey the prosecution's offer of immunity to Fisher, he actively negotiated the terms of an immunity deal on his behalf. The Kentucky Supreme Court rejected this claim, noting that Charters simply passed the prosecution's offer along to Bowling and Fisher, and did not attempt to negotiate better or different terms on Fisher's behalf once he expressed interest. After it became clear to Charters that Fisher would reach a deal, he promptly advised all relevant parties and withdrew from representation. Ample evidence in the record supports the Kentucky Supreme Court's conclusion in this regard. More importantly, White fails to point to any course of action taken by Charters at this time as a direct result of his assertedly conflicting loyalty to Fisher that constituted ineffective assistance of counsel.[50]

---

with prosecution because defendant wanted to pursue defense of innocence and would not testify against co-defendant).

White also posits that a "relative culpability" defense should have been pursued, but this too disregards the facts. Blaming Fisher and Bowling for the crimes would certainly have prompted either or both of them to turn on him, inviting the very "reciprocal recriminations" a mutual defense avoids. And in addition to their testimony, Donna Jones, Henry White, and Butch Napier would have testified that it was White who was the primary instigator of the plot, planning how the robbery would be carried out and later making statements establishing his involvement with the murders. The evidence did indicate that it was likely that Bowling struck Lula because her hair and blood were on the tree limb he used. But it is unclear whether White also struck Lula or Charlie or Sam, as well as how many times and how hard. If White had implicated Bowling and Fisher in the crimes, they would have been freed from any ongoing loyalty to him and likely would have laid most of the blame upon him. Fisher did that to some degree under a grant of immunity, stating that once Bowling declined to hit Sam a third time, White hit Sam with his crowbar, and did the same to Charlie when he tried to stand up. Fisher's testimony suggested that it was White's blows that likely ended the lives of both Sam and Charlie, and Fisher proved a solid, believable, and mildly sympathetic witness because of his youth and obvious remorse for his role in the crimes. In light of these facts, White cannot reasonably complain that the alibi defense of all three defendants was pursued at his expense; quite the opposite, he was its primary beneficiary.

[50]  White relatedly suggests that counsel should have explored a defense that White was not involved in the crimes at all, but did not do so because they also represented Fisher. A defense by White that he simply was not involved was entirely untenable. Donna Jones, Butch Napier and Henry White would all testify that White talked about robbing the store, both before and after the crimes, and actively solicited their participation. Noble and McIntosh's testimony placed Fisher in the vicinity of the store right before the robbery, and White had already told the police that he was with Fisher all of that evening, thus placing White near the crimes as well. Henry White would also testify that after the robbery White acknowledged some role in the robbery, and that he possessed a blue pistol just like the one stolen from the store. The Kentucky Supreme Court quite rightly rejected White's argument in this regard as fanciful: "The argument that Charters and Early should have explored a defense that White was not involved is not realistic. The circumstantial evidence was strong and with Fisher testifying for the prosecution, the evidence that White committed the crimes was overwhelming." *White*, 671 S.W.2d at 244.

White argues that defense counsel did not "vigorously" cross examine Fisher about changing his story from innocence to guilt. All of the defendants, Fisher and White included, first asserted that they weren't involved at all and had no knowledge of any wrongdoing. Fisher later admitted that he and the others were involved in the crimes. But White also admitted his participation. Counsel could understandably choose not to cross-examine Fisher for making the same inconsistent statements made by his own client. As with his other critiques of his counsel's performance, White does not explain how such Charters' cross-examination was allegedly affected by a conflict or would have assisted his cause had it been different.

In certain contexts, the risk of a conflict in successive representation is apparent. *Cf. Moss*, 323 F. 3d at 460 ("... the most common example of an actual conflict of interest arising from successive representation occurs where an attorney's former client serves as a government witness against the attorney's current client at trial."). In such circumstances, "[t]he fear ... is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information."). *Id.* Here, however, Fisher was testifying under a grant of complete immunity, and the nature of White's defense had changed entirely from alibi to insanity or intoxication. Both distinctions are important in this case. As the Kentucky Supreme Court held, once Fisher was granted immunity from prosecution there was no reason for White's defense counsel to "hold back" in cross-examining him: any statements in Fisher's testimony that might otherwise have incriminated him could not result in criminal consequences. *White*, 671 S.W.2d at 244 (noting that because "Fisher was granted immunity, he can no longer be in jeopardy, [and counsel] had no possible interest to advocate or to protect."). And a review of the trial transcript indicates that the cross examination of Fisher was not curtailed. Fisher was examined and testified openly and in detail regarding the specifics of the crimes. Notably, while he could have done so, Fisher did not try to lay blame solely upon White. Instead, he acknowledged his own participation, took responsibility for his part, and stated that his actions were undertaken voluntarily rather than under the direction of White. Counsel did not act unreasonably in choosing not to dissect the testimony of a witness who was providing testimony which, at least to some degree, diminished White's responsibility. This is especially so because the change in the defense theory of the case significantly limited the value of cross-examining Fisher regarding the crimes. White's defense was no longer that he was not involved at all with the crimes, but that he was not criminally responsible for his actions. Accordingly, the

38

examination of Fisher shifted from one set of essential facts (the whereabouts of the defendants at the time the crimes were committed) to another (the manner in which the crimes were committed). The Kentucky Supreme Court reasonably held that Fisher was "vigorously cross-examined by Charters as to White's habits with various drugs, bizarre behavior, etc. This cross-examination and the cross-examination of other witnesses attempted to establish that the crimes showed they had been committed by a 'berserk' individual." *White*, 671 S.W.2d at 244. White fails to establish that the Kentucky Supreme Court contravened pertinent Supreme Court authority when it concluded that the cross-examination of Fisher was not curtailed, that Charters did not provide ineffective assistance with respect to it, or that the manner in which it was conducted did not evidence any conflict of interest.

Finally, White contends that defense counsel could have attempted to paint Bowling as the most responsible party, but did not because of their obligations to him. White's speculation is inconsistent with both the actual facts available to counsel and the strategy of insanity and/or intoxication adopted by the defense after Fisher turned state's evidence. The evidence indicated that a tree limb like the one Bowling possessed had been used to strike Lula because it had her blood and hair on it, and Fisher testified that Bowling had struck Sam twice. But apart from White's own testimony that he played no role in the killings at all (an assertion he abandoned almost immediately), there was no factual basis for counsel to suggest through their questioning that Bowling had hit Charlie or played a more significant role in the killing of Sam. As the Kentucky Supreme Court noted, the purpose of counsel's examination was not to lessen White's role in the killings in terms of his actions, but to focus instead on his mental state to make him appear unstable, intoxicated, and not possessed of his faculties. *White*, 671 S.W.2d at 244. While the strategy was ultimately unsuccessful, White fails to establish either that that it was chosen at his expense in an effort to bolster Bowling's defense or that the strategy was not a legitimate one when judged under *Strickland's* deferential standard. *McFarland*, 356 F. 3d at 706. *See Burger*, 483 U.S. at 784 (defense counsel's decision not to argue that defendant was less culpable than his co-defendant in murders did not evidence conflicting loyalties where choice had a "sound strategic basis" in light of evidence adduced at trial that defendant himself had drowned the victim); *United States v. Mays*, 77 F. 3d 906, 908 (6th Cir. 1996) (rejecting argument that questions were caused by defense counsel's conflict where "arguably unwise questions by defense counsel of prosecution witnesses appear to have been

part of a losing strategy but they were not the result of choices made where there were clearly better alternatives.").

Affording the state court's resolution of this claim the deference required by Section 2254(d), that Court concludes that the Kentucky Supreme Court's decision was not contrary to or an unreasonable application of clearly-established Supreme Court precedent. *See Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (*per curiam*) (holding that the deference required by Section 2254(d) means that a federal court may only grant habeas relief if it "carefully consider[s and rebuts] all the reasons and evidence supporting the state court's decision."); *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (*per curiam*); *Gagne v. Booker*, 680 F. 3d 493, 513 (6th Cir. 2012) (*en banc*).

**B.     Claim D(2) – White's Counsel Did Not Render Constitutionally Ineffective Assistance During the Guilt Phase of the Trial.**

On appeal to the Kentucky Supreme Court from the denial of relief in collateral review proceedings, White claimed that once Fisher turned state's evidence his attorneys rendered constitutionally ineffective assistance during the guilt phase of the trial in two respects. White first complained about defense counsel's opening statement. Specifically, counsel explained to the jury that at first all three of the defendants had told them that they were not involved in the crimes at all, but that later on the cusp of White's trial Fisher - in exchange for immunity - advised the prosecution that all three of them had participated in the robbery and murders. Counsel also told the jury that White had participated in an "orgy of violence" without asserting that Fisher and Bowling were equally to blame. Second, White complained that defense counsel told the jury that they would present expert testimony to support the insanity defense, but they had not, in fact, secured a favorable expert witness and never presented expert testimony during trial. Instead, counsel presented extensive testimony from White's family about his aberrant childhood behavior, testimony that he now contends was prejudicial and either exaggerated or outright fabricated. White's entire factual and legal argument regarding these claims spanned less than three pages of his appellate brief. [RCr 11.42 (second direct appeal) at 23-26]

In his habeas petition before this Court, White's argument more than doubled in length to seven pages, but the factual basis upon which he relied remained essentially the same as that presented to the Kentucky Supreme Court. [R. 14-1 at 141-148] The warden responded to the arguments made by White in equal measure. [R. 84 at 107-113] White's reply brief expanded his

Case: 5:02-cv-00492-KKC   Doc #: 105   Filed: 09/16/21   Page: 41 of 147 - Page ID#: 2962

argument with respect to this claim to 21 pages in length [R. 90 at 160-181], which is three times as long as in his petition and seven times as long as his appellate brief before the Kentucky Supreme Court. The length of the argument alone, of course, is not problematic. But White's unabashed inclusion of facts and claims never before presented – either to the Kentucky Supreme Court in his appellate brief or to this Court in his original petition – is impermissible.[51] For instance, White claims for the first time in his reply that when counsel made their opening statement to the jury, they already knew for certain that they wouldn't have an expert witness to testify.[52] *Id.* at 160. In his reply White also contends not merely that White's family members exaggerated and lied about his childhood behavior in their trial testimony, but alleges for the first time that defense counsel actively encouraged them to do so.[53] [R. 90 at 171-72] White also contends, for the first time and without supporting evidence, that a "relative culpability" defense would have been more likely to be successful.[54] *Id.* at 175-76.

---

[51] Indeed, White's inclusion of entirely new arguments and claims in his Reply constitutes a transparent effort to circumvent a prior Order of this Court. More than a decade after White filed his petition, he moved for permission to amend his petition to add new claims and to "supplement" it with "further factual support and/or legal reasoning or arguments." The Court denied that motion. [R. 61-1; R. 65; R. 67; R. 71] Undeterred, White has used his 270-page "reply" brief [R. 90] to impermissibly reargue each of his claims from the ground up, attempting to have it serve as the amended petition he was denied permission to file.

[52] There is ample record evidence to the contrary. [Trial at 879-80, 1518; RCr 11.42 at 623, 931-32]

[53] During the collateral review hearing, Mary Ann Miller and Mildred Thomas testified that they had given testimony during White's trial (about his alleged childhood sexual advances towards them) that they knew was false, but did so because Early and Charters urged them to provide it to assist in White's insanity defense. [RCr 11.42 at 301-08, 330-31, 403-05, 461-63] If these were lies, Miller and Thomas were ready and willing to offer them at trial, under oath, both on direct examination and through persistent cross-examination. [Trial at 686-87, 697, 707-09, 713-18] Given their admitted willingness to lie under oath during their testimony at trial in 1980 in an effort to support White's insanity defense, the potential that they were also willing to lie under oath during their testimony in 1999 in an effort to support White's ineffective assistance claim must be acknowledged. *Accord Burgess v. Booker*, 526 F. App'x 416, 431 (6th Cir. 2013) ("... exculpatory affidavits made years after the events are 'treated with a fair degree of skepticism,' especially when there is 'no reasonable explanation for the ... delay.'") (*quoting Herrera v. Collins*, 506 U.S. 390, 423 (1993)). It should also be noted that both Early and Charters testified at the collateral review hearing *after* Miller and Thomas had testified, but curiously White's habeas counsel never attempted to question defense counsel about his newly-minted allegation that they had suborned perjury at his trial.

[54] White's argument is speculative and unsupported by evidence in the record. As set out more fully below, even before Chuck Fisher agreed to testify for the state, the prosecution had assembled a formidable case based upon circumstantial evidence about the crimes and White's leading role in committing them. *Cf.* [January 14, 1980 hearing at 177-78 (prosecutor Bryant advising Judge Graham that he intended to call 70-

41

None of these grounds or the factual basis for them was ever presented in support of White's ineffective assistance claim, either to the Kentucky Supreme Court in his appellate brief or to this Court in his habeas petition. The former fact renders these claims procedurally defaulted. *Hanna v. Ishee*, 694 F. 3d 596, 609 (6th Cir. 2012) ("Although we agree that Petitioner diligently advocated for the broad release of all potential *Brady* material throughout his state proceedings, it is clear that the state courts were not fairly presented with the argument now made before this Court. Whether or not Petitioner's efforts to exhaust were sufficient, his current claim is easily distinguishable because the factual basis supporting his arguments has changed dramatically."). The latter fact renders these grounds forfeited: issues and arguments cannot be raised for the first time in a reply brief, which would deprive the non-moving party of an opportunity to respond:

> It is impermissible to mention an issue for the first time in a reply brief because the appellee then has no opportunity to respond. Court decisions have made it clear that the appellant cannot raise new issues in a reply brief; he can only respond to arguments raised for the first time in appellee's brief.

*United States v. Jerkins*, 871 F. 2d 598, 601 (6th Cir. 1989) (quoting *Knighten v. Commissioner*, 702 F. 2d 59, 60 n. 1 (5th Cir.), *cert. denied*, 464 U.S. 897 (1983) and 16 C. Wright, A. Miller, E. Cooper, & E. Grossman, Federal Practice and Procedure § 3974 at 428 (1977)) (quotation marks omitted). These grounds are forfeited before this Court because White did not assert them in support of his claim in his petition. *United States v. Olano*, 507 U.S. 725, 733 (1993); *Johnson v. Williams*, 560 U.S. 289, 299 (2013) ("Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development."); *United States v. Fowler*, 819 F. 3d 298, 309 (6th Cir. 2016). The Court therefore limits its discussion to the grounds properly before it.

The Kentucky Supreme Court addressed White's claim as follows:

> White mounts a comprehensive and vigorous attack on the performance of his defense counsel in both the guilt and penalty phases of the trial. The seminal case for measuring ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 104 2052, 80 L.Ed.2d 674 (1984). There is always a strong presumption that

---

80 witnesses)]; [RCr 11.42 at 639 (defense counsel Early characterizing the prosecution's evidence against White as "overwhelming")]; *White*, 671 S.W.2d at 244 ("The argument that Charters and Early should have explored a defense that White was not involved is not realistic. The circumstantial evidence was strong and with Fisher testifying for the prosecution, the evidence that White committed the crimes was overwhelming.").

"counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland, supra*. "Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*. A reviewing court in an ineffective assistance claim must consider the totality of the evidence before the judge or jury. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*. The critical question is whether the conduct of counsel "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*; *see also Sanborn v. Commonwealth*, Ky., 975 S.W.2d 905 (1998).

** ** **

White complains about a number of aspects of the performance of defense counsel beginning with their failure to investigate all possible defenses. We find that the performance of trial counsel was not deficient. An investigation must be reasonable under all the circumstances. *See Stevens v. Zant*, 968 F. 2d 1076 (11th Cir. 1992). White originally denied involvement in the crime and consequently, the defense preparation was geared to a noninvolvement theory. The reasonableness of counsel's action may be determined by the defendant's own statements or actions. *Burger v. Kemp*, 483 U.S. 776, 107 3114, 97 L.Ed.2d 638 (1987). Trial counsel Early and Charters both testified at the RCr 11.42 evidentiary hearing and each stated that he thought the three defendants were innocent until learning that Fisher wanted to testify. The evaluation of the case by defense counsel was not clearly unreasonable or unprofessional under all the circumstances. Counsel discharged their duty to make a reasonable investigation. Because the defendants originally claimed they were not guilty, there was no reason to investigate White's background or his physical or mental health.

After there was a change in the defense strategy because of the testimony of Fisher, White was examined by two mental health professionals. At the time of the 1980 trial, a defense attorney had no duty to discover and provide information about every aspect of White's entire life or an account of several generations of his extended family. *See Hendricks v. Calderon*, 70 F. 3d 1032 (9th Cir. 1995).

** ** **

White received effective assistance of counsel at the guilt phase of the trial when counsel changed White's plea from not guilty to not guilty by reason of insanity or intoxication. This issue was first raised and rejected on direct appeal and cannot be relitigated now by claiming that it amounts to ineffective assistance of counsel. *Sanborn, supra*. In any event, in light of the testimony of Fisher, this was reasonable trial strategy.

43

White now criticizes the presentation of evidence of his bizarre conduct without an explanation by mental health experts.  Defense counsel called seven members of White's family, who testified about his life, conduct and mental state.  Persons who are not experts but who have the opportunity to observe and form an opinion about the sanity of a person, may testify about that opinion.  *Jewell v. Commonwealth*, Ky., 549 S.W.2d 807 (1977).  White's defense counsel did the best they could with what they had to work with.  White and his appellate counsel are now merely second-guessing the trial counsel's practical, strategic decisions.  *See Preston v. Delo*, 100 F. 3d 596 (8th Cir. 1996); *Strickland*.  The very limited concessions by defense counsel during opening statement and closing argument were made in an obvious attempt to avoid the death penalty and were reasonable under all the circumstances. *Sanborn*.

*White v. Kentucky*, 1994-SC-0326-MR (Ky. May 16, 2002) (slip opinion at 3, 4-5, 6-7) (unpublished).

The Sixth Amendment guarantees the right to counsel, including "the right to the effective assistance of counsel."  *Buck v. Davis*, 137 S. Ct. 759, 775 (2017).  The right to effective counsel "imposes a baseline requirement of competence."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006).  The purpose of the requirement is to assure "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing.  When a true adversarial criminal trial has been conducted - even if defense counsel may have made demonstrable errors - the kind of testing envisioned by the Sixth Amendment has occurred."  *United States v. Cronic*, 466 U.S. 648, 656 (1984).

A petitioner who contends that her counsel was not "effective" must demonstrate both that her attorney performed deficiently and that she suffered prejudice as a direct result.  *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).[55]  When evaluating whether counsel's performance was

---

[55]  The warden makes a passing argument that the general rule of non-retroactivity found in *Teague v. Lane*, 289 U.S. 288 (1989) may render *Strickland* and/or its progeny inapplicable to White's ineffective assistance claims.  [R. 84 at 112]  Of course, a criminal defendant's right to the effective assistance of counsel was established as far back as 1932, long before White's trial was conducted in 1980.  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel.").  In *Strickland*, the Supreme Court established for the first time the test to be used to measure whether the right was violated.  466 U.S. at 685-87.

In any event, the warden's argument is misplaced.  In habeas matters, both *Teague*'s non-retroactivity rule and § 2254(d)'s requirement that the pertinent Supreme Court precedent be clearly established at the time of the relevant state court decision apply independently to constrain the Supreme Court cases against which a petitioner's claims may be measured.  *Horn v. Banks*, 536 U.S. 266, 271-72 (2002) (holding that the AEDPA does not "relieve[] courts from the responsibility of addressing properly raised *Teague* arguments.").  *Teague*

deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Woods v. Donald*, 575 U.S. 312 (2015) (*citing Strickland*, 466 U.S. at 689). The petitioner must therefore establish that her counsel's actions were objectively unreasonable under prevailing professional norms. *Railey v. Webb*, 540 F. 3d 393, 415 (6th Cir. 2008). When making that assessment the reviewing court must scrupulously avoid "the distorting

---

establishes that apart from two exceptions, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310.

In White's case, *Strickland* need not be retroactive for it to apply to his claims. A conviction becomes "final" for *Teague* purposes when the United States Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of *certiorari*, or when the time for filing a *certiorari* petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003). The Supreme Court denied White's petition for a writ of *certiorari* from his direct appeal on October 29, 1984. *White v. Commonwealth*, 469 U.S. 963 (1984). *Strickland* was decided before that date, on June 25, 1984 upon the denial of rehearing. *Strickland v. Washington*, 466 U.S. 668 (1984). Because White's conviction was not yet final when *Strickland* was decided, *Teague's* non-retroactivity rule is not implicated. In addition and more importantly, for purposes of § 2254(d) *Strickland* was clearly-established law when the Kentucky Supreme Court decided White's ineffective assistance of counsel claims in 2002. *Drain v. Woods*, 595 F. App'x 558, 565 (6th Cir. 2014) ("[c]learly established law is the law that existed at the time of the relevant state-court decision, not the date of finality of conviction.") (citing *Greene v. Fisher*, 565 U.S. 34, 38 (2011)). The relevant state-court decision is the Kentucky Supreme Court's 2002 decision rejecting White's ineffective assistance claims and affirming the denial of relief on collateral review, a decision rendered 18 years after *Strickland* was decided.

As for post-1984 Supreme Court cases which merely applied *Strickland's* general rule to particular circumstances, "*Teague* makes the retroactivity of our criminal procedure decisions turn on whether they are novel. When we announce a 'new rule,' a person whose conviction is already final may not benefit from the decision in a habeas or similar proceeding. Only when we apply a settled rule may a person avail herself of the decision on collateral review." *Chaidez v. United States*, 568 U.S. 342, 347 (2013). Of course, "... garden-variety applications of the test in [*Strickland*] for assessing claims of ineffective assistance of counsel do not produce new rules." *Id.* at 348 (suggesting that its decisions in *Williams v. Taylor*, 529 U.S. 362 (2000), *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510 (2003) did not announce new rules, but holding that *Padilla v. Kentucky*, 559 U.S. 356 (2010) did announce a new rule). Thus, post-1984 Supreme Court decisions applying *Strickland* set forth may provide a basis for relief to White insofar as they break no new ground and represent mere "garden variety" applications of its general rule. Of course, a habeas petitioner must *also* satisfy § 2254(d)'s requirement that the rule upon which he relies be "clearly established" such that the state court addressing the issue was required to properly apply it. In this context, where the petitioner seeks to rely upon a "garden-variety application" of *Strickland* decided by the Supreme Court *after* the state court's decision, § 2254(d) would appear to require, at a minimum, the petitioner to demonstrate that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

effects of hindsight" and must "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 687.  The Sixth Amendment is not violated unless the attorney's errors are "so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment."  *Id.*

When an ineffective assistance claim is considered in federal habeas proceedings, a state court's rejection of that claim on the merits is "doubly deferential," both because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (*quoting Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) and *Burt v. Titlow*, 571 U.S. 12, 22 (2013)), and in light of the deferential standard of review embodied in § 2254(d).  Therefore the federal habeas court, viewing an ineffective assistance claim through two layers of deference, asks only "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Richter*, 562 U.S. at 105.

To demonstrate prejudice, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Hodges v. Colson*, 727 F. 3d 517, 534 (6th Cir. 2013); *Harvey v. United States*, 798 F. App'x 879, 883-84 (6th Cir. 2020).  And "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."  *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (*quoting Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  *See also Walker v. McQuiggan*, 656 F.3d 311, 323 (6th Cir. 2011) ("... the Supreme Court's *Strickland* guidelines provide us only minimal direction.  But in a habeas case, such generality necessarily works to the petitioner's disadvantage.") (Cook, J., dissenting), *cert. granted, judgment vacated sub nom. Howes v. Walker*, 567 U.S. 901 (2012).

White first complains that in counsel's opening statement, he told the jury that White initially denied having any role in the robbery and murders, but later admitted that he was involved once Fisher agreed to testify for the prosecution.  He likewise takes exception to counsel's statement that the murders were committed in an "orgy of violence," and his failure to argue that Fisher and Bowling were just as guilty, if not more so, than White.

The Kentucky Supreme Court determined that White failed to demonstrate ineffective assistance of counsel in these respects.  This Court having thoroughly reviewed the record, it cannot

46

conclusively say that there is "[no] reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S. at 105. As the Kentucky Supreme Court held, long before Fisher's decision to testify for the prosecution all three of the young men had insisted to their attorneys that they were innocent. Both attorneys repeatedly stated that they believed that to be the truth.[56] Charters had talked with Kitty Neace and other members of White's family, who told him that White would never participate in crimes like those committed.[57] Counsel therefore had prepared a defense, consistent with their clients' wishes, that the three were simply not involved. Charters had talked to Freddy Williams, who was going to testify that he picked up the three boys hitchhiking later that night and that they appeared normal and didn't have any blood on them. Counsel located other witnesses who were prepared to testify that they had seen one or more of the defendants at a dance held at Lees College that night and that they were behaving normally.[58]

Once Fisher turned state's evidence, counsel concluded that their existing alibi defense – that White was not involved at all – was no longer viable.[59] They also believed that a relative culpability defense – claiming that White was responsible only to the same or lesser degree than Bowling or Fisher – was untenable.[60] Based upon their subsequent investigation and conversations with White's family, they decided that a defense of not guilty by reason of insanity or intoxication was the best, if not only, remaining option short of capitulation.[61] During his opening statement, therefore, counsel told the jury the nature of White's new defense and the reason for the change. Of course, by that point the jury was already aware that the defendants were involved and that the

---

[56] [RCr 11.42 at 568-69, 596, 894-95]

[57] [RCr 11.42 at 900-03]

[58] [RCr 11.42 at 572, 654-55, 975-77]

[59] [RCr 11.42 at 609]

[60] [RCr 11.42 at 611-12, 958-59]

[61] As noted above, each of the various alternative defense strategies suggested by White in his petition were implausible in light of the facts known to counsel at the time and the prosecution's view of the case. See notes 49, 50, 54.

nature of the defense had changed: counsel made that plain to them on the fourth day of *voir dire*.[62] Counsel's opening statement was therefore designed to maintain credibility with the jury by explaining why they had changed White's defense and by previewing what the testimony at trial, especially from Fisher, would show. As the Sixth Circuit has held, it is reasonable trial strategy to confront known harmful facts or weaknesses in the defense by forthrightly admitting them during opening statements. *See Awkal v. Mitchell*, 613 F.3d 629, 642 (6th Cir. 2010) ("It is always desirable in planning one's trial strategy to anticipate disclosures by the prosecution of highly unfavorable and damaging evidence against the accused. ... No matter how damaging the evidence against the accused is, expose it. *You can be sure that the prosecutor will!*") (quoting F. Lee Bailey & Henry B. Rothblatt, *Successful Techniques for Criminal Trials*, at 248-49 (2d ed. 1985) (emphasis in original)). Counsel's reference to an "orgy of violence" was designed to preview the graphic medical and forensic testimony that would describe the crime scene. It was also stated in furtherance of counsel's contention that White was acting in a crazed and/or drug-induced rage at the time of the murders, a position reinforced through defense counsel's repeated reference to White's dysfunctional family background and drug use.[63] Counsel returned to these themes in his closing statement.[64]

White points to no Supreme Court decision indicating that his counsel's judgments regarding the substance of his opening statement unequivocally constituted ineffective assistance. To the contrary, "[t]he timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel." *United States v. Rodriguez-Ramirez*, 777 F. 2d 454, 458 (9th Cir. 1985). Nor is there any basis to conclude that counsel's opening statement could have and did cause White to suffer the kind of prejudice *Strickland* requires. *Moss v. Hofbauer*, 286 F. 3d 851, 863-64 (6th Cir. 2002) ("[Petitioner's] conclusory allegations are insufficient to justify a finding that an opening statement would have created the reasonable

---

[62] [Trial at 869-70 ("[White's] plea of not guilty remains, but it is now changed to one of not guilty by reason of insanity. The nature of that is that the evidence in the case will now show that to some degree or other, the three defendants who were arraigned on this case were also involved in the commission of those crimes.")]

[63] [Trial at 1027-31]

[64] [Trial at 2063-66, 2071, 2075, 2082]

probability of a different outcome in his trial."). Consistent with the nature of an insanity and intoxication defense, White's counsel acknowledged his participation in the crimes but did not admit his guilt to them, contending instead that he lacked the requisite *mens rea* to be guilty of murder. *Cf. Holder v. United States*, 721 F. 3d 979, 989-90 (8th Cir. 2013). The Kentucky Supreme Court did not err in concluding that "[t]he very limited concessions by defense counsel during opening statement and closing argument were made in an obvious attempt to avoid the death penalty and were reasonable under all the circumstances." *Cf. Goodwin v. Johnson*, 632 F. 3d 301, 309-11 (6th Cir. 2011). Because White has not shown "far more than that the state court's decision was 'merely wrong' or 'even clear error[,]'" *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020), the Kentucky Supreme Court did not unreasonably apply *Strickland* when denying this claim. *Gagne v. Booker*, 680 F. 3d 493, 513 (6th Cir. 2012) (*en banc*).

White's second contention is that defense counsel provided ineffective assistance with respect to the evidence they provided in support of his insanity defense during the guilt phase of the trial. White complains that counsel promised the jury that experts would testify on his behalf but then failed to provide such testimony, and instead presented testimony from his family about his childhood that he now claims was prejudicial and exaggerated or false.

Before Fisher agreed to testify for the prosecution, defense counsel pursued an alibi defense because all three defendants denied any involvement with the crimes.[65] The joint alibi defense had the virtue of limiting the prosecution's case to circumstantial evidence. That evidence was strong, but there was no eyewitness or forensic evidence that definitively tied the defendants to the crimes. Thus, that "common defense [gave] strength against a common attack." But once Fisher agreed to provide incriminating testimony in exchange for immunity from prosecution, the alibi defense crumbled and left counsel with few remaining options.[66] Persisting in an alibi defense that White

---

[65] [RCr 11.42 at 543, 654]

[66] As noted above, White's claim before the Kentucky Supreme Court and in his habeas petition did not challenge counsel's *choice* of the insanity defense but only the *adequacy* of its presentation. Therefore his recent claim in his reply brief that counsel should have chosen an entirely different defense strategy is procedurally defaulted and forfeit. Nonetheless, should a court determine otherwise upon further review, out of an abundance of caution the Court addresses the substance of this argument.

was not involved in the crimes at all was not realistic.[67]  Charter and Early knew from the preliminary hearing held on August 10, 1979, that the prosecution had built a formidable case against White based upon circumstantial evidence alone:

- Donna Jones testified that she and White were dating two to three months before the robbery and murders, and that he had told her that he was looking for people to help him rob three old people at their store in Haddix by knocking them out;[68]

- Butch Napier testified that before the robbery and murders he visited the store with Fisher, White, Bowling and Henry White, and after the visit White had said that the store would be easy to rob;[69]

- Henry White, like Napier, testified that after the group of young men visited the store White talked about how easy it would be to rob it.  He also testified that on the day of the robbery and murders, White (with Bowling present) told him that there was a lot of money in the store and asked Henry to help him rob it.  Henry declined;[70]

- Elishamere Noble testified that on the night of the crimes he picked up Fisher, Bowling and White and dropped them off close to the store in Haddix.  Noble also testified that Fisher was wearing a toboggan cap with the words "4-Wheel Drive" on it and a green and grey jacket;[71]

- Bobby McIntosh testified that just before the robbery he saw a young man trying to break into the side door of the store, and that a second young man was standing outside in front of the store, and he was wearing a toboggan cap with the words "4-Wheel Drive" on it;[72]

- Detective Pat Simpson testified that a brand new blue 0.38 Smith & Wesson pistol had been stolen from the store, and that officers recovered a green and grey CPO jacket near the store;[73]

---

[67] See note 50.

[68] [August 10, 1979 hearing transcript at 92-95]

[69] [August 10, 1979 hearing transcript at 108-112]

[70] [August 10, 1979 hearing transcript at 147-152]

[71] [August 10, 1979 hearing transcript at 41-43]

[72] [August 10, 1979 hearing transcript at 48-51]

[73] [August 10, 1979 hearing transcript at 18, 34-35]

- Detective Simpson testified that during his investigation each of the defendants told him that they had not been in Haddix that night but instead went to Lees College to visit a friend, but later changed their story and admitted that they did go to Haddix, allegedly to buy marijuana;[74]

- Butch Napier testified that after the crimes were committed, White offered to sell him a brand new 0.38 Smith & Wesson pistol, and that at one point he drove White to a place near the woods where White retrieved a muddy coffee can that had money in it;[75] and

- Henry White testified that after the robbery and murders White, Fisher, and Bowling each told him that they had participated in the crimes. He also testified that White told him he had taken two guns from the store, and that one of the guns was blue.[76]

Fisher's testimony corroborated this existing circumstantial evidence, filled in some gaps in the proof, and provided eyewitness testimony about both the planning of the robbery and details about how the murders were committed. An alibi defense had become untenable. The Kentucky Supreme Court held that "[t]he argument that Charters and Early should have explored a defense that White was not involved is not realistic. The circumstantial evidence was strong and with Fisher testifying for the prosecution, the evidence that White committed the crimes was overwhelming." *White*, 671 S.W.2d at 244. That holding was not an unreasonable application of clearly-established Supreme Court precedent.

Other possible defense strategies were no more appealing. The prosecution was not interested in a plea deal with White even before Fisher agreed to testify, and had no incentive whatsoever to make a deal with him after Fisher turned state's evidence.[77] White has suggested that his counsel should have pursed a relative culpability defense by trying to lay most of the blame upon

---

[74] [August 10, 1979 hearing transcript at 15-17]

[75] [August 10, 1979 hearing transcript at 115-119]

[76] [August 10, 1979 hearing transcript at 153-57]

[77] [RCr 11.42 at 1163-66]

his half-brother Tommy Bowling.  But as explained above,[78] such an approach would have been highly problematic.  Donna Jones, Butch Napier, and Henry White would all testify that it was White who had repeatedly solicited their participation in the robbery.  Fisher would testify that the robbery was White's idea; that White had planned how to carry it out; and that it was White – not Bowling – who had hit Charlie and Sam many times and very hard.  And had White sought to blame the crimes upon Bowling, Bowling in turn could and likely would have testified and provided even more incriminating details against White, perhaps reaching his own deal with the prosecution.  Given those concerns counsel could reasonably choose to forego that defense in favor of another.[79]  And it is a matter of pure speculation that a defense of this kind would have produced a different and better result.  This kind of second-guessing is precisely what *Strickland* forbids.  *Strickland*, 466 U.S. at 687 (cautioning reviewing courts against "the distorting effects of hindsight" and stressing that professional judgments must be assessed "from counsel's perspective at the time.").

Reviewing counsel's line of defense the Kentucky Supreme Court concluded that it amounted to "reasonable trial strategy" under the circumstances.  *White*, 1994-SC-0326-MR (Ky. May 16, 2002) (slip opinion at 6).  The defense strategies proposed by White on collateral review suffered from clear weaknesses, making each of them an unpalatable alternative.  White has failed to demonstrate through reference to controlling Supreme Court precedent that the Kentucky Supreme Court clearly erred when it held that his attorneys' decision in this regard was not self-evidently ineffective.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Instead, counsel chose a defense of intoxication and/or insanity.[80]  Once Fisher reached a deal with the prosecution, counsel Early immediately requested an examination and a hearing to assess White's competency to stand trial.  This maneuver by the defense had two benefits:  it bought

---

[78]  See note 49.

[79]  *See* [RCr 11.42 at 607 (Early testifying that "… you could have had [White] testify that the other guys were lying, but I'm not going to tell him to get up there and lie.")]

[80]  Both defense counsel would later testify that Fisher's decision to testify against White on the eve of trial left the insanity defense as the least-awful option remaining.  *Cf*. [RCr 11.42 at 607 (Early describing the insanity defense as "the only viable defense available at the time"; at 950 (Charters describing it as " … an extraordinary defense under extraordinary circumstance.")]

time for counsel to investigate and assess the viability of an insanity defense,[81] and it garnered an initial assessment by Dr. Robert Granacher of not only White's ability to stand trial but also a sense of his psychological state at the time of the crimes in advance of the hearing.[82]  While Granacher concluded that White was competent to stand trial, he did indicate that White might have been intoxicated when the crimes were committed and recommended a second evaluation.  Before *voir dire* resumed, defense counsel thought that Dr. Granacher might be able to provide expert testimony for White at trial.[83]  Dr. Granacher was ultimately not called to testify, although the record indicates that it was only after counsel gave his opening statement that it became apparent to counsel that Dr. Granacher would not be able to provide helpful testimony.[84]

Early also asked Dr. Paul Evensen to evaluate White with regard to his criminal responsibility for the robbery and murders as well as for development of his rehabilitative potential for use as possible mitigation evidence.  Evensen interviewed White and Bowling for several hours on February 23, 1980.  Dr. Evensen concluded in his report that White was not insane when he committed his crimes; instead, White felt justified in using violence upon the victims to avoid identification when Fisher yelled his name during the robbery.  Evensen would later acknowledge that his report or testimony would not have been helpful to White during the guilt phase of the trial.  Early did not contact Evensen to request his participation in the trial.[85]  Finally, counsel had retained Dr. Jerry

---

[81]   Once Fisher reached a plea agreement, counsel began diligently searching to find psychologists, psychiatrists, and others who could testify as expert witnesses at White's trial.  Counsel contacted the Department of Public Advocacy in Frankfort for help finding experts.  Early located three possible experts, but all had scheduling conflicts.  Early also filed a motion to have White evaluated at the Kentucky Correctional Psychiatric Institute, but that motion was denied.  Eventually White was evaluated by Drs. Granacher and Evensen, but their assessments were not helpful to his defense.  [RCr 11.42 at 556-57, 564; 601-02, 616-17, 618-19]

[82]   [Trial at 506-508]  Charters would later explain that "[w]hat served as a competency hearing – our hope from that was not that Judge Graham wanted to declare him incompetent, but that's ~ there would be sufficient evidence to convince the Judge that he ought to be given a thorough evaluation."  [RCr 11.42 at 925]

[83]   [Trial at 873, 879-880]

[84]   [RCr 11.42 at 930-32].

[85]   *See* [Evensen Depo. (June 8, 1999) at 4; 8-9; 13-14; 24-27; 34; Exh. #2 (Feb. 26, 1980 report)]

Drew, a neuropsychopharmacologist, to testify as an expert witness about the effects that drugs have on individuals who take them.  However, at the conclusion of the guilt phase Early indicated that he had just learned that Dr. Drew had suffered a heart attack and was unable to testify.[86]

Without an expert witness to testify that White was criminally insane, counsel took the remaining avenue permitted by Kentucky law: testimony from lay witnesses who had observed the defendant and formed an opinion about his sanity.  *See Brown v. Commonwealth*, 934 S.W.2d 242, 248 (Ky. 1996).  Counsel therefore called numerous members of White's family who testified that during his childhood and teenage years he had behaved in bizarre ways, had nightmares in his sleep, wet the bed until his late teens, could be abusive towards animals, and had made sexual advances toward his half-sisters.  Counsel also took advantage of this rule to present testimony from Mildred Neace, one of White's half-sisters, that she had taken college courses in psychology and concluded from White's upbringing that he could not "conform his conduct to what was expected of him" and needed psychiatric care.[87]

The Kentucky Supreme Court concluded that defense counsel did not provide ineffective assistance with respect to the presentation of White's insanity defense, holding that even without expert testimony "White's defense counsel did the best they could with what they had to work with." Given the two layers of deference afforded by *Strickland* itself and by Section 2254(d), the question for this Court is only "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S. at 105.  The Court concludes that there is, and thus the Kentucky Supreme Court did not contravene or unreasonably apply clearly established Supreme Court precedent.

As shown above, defense counsel initially believed that they would have expert testimony to support the insanity defense, and so advised the jury during the opening statement.  When the experts that counsel believed would offer helpful testimony could not do so, counsels' decision not to present that testimony did not render their performance ineffective.  *Cf. Awkal v. Mitchell*, 613 F. 3d 629, 641-44 (6th Cir. 2010) (holding that it is a matter of strategic choice for counsel to determine

---

[86]  [Trial at 2020-2021; RCr 11.42 at 561-62, 623, 931-32]

[87]  [Trial at 1627-1735]

whether to call expert witness during guilt phase who would provide both helpful testimony that defendant was taking medications and suffered hallucinations and unhelpful testimony that defendant was not insane when he committed his crimes).  Counsel traversed a number of avenues to contact other psychiatrists and attempted to have White evaluated at a state-run facility, to no avail.  Under such circumstances the failure to present expert testimony anticipated in an opening statement does not necessarily constitute ineffective assistance.  *Cf. Fayemi v. Ruskin*, 966 F. 3d 591, 593-94 (7th Cir. 2020) (noting that performance is not *per se* ineffective "when in an opening statement a lawyer promises to present a key witness who never testifies" because of a change in circumstances or strategy occurring mid-trial); *Wilborn v. Jones*, 964 F. 3d 618, 621 (7th Cir. 2020) (same), *cert. denied*, 141 S. Ct. 1451 (2021); *Yeboah-Sefah v. Ficco*, 556 F. 3d 53, 77-78 (1st Cir. 2009).

Nor has White demonstrated that counsel rendered deficient performance when they attempted to establish the insanity defense through the only means remaining and available under Kentucky law: testimony from lay witnesses as to his mental health.  Lacking an expert witness's testimony that White was not sane when he committed the crimes, counsel called several members of his extended family to describe a difficult childhood.  White had witnessed the murder of his father at a young age, had difficulty adapting to school, had behaved inappropriately toward his siblings, and had behaved in bizarre and aggressive ways towards others.  Counsel also presented testimony from White's half-sister who, based upon her interactions with White and several psychology courses she took in college, opined that White could not "conform his conduct to what was expected of him."  Although the jury ultimately rejected White's insanity defense, the decision to present this lay testimony in support of it was not an unreasonable one given the absence of viable alternatives.  White does not point to any decision of the United States Supreme Court which clearly establishes that counsel's choice to present lay testimony on the defense was a patently unreasonable strategic choice under the circumstances.  *Cf. Hartman v. Bagley*, 492 F. 3d 347, 360 (6th Cir. 2007) (holding that counsel was not ineffective for making a strategic choice to present evidence of the defendant's difficult childhood through the testimony of family members rather than an expert witness, where the expert's report "contain[ed] some sympathetic commentary [but] other aspects of it paint a decidedly unsympathetic portrait."); *Broom v. Mitchell*, 441 F. 3d 392, 410 (6th Cir. 2006) (counsel's performance was not objectively unreasonable because he had "attempted to obtain psychological testimony as well as the services of a mitigation expert" as part of his investigation).

Having failed to establish that the Kentucky Supreme Court clearly erred when it concluded that "White's defense counsel did the best they could with what they had to work with[,]" White's claim must be denied.  *Gagne v. Booker*, 680 F. 3d 493, 513 (6th Cir. 2012) (*en banc*).

Finally, independent of the question of deficient performance, White makes no credible argument establishing prejudice flowing from the manner in which counsel chose to present the insanity defense.  Defense counsel was unable to obtain favorable testimony from an expert to support the defense.  But even if counsel had found an expert to testify in support of the insanity defense, both Early and Charters stated that they could not say with any certainty that the case would have turned out any differently.[88]   And Dr. Granacher, a highly-credentialed psychiatrist with extensive experience offering expert testimony at criminal trials, testified that even when an expert *does* testify in support of the insanity defense, it still fails 99.5% of the time.[89]  White failed to provide the Kentucky Supreme Court with record evidence demonstrating that a reasonable probability existed that the outcome of the trial would have been different had his counsel performed differently.  *Cf. Roberts v. Comm'r, Alabama Dep't of Corr.*, 677 F. 3d 1086, 1092 (11th Cir. 2012) ("The appropriate prejudice analysis for this claim would require the state court to consider whether there is a reasonable probability that Roberts's trial would have resulted in his being found not guilty by reason of insanity had his trial counsel properly investigated and presented an insanity defense."); *Blackshere v. Maclaren*, No. 15-1904, 2016 WL 561521, at *5 (6th Cir. Feb. 9, 2016) (holding that petitioner failed to establish prejudice where he "did not identify any facts to suggest that an insanity defense would have succeeded.").  Having failed to demonstrate prejudice, the Kentucky Supreme Court did not err in rejecting his ineffective assistance of counsel claim.  *Sneed v. Johnson*, 600 F. 3d 607, 611 (6th Cir. 2010).

**C.     Claim F(4) – The Prosecution Did Not Violate *Brady*.**

White alleges that prior to trial, the prosecution violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963) in two ways: by failing to give defense counsel (1) witness Donna Jones's initial

---

[88]  [RCr 11.42 at 640-43, 977-79]

[89]  [Granacher Depo. (June 1, 1999) at 55 ("Q.  ... what I interpreted you were saying is that in cases where experts are used with the insanity defense, that a jury accepts that only one-half of one percent?  A.  I think it's one out of 200 cases that are successful ~ one-half of one percent.")]

statement to police; and (2) certain handwritten notes by Kentucky State Police forensic scientist Edward Taylor. [R. 14-1 at 214-218] In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Supreme Court has explained that "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). The suppressed evidence is "material" only if its absence rendered the trial fundamentally unfair, that is, one undermining confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Gumm v. Mitchell*, 775 F. 3d 345, 363 (6th Cir. 2014). As explained more fully below, the Kentucky Supreme Court properly rejected these claims as wholly without merit.

As for Donna Jones's testimony, during White's trial she testified that she and White had dated for a few months in late 1978 (about 3 months before the robbery and murders), and that during that time she and White had a conversation during which White expressed his desire to rob the store. Jones further testified that:

> A. When he first told me about it, he told me he knew I wouldn't want anything to do with it because *we might have to kill somebody*. He said it would be easy to knock them out. He mentioned Henry White. He said Henry White wouldn't do anything like that, but Tommy and Chuck might. That was about all that was mentioned about it then.
>
> Q. What did he want you to help him do?
>
> A. Rob those old people. He never asked me to help him, he said he knew I wouldn't, that somebody might be killed.[90]

On cross-examination, White's counsel Early focused on Jones's testimony that White told her that "we might have to kill somebody." Specifically, Early questioned Jones about her testimony before the grand jury[91]:

---

[90] [Trial at 1066-67 (emphasis added)]

[91] In his petition White incorrectly states that during trial Early "used her *preliminary hearing* testimony, as a sworn prior inconsistent statement" to cross-examine her. [R. 14-1 at 205 (emphasis added)] Early initially

Q.  Do you recall being asked this question, number fifty-one, "Going back to the first time he told you about his plans, did he make any statements to the effect that he might have to kill somebody?"  And did you answer, "I don't really know whether he did or not, the best I can remember he said he would have to knock them out." Did you give that answer?

A.  Yes.

Q.  He didn't say anything at all about killing anybody, did he?

A.  No, but when he first told me about it .....

MR. EARLY:  That's all I have.

THE COURT:  Well, wait a minute, let her give her explanation.

A.  When I first asked him about it, that's what I was referring to.  He didn't ask me to help him, he said there wouldn't be much use to tell me about it anyway cause he knowed I would help him[92] because someone might get killed.[93]

Thus, through cross-examination Early was able to establish that when Jones was before the grand jury she did not testify that White had said anything about killing the victims to accomplish the robbery.

Jones had recounted the substance of her conversation with White on three prior occasions, and in none of them did she indicate that White had said anything about the possibility of having to kill the victims of the robbery.  First, in March 1979 Jones gave a short written statement to police detective Pat Simpson.  In that statement she indicated that White had told her that he "wanted to do something" about robbing the store "but he knew I would not help him do it."  She also stated that White indicated that "he did not know how he would go about it but [White] said he would probably have to knock one of them out."  [R. 14-1 at 206]  Second, as set forth above, during her

_____

suggested during trial that he was relying upon her prior testimony from the August 10, 1979 preliminary hearing, but he later made clear that he was actually quoting from her August 6, 1979 testimony before the grand jury.  [Trial at 1071, 1073]

[92]  The Court assumes that given the statement's context, Jones intended to say that "he knowed (*sic*) I would [**not**] help him because someone might get killed."

[93]  [Trial at 1074]

grand jury testimony on August 6, 1979, Jones did not mention White expressing an expectation that the robbery might involve killing the victims. Third, during a preliminary hearing held on August 10, 1979, Jones testified that before the crimes White had told her that he wanted to rob Charles and Lula Gross and Sam Chaney at the grocery store, preferably when only one of them was present. When asked "What was his plans as to how he would bring these old people under control?", she responded only "Knock them out."[94]

By the time of the trial, defense counsel Early was already aware of each of these three prior statements. He was aware of Jones's written statement to the police: during the preliminary hearing that Early had participated in, police detective Simpson told him that Jones had given him a written statement, and Jones herself testified that detective Simpson had come to her home and asked her questions about White.[95] Early also cross-examined Jones during that proceeding about her testimony.[96] Early was aware of her grand jury testimony on the issue, and quoted directly from it to cross-examine her during trial. And as noted above, Early attended the preliminary hearing and directly heard Jones's testimony; indeed, he referred to it during the trial.

In 1999 a hearing was held in the RCr 11.42 proceedings. At that time, nearly 20 years after the trial had concluded, White's habeas counsel did not question Early about these matters. Instead, he questioned co-counsel Charters about the written statement that Jones had given to the police:

Q. Now, you didn't cross-examine her; Jim Early did. I don't mean to mislead you. But, do you know why ~ let me ~ did you have the previous statements of this woman ~ the defense?

A. If we did, I don't recall having them.

Q. ... Let me hand you part of Exhibit 11. It is the statement of Donna A. Jones. Do you remember that statement or getting a statement like that?

A. No, I don't recall getting that statement.[97]

---

[94] [Preliminary at 98-99]

[95] [Preliminary at 27-28, 95]

[96] *Id.*

[97] [RCr 11.42 at 933]

Of course, Charters testified that with respect to Jones's trial testimony generally, "I don't recall much about it."[98]  And as noted during the exchange, it was defense counsel Early, not Charters, who was responsible for cross-examining Jones at trial.

Earlier in that same hearing, Early testified as follows:

Q.  Her name was Donna A. Jones?

A.  I don't remember, sir.

Q.  Donna Ackers – she's referred to as different names in the ...

A.  No, I don't recall.  She's quoting Gene as saying, "We might have to kill."

Q.  Yes.

A.  All right.

Q.  Do you recall impeaching her with her grand jury testimony where she's asked that question and she doesn't have any information about him saying something like that?

A.  No, I don't remember.

Q.  Well, my question, then, was going to be why didn't you impeach her with her statement to the police that didn't contain any reference to this killing the victims or her preliminary hearing's testimony, which also didn't contain any reference to killing since she was such a critical witness?

A.  I don't know the answer to your question.  You say we did impeach her, though, with her preliminary hearing testimony or grand jury testimony?

Q.  You impeached her with her grand jury, but not with her statement to the police or with her preliminary hearing testimony?

A.  I don't remember.[99]

After the trial court denied relief in the RCr 11.42 proceeding in 2000, on appeal to the Kentucky Supreme Court White argued that the prosecution violated *Brady* by failing to give the

---

[98]  *Id.* at 932.

[99]  [RCr 11.42 at 625-26]

defense a copy of Jones's statement to the police.  The factual basis for that assertion was that Charters – not Early, the attorney who was actually responsible for cross-examining Jones – could not remember 20 years after the trial if they had received a copy of that statement.[100]  The Kentucky Supreme Court rejected this claim on two grounds, stating:

> Finally, White contends that the prosecutor failed to disclose evidence involving the impeaching statements of a key prosecution witness and the handwritten notes of the KSP forensic scientist.  The prosecutor did not fail to disclose exculpatory evidence regarding the statement of the witness or the handwritten notes.  Statements of the witness were not exculpatory.  In regard to the forensic scientist, White does not claim that the notes differ from the reports the defense lawyers had access to.

*White v. Kentucky*, 1994-SC-0326-MR (Ky. May 16, 2002) at 14 (unpublished).  This passage encompasses two holdings: first, that the prosecution did not fail to give Jones's statement to the defense, and second, that the statement was not exculpatory within the meaning of *Brady*.

The Kentucky Supreme Court first concluded that, as a factual matter, "[t]he prosecutor did not fail to disclose exculpatory evidence regarding the statement of the witness ..."  In light of the evidence set forth above, this was not an unreasonable determination of the facts under § 2254(d)(2) because it is not "objectively unreasonable in light of the evidence presented in the state court proceeding[.]").  *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).  During collateral review proceedings Early, the attorney responsible for cross-examining Jones during both the preliminary hearing and at trial, couldn't even recall his impeachment efforts.  White relies entirely on co-counsel Charters's statement that, 20 years after the fact, he couldn't recall having received the statement.  Given that Charters had no involvement at all with the cross-examination of Jones at any point during the trial, this sliver of evidence falls far short of the clear and convincing proof necessary to overcome the presumption of correctness that attaches to the Kentucky Supreme Court's factual determination.  28 U.S.C. § 2254(e)(1)); *Johnson v. Genovese*, 924 F. 3d 929, 938 (6th Cir. 2019).[101]  Because the

---

[100]  [Brief of Appellant RCr 11.42 (second appeal) at 67-68]

[101]  White argues that the Kentucky Supreme Court did not make a factual determination at all regarding whether the prosecution did or did not fail to turn over the evidence.  He argues that its statement – "[t]he prosecutor did not fail to disclose exculpatory evidence ..." – meant only that the evidence was not "exculpatory," not that it wasn't turned over.  [R. 90 at 227-28]  White misreads the Kentucky Supreme Court's opinion.  In the sentence immediately following, the Court held that the "[s]tatements of the witness were not exculpatory," a statement that would have been entirely redundant if, as White claims, it had just

Kentucky Supreme Court's holding conclusively undermines the factual predicate for White's *Brady* claim, that claim necessarily fails.

Even if that were not so, White fails to establish that the Kentucky Supreme Court's legal conclusion that his *Brady* claim fails was an unreasonable application of federal law. There is little question that Jones's written statement did have some incremental impeachment value to the defense. However, the statement was functionally identical to Jones's testimony both before the grand jury and during the preliminary hearing. Because defense counsel could, and in fact did, cross-examine Jones with that earlier testimony, White cannot show prejudice even if the prosecution did fail to turn over the written statement. "The prejudice analysis under *Brady* evaluates the materiality of the evidence." *Jefferson v. United States*, 730 F. 3d 537, 550 (6th Cir. 2013). Here, any omission was immaterial because Jones was cross-examined from several other sources about the same information contained in the written statement. *Id.* at 551. Because the written statement did not provide anything new to the defense, "the potentially impeaching evidence was of marginal significance." *Jalowiec v. Bradshaw*, 657 F. 3d 293, 313 (6th Cir. 2011). Therefore any failure to disclose it does not undermine confidence in the verdict, and no *Brady* violation occurred. Cf. *Byrd v. Collins*, 209 F. 3d 486, 518 (6th Cir. 2000) ("where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.").

White's second *Brady* claim asserts that the prosecution did not turn over handwritten notes by KSP forensic scientist Edward Taylor.[102] Those notes indicated that hair found on the tree limb

---

reached that exact same conclusion in the sentence immediately before. The Kentucky Supreme Court's express holding that "[t]he prosecutor *did not fail to disclose* exculpatory evidence ..." means exactly what it says.

[102]  In his petition White bases his *Brady* claim upon Taylor's handwritten notes [R. 14-1 at 216 ¶7], but he does assert in passing that defense counsel testified in 1999 that they did not receive Taylor's *lab report* either. [R. 14-1 at 216 ¶8] It is uncertain if White intends to assert at this late juncture that the prosecution violated *Brady* a third time by failing to turn over Taylor's lab report. If he does, that claim is procedurally defaulted because he did not clearly present it to the Kentucky Supreme Court. The only claim White fully and fairly presented to the Kentucky Supreme Court was whether the prosecution turned over Taylor's notes. [Brief of Appellant (RCr 11.42 second appeal) at 68] In his reply, White stated for the first time in passing that "It is not clear whether trial counsel had the *reports*. They did not have the handwritten notes." [Reply Brief of Appellant (RCr 11.42 second appeal) at 9 (emphasis added)] Because White made a clear *Brady* argument

used by Bowling was similar to Lula Gross's. White contends that during the RCr 11.42 proceedings in 2000, counsel Early and Charters indicated that they did not have Taylor's notes during trial. [R. 14-1 at 216]  However, as the Kentucky Supreme Court noted, White has never claimed that Taylor's notes were inconsistent in any way from what he set forth in the formal report that was issued and provided to the defense.  *White v. Kentucky*, 1994-SC-0326-MR (Ky. May 16, 2002) at 14 (unpublished).[103]

As with Donna Jones's written statement, even if White could demonstrate that the prosecution failed to turn over Taylor's handwritten notes, he cannot show that the omission was "material" under *Brady* because the contents of those notes was contained within the report they did receive.  Evidence regarding the hair found on the tree limb used by Bowling was also provided by

---

related to the handwritten notes and none at all related to Taylor's actual report, the Kentucky Supreme Court appropriately limited its discussion to the former.

In any event, such a claim is contradicted by the record.  During the 1999 hearing, Early's testimony was equivocal, stating that although the prosecution did give the defense forensic reports from KSP, including "reports that frankly and fully described everything including splinters and stuff," he "didn't believe" he had received Taylor's report regarding the hairs found on the tree limb.  [RCr 11.42 at 559-61, 666]  But Charters testified that he thought he or Early had actually interviewed Taylor, something that plainly would not have happened if they had never received his lab report in the first place.  *Id.* at 938.  And during trial Early referred at length to both the serology report and Taylor's report during his cross-examination of detective Simpson, conclusively rebutting any assertion that they had not been turned over.  [Trial at 1316-30]

[103]  The warden makes a passing argument that White procedurally defaulted this aspect of his claim because he did not assert it before the trial court in his RCr 11.42 motion as required by RCr 11.42(2).  [R. 84 at 153 n.72]  This contention is without merit.  The Commonwealth made a similar argument on appeal in the RCr 11.42 proceedings, contending that White's failure to assert this claim in his RCr 11.42 motion rendered it unavailable for appellate review as a matter of Kentucky law.  His argument before this Court is an attempt to turn that state law argument into a federal claim of procedural default.  But "the nature of claims cognizable under RCr 11.42 for purposes of defining the scope of state collateral review in Kentucky and the requirements of exhaustion and the related doctrine of procedural default for purposes of federal habeas review are entirely distinct."  *Caudill v. Conover*, No. 5: 10-84-DCR, 2014 WL 349300, at *22 n.2 (E.D. Ky. Jan. 31, 2014).  The Kentucky Supreme Court could have refused to address this aspect of White's *Brady* claim on the state procedural ground pressed by the warden here, but it did not, choosing instead to reject the claim on its merits.  As the case cited by the warden makes plain, a claim is not procedurally defaulted unless the state court actually enforces its procedural rule and refuses to address the claim on its merits. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Williams v. Anderson*, 460 F. 3d 789, 806 (6th Cir. 2006). Here, the Kentucky Supreme Court did not rely upon any procedural irregularity and instead rejected the claim as meritless.  The claim is therefore not procedurally defaulted.

testimony at trial, including that of Fisher.[104]  The handwritten notes were therefore redundant.  The Kentucky Supreme Court did not unreasonably apply federal law when it concluded that any omission was not prejudicial to White.  See *United States v. Lawson*, 2009 WL 2136866, at *1-2 (E.D. Ky. July 16, 2009) (citing *United States v. Pellulo*, 105 F. 3d 117 (3d Cir. 1997)) (noting that the failure to turn over an agent's notes may violate *Brady*, but only if the notes contain exculpatory evidence not disclosed elsewhere); *Villasana v. Wilhoit*, 368 F. 3d 976, 979 (8th Cir. 2004) (failure to disclose underlying lab test results and notes did not violate *Brady* where their contents were encapsulated in the lab report produced to defense and they did not contain additional impeachment or exculpatory value).

Finally, as set forth above the Court concludes that the Kentucky Supreme Court did not err in concluding that White failed to establish that the prosecution did not turn over either Jones's written statement to police or Taylor's handwritten notes, and that no *Brady* violation occurred even if it did.  While the Court has assessed each of these alleged omissions separately, it must also assess the effect of any suppressed evidence collectively rather than item by item.  *Cone v. Bell*, 556 U.S. 449, 474 (2009); *United States v. Agurs*, 427 U.S. 97, 112 (1976) ("[T]he omission[s] must be evaluated in the context of the entire record.").  Even if the Court assumes that both Jones's written statement to the police and Taylor's lab notes were not turned over to the defense, those omissions would not be material under *Brady* even if considered collectively.  As noted above, Jones's written statement was consistent with the testimony that she gave both to the grand jury and during the preliminary hearing, and thus did not provide the defense with any new or different material to impeach her with during trial.  And the content of Taylor's notes was set forth in the lab report which was turned over to the defense, and thus provided no additional evidence helpful to the defense in that regard. Finally, these two pieces of evidence did not relate to the same or similar subject matters and hence were not mutually reinforcing in any respect.  The Court thus concludes that even if this evidence was not given to the defense, when considered together they were not material under *Brady* because their absence does not undermine confidence in the verdict.  *Kyles*, 514 U.S. at 434.

**D.**    **Claim C(1) – The Trial Court's Denial of Two Defense Motions to Continue the Trial Did Not Render it Fundamentally Unfair.**

---

[104]    [Trial at 1278, 1311, 1448, 1451]

On February 15, 1980, after Fisher agreed to testify for the prosecution that White was involved in the robbery and murders, the defense promptly shifted strategy and, in an effort to lessen his culpability, asserted that White was intoxicated and/or suffered from a mental disease or defect at the time of his crimes.  At White's request, a pretrial hearing was set to determine his competency to stand trial, and the trial court granted White's request to be evaluated by Dr. Granacher prior to the hearing.[105]  Dr. Granacher concluded that White was competent to proceed at trial; may have been under the influence of intoxicants at the time of the crimes; and recommended further psychiatric evaluation.[106]  A two-day competency hearing was held on February 18-19, 1980.  After all of the evidence had been presented, White asked the trial court for a continuance "to acquire a commitment of the defendant to a forensic unit for an examination as to the existence of a mental disease or defect."  The trial court found White competent to stand trial and, it appearing that Dr. Granacher would provide expert psychiatric testimony for White,[107] denied the defense motion for a further continuance of the trial.[108]

A week later at the conclusion of the guilt phase, White's counsel advised the court that he had intended to call Dr. Jerry Drew, a psychopharmacologist, as a witness but that Drew had suffered a heart attack and was unable to attend trial.  Dr. Drew had not examined White, but could testify generally about the effects that drugs have on individuals who take them.[109]  White again asked for a continuance to obtain alternate testimony on the subject, but the trial court denied that motion.

---

[105]  [Trial at 506-508]

[106]  *See* [Granacher Depo. (June 1, 1999) at 14-15; 23-24; Exh. #3 (Feb. 16, 1980 report)]

[107]  [Trial at 873, 879-880]

[108]  After two days of testimony, the trial court also stated that White "was sane and knew what he was doing and the consequences of his acts at the time of the murders."  [Trial at 863-864]  White complains in his petition that this was an unsolicited and gratuitous ruling by the judge [R. 14-1 at 107], and asserts as part of Claim C(4) that it rendered his trial unfair.  [R. 14-1 at 125]  The judge's comment was not gratuitous; indeed before the hearing, in both his opening statement and in his closing statement, White's counsel directly asked the judge to make such a ruling.  [Trial at 477, 508, 850 (stating that "testimony for both sides has been submitted to the Court on the question of competency *both at this time and at the time of the incident*.") (emphasis added)]

[109]  [Trial at 2020-2021]

White contends that these two rulings prejudiced his defense by depriving him of time he needed to conduct psychological testing and to obtain and present expert witness testimony to support his intoxications and/or insanity defense, rendering his trial unfair.[110]  [R. 14-1 at 106-111]

The Kentucky Supreme Court rejected White's claim that the refusal to grant him a continuance denied him a fair trial:

> White argues that he did not have sufficient time to procure expert testimony to bolster his defense of insanity.  The trial court recessed for almost a week to permit psychiatric tests and examination.  White called neither the psychiatrists nor the psychologist, who conducted the tests, nor did he make a showing as to what they would testify.  The inescapable conclusion is that in this respect the testimony would not have been favorable to White.  There were many witnesses who testified as to White's bizarre behavior which led them to the conclusion that he was insane or unstable.  Dr. Drew, the psychopharmacologist White intended to call, could not appear because of illness.  No attempt was made to take his deposition or to subpoena him.  White's counsel stated that he would have testified extensively about the effects psychologically and physiologically on any individual who made extensive use of drugs.
>
> We are of the opinion there was no error in the trial court's refusal to grant a further continuance in the first instance or grant a continuance for the reason Dr. Drew could not attend the trial.  White testified extensively about himself, including the use of drugs and alcohol.

*White*, 671 S.W.2d at 245.

The Constitution guarantees a criminal defendant "a fair trial and a competent attorney." *Engle v. Isaac*, 456 U.S. 107, 134 (1982).  Indeed, the Supreme Court has indicated that providing the latter is one way of ensuring the former: competent counsel will test the sufficiency of the prosecution's case through the adversarial process, thus providing a fair trial.  *United States v. Morrison*, 449 U.S. 361, 364 (1981) (noting that right to the assistance of counsel "is meant to assure

---

[110]   White also characterizes the effect of the trial court's ruling as denying him the effective assistance of counsel, and separately complains that certain jurors were antagonistic to his insanity defense.  White has elsewhere asserted a separate *Strickland* claim regarding his counsel's preparation for trial and performance.  The Court need not repeat that discussion here, and will limit its analysis in this section to the fairness of White's trial.  Likewise, White presents a distinct claim regarding jury selection and strikes in Claim C(2) that covers essentially the same ground.  Indeed, on direct appeal White acknowledged that that claim was perhaps a better vehicle for presenting his concerns; after, all, more time alone would not have changed the jury composition absent an order from the trial court empaneling (in whole or in part) a new or different jury.

fairness in the adversary criminal process."). To ensure that counsel is capable of giving the defendant the "assistance" contemplated by the Sixth Amendment, including serving as a "guiding hand" to the defendant and to "require the prosecution's case to survive the crucible of meaningful adversarial testing," the Constitution implicitly contemplates that counsel will be given adequate time to prepare. *United States v. Cronic*, 466 U.S. 648, 654-59 (1984).

If a defendant seeks a continuance so that she may have additional time to prepare for trial, the trial court has discretion whether to grant that relief. The Supreme Court has explained:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (citations omitted). If the motion for a continuance is denied, to establish a constitutional violation a criminal defendant must show demonstrable prejudice to his defense, such as "by pointing to specific errors made by trial counsel." *Cronic*, 466 U.S. at 659-66 (holding that even where the case was complex and defense counsel was inexperienced and had only 25 days to prepare for trial, those circumstances did not warrant a presumption that defendant was denied the effective assistance of counsel; defendant must show actual prejudice to establish that trial was rendered fundamentally unfair); *Avery v. Alabama*, 308 U.S. 444, 446-53 (1940) (trial court's refusal to postpone capital trial where counsel had only three days to prepare defenses of not guilty and not guilty by reason of insanity was not improper where witnesses and evidence were readily available to defense counsel).

The Kentucky Supreme Court did not unreasonably apply federal law when it concluded that White failed to show that the judge's rulings denying his motions for a continuance rendered his trial fundamentally unfair. As directed by the Supreme Court, we look at the circumstances presented when the trial court rules upon the motion, including the reasons given by the defense for the requested continuance. *Ungar*, 376 U.S. at 589. First, as noted by the trial court Charters and Early had been retained by White since August 1979, and had therefore had nearly six months

before trial to discover any factual basis for an insanity or intoxication defense and, if viable, find and retain expert witnesses to support it.  Second, the Kentucky Supreme Court correctly noted that the trial court gave Dr. Granacher time to meet with White, and that on February 16, 1980 he provided a psychological evaluation concluding that White was fit to stand trial.  Dr. Granacher indicated that further testing would be helpful.  Even without the general continuance he sought, White had three weeks until the close of his evidence on March 10, 1980, to retain an expert and obtain the testing he sought.  During this period Dr. Evensen examined White, but his assessment was not favorable to his defense.  Third, the trial court and counsel alike believed that Dr. Granacher was an expert who could provide testimony for White; notably, however, White did not call him as a witness.  Other lay witnesses did provide testimony that White had behaved in odd or bizarre ways in the past, leading them to question his sanity.  As for the testimony of Dr. Drew regarding the intoxicating effects of drug use, this testimony was general rather than based upon an examination of White, and lay witnesses and White himself testified regarding his drug use and resulting behaviors.  At no time, either before trial or any time thereafter, has White submitted evidence that Dr. Granacher, Dr. Evensen, or any other qualified expert psychiatric witness concluded that he was criminally insane.

As noted in *Ungar*, a trial court is entitled to considerable discretion in deciding whether to grant a continuance:

> Trial judges necessarily require a great deal of latitude in scheduling trials.  Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons.  Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.

*Morris v. Slappy*, 461 U.S. 1, 11-12 (1983).  Where, as here, the constitutional requirement is a general one of fairness, state courts are entitled to wide latitude in assessing whether that right has been infringed.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("Applying a general standard to a specific case can demand a substantial element of judgment. ... The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").  White having failed to provide credible facts warranting further exploration of the defense, or establish prejudice (before

or after trial) through evidence that more time would have yielded favorable expert testimony, the Kentucky Supreme Court's rejection of this claim was not an unwarranted or unreasonable application of clearly established federal law.

White's reliance upon cases like *United States v. Walker*, 537 F. 2d 1192 (4th Cir. 1976), where the court of appeals held that counsel was not afforded a sufficient opportunity to develop an insanity defense, is misplaced in this habeas proceeding. Casting doubt upon *Walker*'s holding, the Fourth Circuit later explained that "even if the facts of this case were exactly like those of *Walker*, it must be borne in mind that *Walker* involved a direct appeal within the federal system, not a habeas corpus case where we are asked to interfere with a considered state court judgment on the grounds that it was constitutionally defective." *Hutchins v. Garrison*, 724 F. 2d 1425, 1434 (4th Cir. 1983). Noting that "[w]e have located no case where the Supreme Court has overturned a conviction because of refusal to grant a continuance," *id.* at 432, the Court held that the trial court did not act arbitrarily in denying the defendant's motion for a continuance to develop an insanity defense where the defendant had offered no credible evidence that the defendant was insane and had no history of psychiatric disorders. Finally, the Court noted that the petitioner had failed to show prejudice from the denial in the form of evidence to support the defense, instead relying on "post-hoc assertions by counsel that given more time something might have turned up." *Hutchins*, 724 F. 2d at 1434.

**E.   Claim C(2) – The Trial Court's Refusal to Afford White a New and Different Jury after Fisher Turned State's Evidence Did Not Deny Him an Impartial Jury or a Fair Trial.**

*Voir dire* of prospective jurors began on February 11, 1980. After the charges were described, each venireman was individually questioned regarding whether he or she:

- a.   had already formed a firm opinion about the case from pretrial publicity;
- b.   was related to any of the defendants or the victims;
- c.   could believe the testimony of a witness who had been convicted of a felony;
- d.   could return a guilty verdict based solely upon circumstantial evidence;
- e.   understood that the defendant was presumed innocent;
- f.   would draw an adverse inference from a defendant's decision not to testify; and
- g.   could recommend the death penalty under appropriate circumstances.[111]

---

[111]   [Trial at 1-464]

After three days of *voir dire*, eleven of the fourteen members of the jury panel had been selected, and White had used all but one of his peremptory strikes.[112]

The next day, the parties informed the trial court that Fisher had agreed to testify for the Commonwealth. White's counsel then indicated that they intended to pursue an insanity defense, and moved the court to continue the trial and "set aside the present panel of jurors because ... [t]hey have been *voir dire*d ... on the basis of there being no eye witness in this case, and on the basis, frankly, of their non-participation, and now the case has taken a totally different turn ..."[113] The trial court granted counsels' motion to permit a psychology expert to examine White in anticipation of an insanity defense and a competency hearing.[114]

At the conclusion of the two-day competency hearing, the trial court found White competent to proceed to trial. The court then denied White's request for "additional strikes," but permitted him to direct additional *voir dire* about the insanity defense towards the jurors already selected.[115] At the beginning of the re-opened *voir dire*, Charters himself directly *told* the panel of tentatively-qualified jurors that his prior *voir dire* "surely gave you the impression that the defense was that the crimes had not been committed" by White, but that White had changed his plea to not guilty by reason of insanity.[116] Charters having just seeded the idea himself, predictably the first juror indicated that she was given the impression that White claimed he had not committed the crimes.[117]

---

[112] *Id.* at 480, 932. Earlier in the proceedings the trial court indicated that the parties had agreed between themselves that each would be entitled to several additional peremptory strikes above and beyond what was required by Kentucky law: White would be entitled to fifteen peremptory strikes and the prosecution would be entitled to ten. [Trial at 455] The later statement that White was given twelve challenges, *id.* at 932, conflicts with the trial court's earlier statement. Regardless of which statement is correct, under both accounts White had only one peremptory strike remaining when Fisher turned state's evidence.

[113] [Trial at 473]

[114] [Trial at 507]

[115] [Trial at 866-67]

[116] [Trial at 870]

[117] [Trial at 871]

During the course of the re-opened *voir dire*, two members (Smith and Skidmore) expressed significant doubt about the insanity defense in general, and indicated that in a particular case it would be far more persuasive if supported by expert testimony.  Following further discussions with the jurors about the insanity defense, the trial court denied White's motions to strike both members for cause.[118]  White alleges that the trial court would not permit him to exercise his last peremptory strike upon one of the jurors already seated.[119]  [R. 14-1 at 111, 113]  After the jury had been sworn and the prosecution gave its opening statement, White moved for a mistrial, a motion the trial court denied.[120]

---

[118]  [Trial at 872-91]

[119]  This contention is flatly refuted by the record:  neither of White's attorneys ever attempted to exercise his last peremptory strike on any of the jurors that had already been tentatively qualified, nor did the trial court ever suggest, let alone rule, that White could not do so.  At one point, Early – who was not present earlier when Charters participated in the re-*voir dire* of the panel on White's behalf – stated that "[a]s I understood, the Court did not permit the defendant to use any of his remaining strikes."  [Trial at 926]  But a review of the trial transcript establishes that Early's understanding was just wrong:  while Charters had asked the trial court to give him additional peremptory strikes, he never attempted to exercise his last remaining peremptory strike upon a juror, and the trial court did not deny any such request.  See *id*. at 867-91.  Notably, Early did not identify the specific juror that Charters had purportedly attempted to strike, and White has never identified that juror in any proceeding since.  Early was simply incorrect:  the trial court did not deny a defense effort or request to use a peremptory strike upon a juror already tentatively qualified.  Indeed, during collateral review proceedings Early declined White's invitation to say that he had attempted to exercise peremptory challenges in the manner White now contends.  [RCr 11.42 at 546-547]

As the Commonwealth correctly argued on direct appeal [Brief for Appellee (direct appeal) at 65-66], the record contradicts the factual premise for this aspect of White's claim.  In his reply White attempted to rehabilitate the claim by referring to Early's later statement that if "all ten [jurors] on further voir-dire say they don't believe in insanity as a defense ... we'd want to strike every one of them."  [Reply Brief for Appellee (direct appeal) at 30-31]  But Early's statement was not itself an exercise of a peremptory strike.  Indeed, because he articulated grounds for the removal (antagonism to the insanity defense), he was clearly referring to strikes *for cause*.  And at no time did the trial court reject or even comment upon any purported effort to use a *peremptory* strike upon one of the jurors already tentatively qualified.  Finally, a thorough review of the conversation makes plain that Early, the prosecution, and the judge alike referred to "strikes" as not just the use of peremptory strikes but also to challenges of a prospective juror for cause.  See [Trial at 925-927]  This was consistent with the parties' use of the term "strike" throughout the trial to refer to removing a juror for cause, both during *voir dire* and in their agreed statement to the Kentucky Court of Appeals.  *Cf*. [Trial at 22, 35, 52, 144, 933]  Nonetheless, on direct appeal the Kentucky Supreme Court appeared to assume for purposes of discussion that the factual predicate for White's claim was accurate; solely for purposes of discussion, the Court will do so as well.

[120]  [Trial at 1017-1018]

In his petition, White contends that the shift in defense strategy effectively rendered the eleven tentatively-qualified jurors unfit to serve because during the original *voir dire* they had been asked questions based upon his previously planned defense (that he did not commit the crimes) instead of his new defense (that he committed the crimes while criminally insane). Thus, he argues, the trial court's denial of his motions for a mistrial, to conduct additional *voir dire*, and to exercise his last peremptory challenge upon a previously-qualified juror denied him an impartial jury and a fair trial.[121]  [R. 14-1 at 111-118]

> The Kentucky Supreme Court addressed this claim on direct appeal as follows:
>
> The change of theory of the defense precipitated another spate of arguments, White moved for a mistrial, the right to exercise peremptory challenges on the eleven jurors accepted prior to the change of defense to not guilty by reason of insanity. The trial court did permit further *voir dire* of those jurors already accepted on the insanity defense and entertained motions to strike for cause on these jurors. White also made a request for additional peremptory challenges. The trial court had already granted four additional peremptories over and above the eight mandated by RCr 9.40, and there was no abuse of discretion in declining to grant additional peremptories.
>
> We are of the opinion the trial court properly denied all of these motions. White argues that the change of defense necessitated either a mistrial or peremptories on those jurors already seated for the reason they had been qualified for an alibi defense. White misses the point. These eleven jurors had been qualified to try the case on the evidence before them, free of prejudice or bias. This is all White was entitled to, no more.
>
> The trial court properly allowed additional *voir dire* on the insanity defense to see if any of the jurors should be excused for cause. ... White's argument to the contrary, all of the jurors stated they could follow the law on the insanity defense. There is no error.

*White*, 671 S.W.2d at 244-45.

Because the Kentucky Supreme Court considered White's claim and rejected it on its merits, to be entitled to federal habeas relief White must show that its decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" Supreme

---

[121]  The Court will address White's separate claim that the trial judge should have removed certain jurors for cause [R. 14-1 at 118-122] later in its opinion.

Court precedent only if the state court reaches the *opposite* legal conclusion from one reached by the Supreme Court in an earlier case, or arrives at a different outcome when the case presents a "set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., opinion of the Court for Part II). White does not argue or suggest that he can meet this standard, and points to no pre-1984 decision of the United States Supreme Court addressing the same type of claim under functionally-identical facts.

Alternatively, a state court's decision will constitute an "unreasonable application" of Supreme Court precedent only if the issue presented is so one-sided that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. *Harrington*, 562 U.S. at 103 ("the state court's ruling on the claim being presented in federal court [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."). Here, in support of his claim White musters only citations to Supreme Court decisions articulating the right to a fair trial and to an impartial jury at the highest level of generality. *Cf.* [R. 14-1 at 106 (citing *In re: Murchison*, 349 U.S. 133, 136 (1955) (fair trial); *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) (impartial jury)] As previously noted, in such situations state courts are entitled to "more leeway [] in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The Supreme Court has explained that:

> *Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.

*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (citations omitted). However, the Supreme Court has emphasized that judges are "accorded ample discretion in determining how best to conduct the *voir dire*." *Id.* at 189; *Hodges v. Colson*, 727 F. 3d 517, 528 (6th Cir. 2013).

In his petition White contends that the trial judge improperly denied him further *voir dire* and denied his motion for a mistrial on that ground. But the trial court *did* conduct additional *voir dire* on the insanity defense, the very topic that defense counsel indicated he wished to explore

further following the change in defense.[122]   In the original *voir dire*, prospective jurors were questioned individually[123]; in the re-*voir dire* of the tentatively qualified panel, the members were assembled as a group, with some members addressed individually.  When the panel as a group was asked certain questions about the insanity defense, two members expressed opinions or reservations about the defense, the others did not.  The two individual members were spoken to by the court and the parties to expand upon and clarify their comments.[124]  While White contends that he should have been given yet more *voir dire*, he does not explain how it would have differed in measure or kind from the additional *voir dire* that was conducted, or demonstrate that he was prejudiced by the absence of more questions along the same line of inquiry.  Only two members of the assembled panel expressed doubts about the insanity defense, and they were questioned about whether they could sustain the defense if provided adequate proof in support of it.  None of the other panel members expressed such doubts.  In the absence of a more plain indication that the Kentucky Supreme Court's conclusion that the *voir dire* was adequate ran afoul of clear Supreme Court precedent indicating otherwise, White fails to demonstrate his entitlement to federal habeas relief. *White v. Woodall*, 572 U.S. 415, 426-27 (2014) ("... relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question.").

White also contends that the trial court improperly refused to allow use him to use his last peremptory strike upon one of the tentatively-qualified jurors.  As noted above, there is no evidence that this is so, and White has failed (or refused) to identify *which* juror he would have struck had he been permitted to do so.[125]  Even accepting as fact that White was prevented from using his final

---

[122]   [Trial at 866-867]

[123]   The trial transcript indicates that members of the venire were brought into the court room one-by-one for *voir dire*. *See* [Trial at 9 ("Ladies and Gentlemen, we are going to select the jury differently in this case than usual.  We will call you in one at a time.  All of you go out back into the grand jury room and we will call you in one at a time.")]  It appears that panel members who were excused left the court room, while tentatively-qualified members remained in the court room during the questioning of subsequent panel members. *See* [Trial at 89]

[124]   [Trial at 870-922]

[125]   White suggests, with the benefit of hindsight, that he would have "for example" struck juror Smith. [R. 14-1 at 115]  Of course, if he had done so then White would have at that point exhausted all of his peremptory

74

strike upon a tentatively-qualified juror, without a clear record indicating which prospective juror remained seated on the panel as a result, it is not possible for White to establish that the resulting jury actually empaneled and sworn was partial or that he was denied a fair trial.

Peremptory challenges are considered "one means of assuring the selection of a qualified and unbiased jury." *Batson v. Kentucky*, 476 U.S. 79, 91 (1986). But the Constitution does not guaranty the right to exercise peremptory challenges; instead, they are creatures wholly created and governed by state law. *Rivera v. Illinois*, 556 U.S. 148, 152 (2009). Accordingly, even "the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution." *Id.* at 157-58 (citing *Engle v. Isaac*, 456 U.S. 107, 121, n.21 (1982)). White points to no Supreme Court decision indicating that he was denied his constitutional rights by the trial court's assertedly-erroneous refusal to exercise a peremptory strike upon the juror of his choosing. Indeed the Supreme Court's decisions suggest that such a claim is not viable absent an independent demonstration that the jury, as constituted, was biased. Cf. *United States v. Martinez–Salazar*, 528 U.S. 304, 311 (2000) (defendant's statutory right to peremptory challenges was not impaired merely because he had to use it to rectify trial court's improper failure to exercise prospective juror for cause); *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988). Having failed to argue, let alone demonstrate, that this is so, the Kentucky Supreme Court's conclusion that White's claim in this regard is without merit did not contravene or unreasonably apply clearly established Supreme Court precedent.

**F.    Claim C(3) – The Trial Court's Rejection of Motions to Excuse Several Jurors for Cause Did Not Deny White a Fair Trial.**

Once White changed his plea to not guilty by reason of insanity, the trial court permitted additional *voir dire* of the jurors already tentatively qualified regarding the defense.[126] The purpose

---

strikes, leaving juror Skidmore on the jury, about whom he expressed the very same reservations. It also would have prevented White from using his final peremptory strike on prospective juror Gary Bowen, whom he also claims "expressed reservations about the insanity defense." [R. 14-1 at 112; Trial at 913-916, 943] It is therefore plain that even if White had used his last peremptory strike in the manner he now claims to have wished, it would not have made a difference, merely swapping one juror that White claims was antagonistic to his defense for another. As a result, White cannot demonstrate any prejudice to his right to a fair trial from his alleged inability to exercise his last peremptory strike in this fashion; instead, such prejudice could only have flowed, if at all, from the denial of his motions to strike for cause. The Court discusses that claim in the next section.

[126]  [Trial at 850-53]

of the re-*voir dire* was to question the tentatively-qualified jurors regarding their willingness to consider the insanity defense; the defense also used its questioning to support its contention that a second continuance of the trial was needed to obtain additional psychological testing in furtherance of its defense.[127]   Indeed, co-counsel Early was not present at the re-*voir dire* because he was drafting a writ of prohibition to prevent the trial from going forward.[128]   All of the jurors were present during this questioning.[129]

The first juror, Helen Crest, indicated that she could be objective about the insanity defense, and would be able to "seriously consider" the defense even if no psychiatrist testified in support of it.   She later stated that she would be more receptive to an insanity defense if an expert testified in support of it, and "would wonder" about it if an expert had not.   At that point White moved to excuse her for cause, a motion the trial court overruled.   In response to further questioning from the prosecution, Ms. Crest stated that she could listen to all of the evidence presented and return a verdict based on that evidence alone.[130]

The second juror, John McKinney, responded to defense counsel's first question by stating that he would rather have testimony from an expert to support a defendant's claim that he was insane at the time of the offenses.   White promptly moved to excuse him for cause, which the trial court denied.  At this point, the prosecution collectively asked the entire group of jurors if they could find a defendant not guilty by reason of insanity based upon all of the evidence even though no expert witness had testified in support of the defense.   In response Morgan Skidmore, the third juror at issue, stated that he would want "at least one doctor" – someone who "knows something about it more than I do" – to testify that the defendant was insane.   White moved to excuse Skidmore for cause.   The trial court stated to Charters that "[y]ou don't have to introduce medical testimony here

---

[127]   [Trial at 866-67, 873-74]

[128]   [Trial at 867]

[129]   [Trial at 868]

[130]   [Trial at 871-875]

unless you want to, we can't make you do it," but did not rule upon the motion before the parties recessed to chambers for a conference.[131]

After the parties were back on the record and before the panel, Charters asked the group whether any of them did not "believe in" the insanity defense. The fourth juror at issue, Elmo Smith, responded that he did not believe in it "at all," but also stated that he would adhere to the law if he could be convinced that the defendant was not sane. Smith's other answers, viewed collectively, appeared equivocal. On the one hand, he indicated that he would follow the law. On the other, in response to an ambiguous question asking him whether he "could be objective in this case or whether that feeling is so strong that you think you would be prejudice from the start?", Smith responded "Yes, I would be[,]" an answer not clearly indicating whether he "would be" objective or "would be" prejudiced. During further questioning, Smith's answers repeatedly indicated that he was not categorically opposed to the defense of insanity, but that the evidence showing that the defendant was not sane would have to be very strong to convince him of its application. Charters renewed his motion to excuse Smith for cause, which the trial court overruled.[132]

Charters then addressed the panel again and asked if any other jurors "hav[e] a problem" with the insanity defense. Skidmore responded that he "fe[lt] the same way" as Smith about the defense, stating that it was "abused" or "kicked around too much." In terms similar to those used by Smith, Skidmore explained that "it would just be a harder job" to convince him that the insanity defense applied, but that if he were "convinced" it applied then he would sustain the defense. Charters moved to excuse Skidmore for cause, and the trial court overruled the motion.[133]

Having concluded its re-*voir dire* of the tentatively-qualified jurors, the parties returned to *voir dire* of prospective jurors to fill the remaining spots. During the *voir dire* of prospective juror Gary Bowen, when asked about the insanity defense Bowen stated that "I'd have to turn him loose if he

---

[131] [Trial at 876-878]

[132] [Trial at 880-889]

[133] [Trial at 889-894]

was crazy," and otherwise did not express antagonism towards the defense.[134]  After Bowen stated that he would not object to an insanity plea, Charters concluded by stating that only Bowen could tell the court and the parties, under oath, that he would follow the directions from the court.  White did not move to excuse Bowen for cause, and the trial court tentatively qualified him as a juror. After several more prospective jurors were questioned, White later exercised his last peremptory strike to remove Bowen from the jury panel.[135]

In his petition White contends, as he did on direct appeal, that the trial court's denial of his motions to excuse each of these jurors for cause violated his right to a fair trial and an impartial jury. [R. 14-1 at 118-122]  The Kentucky Supreme Court rejected this claim, holding:

> The trial court properly allowed additional *voir dire* on the insanity defense to see if any of the jurors should be excused for cause.  In questions to the jurors, the trial court asked if the jurors believed from the evidence that White was insane would they be willing to "turn him loose"? ... The jurors all answered that they would be willing to do so.  White was receiving as much or more than he was entitled to in this respect. ... White's argument to the contrary, all of the jurors stated they could follow the law on the insanity defense. There is no error.

*White*, 671 S.W.2d at 245.

At the outset, the Court rejects White's claim with respect to prospective juror Bowen because, as mentioned above, Charters never moved – expressly or impliedly – to remove Bowen for cause.  Therefore as a factual matter the trial court did not effectively force White to use a peremptory strike to remove him from the jury.  In any event, White errs when he relies upon *United States v. Nell*, 526 F. 2d 1223, 1229 (5th Cir. 1976) for the proposition that "it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges."  The Supreme Court has squarely rejected this notion: "if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."  *Martinez–Salazar*, 528 U.S. at 307.  Bowen did

---

[134]  White contends that two answers given by Bowen suggest otherwise, see [Trial at 915], but the questions asked by Charters were imprecise, rendering Bowen's answers to them ambiguous.

[135]  [Trial at 913-916, 943]

not sit on the jury, and White therefore cannot show resulting bias on the panel, nor did Bowen's responses during *voir dire* indicate bias against the insanity defense in any event.[136] The Kentucky Supreme Court did not unreasonably apply clearly-established law in its determination.

The Kentucky Supreme Court also did not unreasonably apply clear precedent from the United States Supreme Court when it determined that White had failed to establish that the jury was biased. Both jurors Crest and McKinney indicated, unexceptionally, that testimony from a professional would be of heightened value in assessing the strength and validity of White's insanity defense, but both affirmed that they would consider all of the evidence. Jurors Skidmore and Smith expressed stronger doubts, but both indicated that they felt that while proving insanity might be harder for a defendant than other matters, they would vote not guilty upon that ground if the evidence were there to support it. As the Supreme Court has explained, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict on the evidence in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (holding that if the juror "[swore] that he could set aside any opinion he might hold and decide the case on the evidence," if a juror's impartiality is questioned the trial court's role is to determine whether "the juror's protestation of impartiality [should be] believed."). Here, Judge Graham found the jurors' statements that they could set aside their concerns and follow the law to be credible and honest. The Kentucky Supreme Court did not unreasonably apply federal law when it concluded that White had failed to establish adequate grounds to disturb that assessment.

Habeas relief is also not warranted because White does not cite to any then-decided Supreme Court case which should have clearly indicated to the Kentucky Supreme Court in 1984 that the statements of the prospective jurors were disqualifying. See *Jackson v. Houk*, 687 F. 3d 723, 737-38 (6th Cir. 2012) (denying habeas relief based upon petitioner's challenge to *voir dire* given lack of Supreme Court precedent governing the issue). Instead, he again cites only to decisions which speak broadly of the right to an unbiased jury. *Dennis v. United States*, 339 U.S. 162, 168 (1950) ("[T]he trial court has a serious duty to determine the question of actual bias."). The need for deference

---

[136] [Trial at 913-916]

under § 2254(d) is especially strong in this context.  Indeed, the Supreme Court has admonished that:

> Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review.  The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial.  Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions.  In neither instance can an appellate court easily second-guess the conclusions of the decision-maker who heard and observed the witnesses.

*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *Patton*, 467 U.S. at 1038 (holding that because the assessment of a juror's impartiality is "essentially one of credibility, and therefore largely one of demeanor. ... the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'").  Accordingly, and especially during federal habeas review, "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."  *Uttecht v. Brown*, 551 U.S. 1, 9 (2007); see also *Darden v. Wainwright*, 477 U.S. 168, 178 (1986).  This claim must therefore be denied because White has not provided adequate grounds under § 2254(d) to disturb the Kentucky Supreme Court's decision with respect to it.

## G.    Claim C(4) – Comments Made by the Trial Judge During the Case Did Not Violate White's Constitutional Rights.

In his petition White includes an extensive list of twenty statements and comments made by the trial judge over the entire course of the case.  White asserts – often without explanation – that the utterances were not an accurate or complete statement of the law, were improper, or expressed frustration with defense counsel.  White claims that these statements rendered his trial unfair, and that his counsel's failure to object to one of them constituted ineffective assistance of counsel. [R. 14-1 at 123-129]

White complaints are based upon all of the following statements by the trial judge:

a.   when Early asked prospective juror Rowe Moore during *voir dire* whether a person "may" be guilty simply because he has been arrested, after a pause the judge stated that the term "may" was overbroad, and asked counsel to rephrase: "Well, you could ask if that indicated to him that he was necessarily guilty or was he in fact guilty, not if he may be

guilty.  The word may covers too much territory."  Early simply moved on.  Moore did not sit on the jury.[137]

b.  the judge questioned prospective juror Tracy Tipton during *voir dire* as follows: "We've just been told that this man is going to enter a plea of not guilty by reason of insanity.  Do you know of any reason why you could not consider the evidence and instructions of the Court and try this case according to the evidence and instructions of the Court?"  Tipton did not sit on the jury.[138]

c.  during further questioning of Tipton, the judge interjected a statement:

Q.  What you read or heard about the case, you did not form an opinion as to the guilt or innocence of Mr. White, is that correct?

A.  Yeah.

THE COURT:  The only question here now is insanity, isn't it?  There's no use to go into all that other stuff.

MR. CHARTERS:  There's still the question of the death penalty, Your Honor.

THE COURT:  Well, yes, you can ask him on that, yes.

Tipton did not sit on the jury.[139]

d.  when prospective juror Oliver Barnett did not promptly respond to a question whether he could find White not guilty by reason of insanity if the evidence so indicated, the judge asked him "Otherwise ... you see, you will have to convict this man unless you believe he is insane.  Do you understand that?"  Barnett did not sit on the jury.[140]

---

[137]  [Trial at 349, 949]  Throughout this claim, White asserts that the statements or questions about which he complains were made in front of the entire jury panel.  This is not entirely correct because, as indicated in note 123, such statements or questions were made in front of the member of the venire subject to *voir dire* as well as only those members who had already been tentatively qualified to the panel.

[138]  [Trial at 894-95, 949]

[139]  [Trial at 895, 949]

[140]  [Trial at 906, 949]  In his petition White asserts that the trial judge "volunteered" this statement.  [R. 14-1 at 123]  The judge's question was not "volunteered," it was intended to prompt an answer from a venireman who had not responded to the prosecution's question.

e.  during *voir dire* of prospective juror Paul Napier, the judge explained that White had pled not guilty by reason of insanity, and stated that "[i]t will probably be admitted that he did it."[141]  Napier did not sit on the jury.[142]

f.  during the *voir dire* of prospective juror Ira Francis, White asserts that the judge's statement during the following exchange was inaccurate:

> Q.  Mr. Francis, do you understand that nothing which is said by myself or by the prosecutor, Mr. Bryant, may be construed as evidence?
>
> THE COURT:  I think I would have to qualify that.  Nothing unless you are quoting from evidence. If you're quoting something somebody else said, that might be evidence.
>
> Q.  In terms of arguments, Mr. Bryant and I will summarize the evidence, but what we say ourselves is not evidence, that can come only from the stand. Do you understand that?
>
> A.  Yes.

Francis sat on the jury.[143]

g.  During the *voir dire* of prospective jurors Clay Daniels and Paul Napier the trial judge referred to the burdens associated with jury duty upon the juror, relatives, and employers as "punishment."  Neither or these men sat on the jury.[144]

h.  During *voir dire*, prospective juror Gary Bowen indicated that he had "heard this [case] discussed" previously.  The judge, cognizant of the fact that White no longer contended that he was not involved in the crimes, indicated that Bowen's involvement in pretrial discussion about the case might not necessarily be prohibitive:

> THE COURT:  I don't think that would necessarily be an issue here.  As I understand it, the only ... The people that you worked with, were they especially interested in this case?

---

[141]  Charters had previously indicated as much to the eleven jurors already tentatively qualified.  [Trial at 870 ("... the evidence in the case will now show that to some degree or other, the three defendants who were arraigned on this case were also involved in the commission of those crimes."), 871]

[142]  [Trial at 917, 949]

[143]  [Trial at 363, 949]

[144]  [Trial at 911, 917, 949]

A. At work last night they talked about it.

THE COURT:  Now, the fact that they talked about it, I don't think it would be material much in this particular trial.  It might be in most trials but not in this one.  Would that create any feeling on your part?

A. One of the guys said ...

MR. BRYANT: Excuse me, I would request Your Honor to ask him not to tell what he said.

THE COURT:  If you have any feelings, that's what I want to know.

A. No. But he was a good friend of mine and what he had to say would have a bearing on what I felt about it.

THE COURT:  Well, that might be on whether he did it or didn't do it.  If you believed this man was insane, even though he did it, could you turn him loose?

A. I'd have to turn him loose if he was crazy.

White suggests without explanation that the judge's statement regarding pretrial publicity was improper.  Bowen did not sit on the jury.[145]

i.  White contends that during the trial the judge "pressured" Early to stipulate to the chain of custody of certain items based upon the following exchange:

Q. Now, Drew Strong previously introduced for identification this pen marked as Commonwealth's Exhibit No. 13 for identification only, tell the jury if that is the pen you found?

A. Yes, sir.

Q. Is it in the same general condition as when you received it?

A. Yes, sir.

Q. Has it been in your possession and under your control since that time?

A. Yes, sir.

---

[145] [Trial at 914-15, 949]

MR. BRYANT:  We move its introduction.

MR. EARLY:  Objection.

THE COURT:  Overruled.

MR. BRYANT:  That is Commonwealth's Exhibit No. 13 as evidence.

MR. EARLY:  Show my objection.

MR. BRYANT:  I had hesitated to put this in the record, but the time has come that I must.  I had an understanding with defense counsel that the chain of evidence would be waived and the items could be introduced.  I talked with Mr. Charters about this.  He is not in the Courtroom.

THE COURT:  It would save a lot of time if you could agree.

MR. BRYANT:   Well, we've already agreed, but he's backed up, so I will go on around.[146]

j.  White characterizes the trial judge's statements to defense counsel during four different exchanges as "caustic."  The first involved a ruling on a defense objection:

OBJECTION: BY MR. EARLY:  To leading.

THE COURT:  Objection overruled.  You can ask leading questions in this situation where he is coming back on your cross examination.

MR. EARLY:  Somebody tell me what rule says that.  We have a man here asking leading questions.

THE COURT:  Well, you opened it up and he has the right to ask the questions.

MR. EARLY:  You're doggone right I opened it up.

THE COURT:  Well I'm making the ruling here and I'm ruling against you.  You may ask him any question on anything he brought up.

MR. EARLY Show my objection.[147]

---

[146]  [Trial at 1309-10]

[147]  [Trial at 1326]

The second involved the introduction of physical evidence:

> MR. ROSE:  We move the introduction of five of these jars, all except the lollipop jar.

> MR. EARLY:  Could I ask the Commonwealth to state its purpose in introducing these jars.  It is not evidence of this crime.

> THE COURT:  The jury will decide that, not you. Are these in the same condition as they were when you took charge of them?

> A.  Yes.

> THE COURT:  Let them be introduced.[148]

The third arose during the questioning of detective Frank Fleming, when Early asked:

Q.  Detective, I understand you never got a murder case before where robbery was the motive, is that right?

A.  No, sir, not that I recall.

Q.  You didn't work on a coal miner case where a man was robbed?

A.  No, sir, my brother did.

Q.  This is the only one you ever worked on?

A.  That I can recall right off, yes, sir.

Q.  You have had fifty murder cases, and this is the only one that had robbery involved?

> THE COURT:  Now, you've asked him that three times.  Let's not ask the same question over and over.  I think the jury understands that he says this is the only one that has had robbery involved.  Don't ask the same question over and over.

> MR. EARLY:  I don't mean to, Your Honor.[149]

The fourth came after several witnesses gave extensive testimony about the crime scene and the physical condition of the victims.  The prosecution then called a pathologist who

---

[148]  [Trial at 1349]

[149]  [Trial at 1339-1340]

testified to the victim's injuries and the cause of death. When Early offered to stipulate to the cause of death, the trial judge stated that "[i]t is a little late for that."[150]

k.  After White was found guilty, the judge stated to the jury that its next task was to decide "whether or not this man will receive a life sentence or whether or not he will receive the electric chair. You will make your recommendation on that, which one you think he should have. As I understand the law, you will hear proof on that, and you don't set the penalty, you recommend to me and I am the one that does that."[151] White contends that the first statement did not accurately reflect the range of punishments he faced and that the second and third statements "shift[ed] responsibility for the verdict from the jurors."

l.  After the two-day competency hearing concluded, the trial judge held that there was no credible evidence that White was not competent and ruled that he was fit to stand trial. In chambers, Charters then repeated his request that an entirely-new jury be empaneled, and explained that co-counsel Early was drafting a petition asking the Kentucky Court of Appeals to prohibit the case from proceeding to trial. White contends that the judge expressed hostility towards defense counsel when he replied that "[w]e have got no where on this case because we've had to fool around here with this type of hearing which [in] my opinion had nothing to do with the case. ... I understand Mr. Early wants to do everything he can do to stop every trial he is in, not only in my Court but in every other Court."[152]

m.  During the trial it became apparent that witness Cecil White was intoxicated while giving testimony from the witness stand.[153] After Cecil was temporarily excused and then recalled for cross-examination, Early stated that he would not question an intoxicated witness. Protesting a suggestion that Cecil be tested for alcohol intoxication, Early stated that "[t]he guy is on drugs. The breathalyzer won't do a bit of good." The breathalyzer test was conducted and detected a blood alcohol level of 0.08%. The witness was recalled a few hours later, and testified before the jury that he was intoxicated by alcohol, and that he had also smoked "a couple of joints" in the last few hours. The following exchange then transpired:

> MR. EARLY: Your Honor, this breathalyzer didn't measure intoxication on pot. If he is .08 on alcohol, I suggest ...

---

[150]  [Trial at 1408-10]

[151]  [Trial at 2118]

[152]  [Trial at 864-873]

[153]  [Trial at 1175-1180]

> THE COURT:  Mr. Early, you are the authority on pot, we could have you sworn if you want to testify.
>
> MR. EARLY:  I am not, but I would like to bring witnesses around who can do that.
>
> THE COURT:  Stand aside, Mr. White, and let Mr. Early bring around an expert witness.[154]

n.  During the re-*voir dire*, the eleven tentatively-qualified jurors were asked if they could find White not guilty by reason of insanity if the evidence convinced them that he was not sane when he committed the crimes.  Juror Skidmore responded that "I would like a doctor to say so, myself."  The judge stated: "I doubt if you understood the question, Mr. Skidmore.  That is, if you really believed he was insane."  Skidmore again indicated that he would want testimony from "somebody that know something about it more than I do."  The following exchange transpired:

> MR. CHARTERS:  We challenge him for cause.
>
> THE COURT:  You don't have to introduce medical testimony here unless you want to, we can't make you do it.
>
> MR. CHARTERS:  We want to.
>
> MR. BRYANT:  We have no control over it
>
> CHARTERS:  The Court has control over what we introduce.
>
> THE COURT:  I can't require you to do it.
>
> MR. CHARTERS:  We're asking you to allow us to do it.[155]

o.  During the re-*voir dire*, after juror Smith expressed skepticism about the insanity defense generally, the judge and the parties questioned him further.  White contends that the judge's efforts during the following exchange were an improper effort to "rehabilitate" the juror and did not accurately state the law:

> THE COURT:  Mr. Smith, if you were convinced that a man is actually insane and the law is that if a man is actually insane and doesn't know the consequences of his act, doesn't know what he's doing, then he can't commit a crime.  Could you go by the law on that?

---

[154]  [Trial at 1203-1206]

[155]  [Trial at 877-878]

A.  If you can prove to me he was.

THE COURT:  Yes, they have got to prove it to you. Then if they prove it to you that he's insane and doesn't know what he's doing, then you wouldn't find him guilty, would you?

A.  If they proved he didn't know what he was doing.

THE COURT:  That's exactly what we're talking about.[156]

p.  During the *voir dire*, on several occasions the trial court colloquially referred to returning a verdict of not guilty by reason of insanity as "turning him loose."  For instance, during the re-*voir dire* of tentative juror Skidmore, the judge asked:

THE COURT:  Mr. Skidmore, if after hearing this evidence, if you were convinced that this man was insane at the time of this killing, the instructions of the Court will tell you that if you are convinced, you will have to turn him loose, could you do that?

The judge also used that phrase in questions posed to prospective jurors Tipton, McCoy, Johnson, Barnett, Daniels, Bowen, Napier, "Sam,"[157] and Delbert Wireman.  Of these persons, Skidmore and McCoy sat on the jury, the other eight did not.[158]

q.  White contends that "the trial court rejected Petitioner's [insanity] defense before it had even been presented."  But immediately after White changed his plea to not guilty by reason of insanity, his counsel had requested that the judge "ask questions of Mr. White strictly for the purpose of determining whether or not he is now *or at the time* operating under a mental disease or defect ..."  After two days of behavioral and psychological testimony at the competency hearing, in his closing summary Charters confirmed that one of the purposes for requesting the hearing was for the judge to decide the question of White's mental state at the time of the offenses.  The prosecution likewise expressed that understanding.  Consistent with that expectation the judge issued his ruling, concluding that White "was sane and knew what he was doing and the consequences of his acts at the time of the murders."  Defense counsel did not object or express surprise that the judge had issued a ruling on the question.[159]

---

[156]  [Trial at 880-881]

[157]  The trial transcript on page 918 is partially obscured and shows only the first three letters of the prospective juror's first name.

[158]  [Trial at 890, 897-898, 900, 904-905, 911-912, 914-915, 917-920, 945]

[159]  [Trial at 477, 849-850, 860, 863-864; RCr 11.42 at 925]  Charter's closing argument summary made clear that the ruling was never intended to be dispositive on the issue of White's sanity, a determination plainly

r. White separately contends that the judge's periodically-abbreviated explanation of the insanity defense – that the defendant "doesn't know what he's doing" – expressed skepticism of the defense to the jury. The two instances about which he complains were made individually before prospective jurors Bowen and Delbert Wireman, neither of whom sat on the jury.[160] White omits any reference to the occasions where the trial judge's explanation was more thorough.[161]

s. Over the course of the trial, the judge made several hundred rulings from the bench upon objections made by counsel to questions posed to witnesses. Focusing upon two pairs of these rulings, White argues that the judge employed a double standard, twice sustaining an objection made by the prosecution while overruling a defense objection under what he contends are similar circumstances.

First, the judge sustained a prosecution objection and told Charters not to "make speeches" because Charters had complained to witness Fisher that his memory seemed clear on some facts but uncertain on others.[162] However, the judge overruled a defense objection when the prosecution, dissatisfied with the answer given by witness Louise Evans, told her that she was "smarter than that."[163] On the other hand, the judge had previously sustained a defense objection in similar circumstances when the prosecutor told a witness that "I noticed for Mr. Early your memory was considerably better than when I asked you."[164]

Second, the judge sustained a prosecution objection when defense counsel veered too close to soliciting expert psychological testimony from Kitty Neace, White's grandmother, when he asked her if it "caused him any emotional problem" when White witnessed his father's murder. The judge did permit Neace to testify at length about his behavior after the murder.[165] On the other hand, after Nancy Bowling, White's mother,

---

reserved for the jury. Rather, defense sought the judge's ruling in furtherance of its request to delay the trial so that additional psychological evaluations of White could be obtained. Indeed, immediately after the judge issued his ruling, Charters asked the judge to confirm that he would not grant any further continuances, which he did. [Trial at 850, 853-854, 864]

[160] [Trial at 914, 920, 945]

[161] *Cf.* [Trial at 905, 918]

[162] [Trial at 1487-1488]

[163] [Trial at 1703-1704]

[164] [Trial at 1140]

[165] [Trial at 1615-20]

was permitted to testify regarding her perception of White's mental health and then-present need for psychological care, the trial judge later overruled a defense objection to the prosecution's *cross-examination* when the prosecutor asked whether White recognized her when she visited him in jail, stating "You offered this witness as an expert witness on mental capacity, and she is on cross examination."[166]   Similarly, on direct examination by the defense the judge permitted White's half-sister Louise Evans to testify that White was "affected" by witnessing his father's murder and to offer her opinion on his mental health; on cross-examination the judge overruled a defense objection to general psychological questions, stating that the defense had introduced Evans as an "expert."[167]

t.   Once the jury was prepared for deliberations at the conclusion of the guilt phase, the trial judge stated:

> THE COURT:  Okay, now Dale and I have to go to a meeting at Jackson, supposed to be there thirty minutes from now.  We will go and come back.  We should be back here by nine, or something like that.  Now, if I let you go and deliberate on that now, you can go to this room back here and stay there and talk about it and we'll have the sheriff go out and bring you in sandwiches or whatever you want to eat.  Maybe by the time we come back you might have a verdict.  If you don't, we may have to hold you another night.[168]

> White contends those statements improperly "insinuat[ed] closeness between judge and prosecutor" and coerced the jury to expedite its deliberations.[169]

With minor exceptions, White raised these objections on direct appeal.  The Kentucky Supreme Court rejected this claim, and specifically addressed his contention regarding the trial court's use of the phrase "turn him loose":

> The trial court properly allowed additional *voir dire* on the insanity defense to see if any of the jurors should be excused for cause.  In questions to the jurors, the trial court asked if the jurors believed from the evidence that White was insane would they be willing to "turn him loose"?  White states that numerous objections were made to these questions, but a search of the record does not reveal any objections.  Why should there be?  This line of questioning did not appear to disturb any of the participants.  This expression is clearly, from a reading of the entire *voir dire*, a

---

[166]  [Trial at 1541-43, 1595]

[167]  [Trial at 1692, 1696, 1704-1706]

[168]  [Trial at 2114-2115]

[169]  During closing argument defense counsel Early had already stated that he himself was friends with both the judge and the prosecutor outside the courtroom.  [Trial at 2074]

colloquialism for "not guilty."  The jurors all answered that they would be willing to do so.  White was receiving as much or more than he was entitled to in this respect.  At one point White's lawyer requested the trial court to use another phrase, and the Commonwealth's attorney requested the trial judge to define the term for the jury.  All in all, we cannot see that White has any complaint in this respect.  White's argument to the contrary, all of the jurors stated they could follow the law on the insanity defense.  There is no error.

*White*, 671 S.W.2d at 245.  During collateral review proceedings, White asserted that his counsel was ineffective for not objecting to every iteration of that phrase.  The Kentucky Supreme Court rejected that claim, holding that:

> The propriety of the comments by the trial judge was considered in the direct appeal and is not an issue that can be raised again in an RCr 11.42 motion.  *Sanborn*.  The allegation that the "turn him loose" comment created a prejudicial atmosphere was expressly rejected by this Court in the direct appeal.

*White*, 1994-SC-0326-MR at 10.

White's petition clearly registers dissatisfaction with the judge's comments in each of the twenty items set forth above, but he only meaningfully articulates an argument with respect to six of them.[170]  First, White suggests that he was denied a fair trial because the trial judge made comments "which stated or assumed petitioner's guilt."  [R. 14-1 at 126, ¶16-17]  White fails to identify the comments to which he is referring, but those in item (a) above seem to fit the bill.  During *voir dire*, the trial judge told Early that he could ask a prospective juror whether the mere fact that the defendant had been arrested indicated to him that the defendant was "necessarily" guilty, not whether it meant that the defendant "may" be guilty.  The venireman did not sit on the jury.[171]

---

[170] White does not indicate in his petition that he seeks review of each and every one of the twenty matters of concern he identifies.  As noted above, in most instances White makes no effort at all to explain his claim that the judge's comments were improper or an inaccurate statement of the law, and offers argument only in support of the six sub-claims identified in the argument section of his petition.  The Court will therefore limit its discussion to the matters actually argued.  If White did intend for all twenty matters to be reviewed, the fourteen undiscussed sub-claims have been forfeited for failure to make any developed argument in support of them before this Court.  Cf. *Johnson v. Williams*, 560 U.S. 289, 299 (2013) ("Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development.").

[171] [Trial at 349, 949]

91

The Kentucky Supreme Court's rejection of this sub-claim was not an unreasonable application of federal law.  As a factual matter, the judge's statement in no way assumed White's guilt or suggested bias, and petitioner has offered no explanation for his novel assessment otherwise. Legally, White references three Supreme Court decisions which he contends support his vague claim, but none assist his cause.  In the first, the Supreme Court held that a judge may express his opinion on the facts to the jury, but in doing so must not act as a witness, distort the evidence, usurp the jury's role or express hostility towards either side.  *Quercia v. United States*, 289 U.S. 466, 470-71 (1933).  *Quercia* has no bearing here because the judge's statement in this case was not partial and was not made in front of the entire jury and many of the venireman did not sit on the panel.  The second and third cases, *Bloom v. Illinois*, 391 U.S. 194, 205 (1968) and *Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66 (1971), merely reiterate the well-established and broad rule that a criminal defendant is entitled to a public trial before an unbiased judge.  Especially given the general nature of these holdings and the fact that they arose in contexts different than those present here, White has failed to point to clearly-established Supreme Court precedent that dictated an outcome other than the one reached by the Kentucky Supreme Court.  *Yarborough*, 541 U.S. at 664.

Second, White complains that during *voir dire* the judge asked several potential jurors whether they could "turn him loose" if they concluded from the evidence that White was not sane. As noted in item (p) above, this phrase was used in front of ten potential jurors, only two of whom were selected to sit on the panel.  White contends that the judge's question (1) mis-stated the law; (2) suggested that White was trying to trick the jury; and (3) improperly commented on the consequences of a not guilty verdict.  He also argues that his counsel were ineffective because they did not object more aggressively to the judge's repeated use of the phrase.  [R. 14-1 at 126-128, ¶18-22]

This sub-claim is wholly without merit.  As to the first ground, White has made no effort to explain the legal basis for his implicit assertion that a not guilty verdict would *not* have resulted in his release from pretrial detention based upon the criminal charges against him.[172]  Indeed, a

---

[172] White did provide an explanation for this argument to the Kentucky Supreme Court, but he never asserted it in his petition before this Court.  On direct appeal, White argued that the phrase "turn him loose" did not accurately state the consequences of a verdict of not guilty by reason of insanity because Kentucky law *authorized* the trial court and the prosecutor to initiate civil commitment proceedings following such a verdict. [Brief of Appellant (direct appeal) at 123-124]  The fallacy of this argument should be apparent.  Upon a not

thorough review of the trial transcript makes plain that this is all that the prospective jurors interpreted that phrase to mean.  Further, during his closing argument Early explained to the jury that a verdict of not guilty by reason of insanity would not mean that White would be "cut loose": "If you say that is what you feel the defendant does not go free.  The defendant is committed and brought back to the Court eventually for the purpose of determining if he can function in society."[173] And during informal questioning in *voir dire*, the judge was not required to give each venireman a thorough and legally precise explanation of the legal proceedings which might ensue in the future if White was found not guilty by reason of insanity.  As the Kentucky Supreme Court noted, the phrase was merely a shorthand for a not guilty verdict and the defendant's resulting release from custody. That the latter would necessarily follow from the former was a fact already well within the common knowledge of the jury.

As to the second ground, the warden is correct that White never argued to the Kentucky Supreme Court that the trial court's use of the phrase had the effect of undermining his defense by suggesting that White was trying to trick the jury.[174]  This aspect of the claim is therefore procedurally defaulted.  *Gray v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court.").  In any event, it is also illogical.  As White himself recognizes, the phrase was a shorthand reference for the *consequences* of a not guilty verdict, not the validity of White's insanity defense itself.  See [R. 14-1 at 118 (arguing that use of the phrase "constitute[d] improper comment on the consequences of a particular verdict...")]  The phrase therefore did not and could not suggest

---

guilty verdict a defendant would be entitled to release from pretrial detention as to those charges; the fact that a separate civil proceeding *might* be instituted in the future which *might* result in his return to custody, for an indefinite period of time, does not alter that basic fact.  Further, the insanity defense demands consideration of the criminal defendant's state of mind when he committed his crimes, whereas civil commitment proceedings focus upon the respondent's present mental condition at the time of the proceeding.  It is therefore simply untrue that a finding that a defendant was at some earlier point in time insane (or, alternatively, intoxicated) years before will necessarily result in a finding that he is presently psychologically unfit sufficient to warrant involuntary commitment.  White's facile suggestion that a defendant will not be "released" because he might face civil commitment proceedings at some point in the future does not withstand scrutiny.

[173]  [Trial at  2073]

[174]  See [Appellant's Brief (direct appeal) at 177-178]

that White's underlying defense – that he was insane when he committed the robbery and murders – was made up or without merit.  Instead it merely reflected what was already the obvious to the jurors: that White would not be imprisoned for his crimes if they concluded that he was not sane when he committed them.

The Kentucky Supreme Court also did not improperly apply Supreme Court precedent when it rejected White's third ground, to wit, that the phrase "turn him loose" constituted "comment[] on the consequences of a particular verdict."  White, relying solely upon *Shannon v. United States*, 512 U.S. 573 (1994), argues that "[r]emarks which imply that a verdict of insanity by the jury will set a defendant free improperly invite the jury to consider the sentences (*sic*) consequences of its verdict."  [R. 14-1 at 118]  But the discrete question posed in *Shannon* was whether "federal district courts are *required* to instruct juries with regard to the consequences of an NGI verdict" pursuant to the Insanity Defense Reform Act of 1984, 18 U.S.C. §§ 17, 4241-47, a federal act expressly recognizing the defense in federal criminal prosecutions.  *Id*. at 575, 579 (emphasis added).

White's reliance upon *Shannon* is sorely misplaced.  First, *Shannon* involved a federal criminal prosecution, not a state one; involved jury instructions, not *voir dire*; and resolved a matter of statutory interpretation, not constitutional command.  *Id*. at 580-88.  Second, in *Shannon* the Supreme Court noted that "juries are not to consider the consequences of their verdicts" in significant part because the jury's only job is to find guilt or innocence; deciding the consequences that flow from that verdict is solely the province of the judge.  *Id*. at 579.  But that clear division of labor in ordinary federal criminal cases does not apply to Kentucky capital cases, where the jury *does* participate in the decision whether or not the death penalty should be imposed.  Third, and most importantly, the decision in *Shannon* was issued in 1994, a decade after the Kentucky Supreme Court had already addressed White's claims.  It therefore cannot supply Supreme Court precedent that was "clearly established" at the time of the Kentucky Supreme Court's decision in 1984.  *Taylor v. Withrow*, 288 F. 3d 846, 850 (6th Cir. 2002) ("clearly established law" refers to legal principles set forth in Supreme Court decisions issued as of the time the state court rendered the pertinent decision).  The *Shannon* Court did make a passing reference to its earlier, pre-1984 precedent that "when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed."  *Id*. at 579 (citing *Rogers v. United States*, 422 U.S. 35, 40 (1975))

94

(internal quotation marks omitted).  But as the Supreme Court expressly noted, "[p]articularly in capital trials, juries may be given sentencing responsibilities.  It is undisputed that the jury had no such responsibilities in Shannon's case."  *Id.* at 579 n.4.  At bottom, White relies upon a principle that does not apply in capital cases where the jury does exercise some sentencing function, and which is applicable to his case only at the highest level of generality.  Affording the Kentucky Supreme Court the broad measure of deference to which it is entitled, White fails to establish viable grounds for habeas relief with respect to this claim.

White's fourth assertion, that his trial counsel rendered ineffective assistance for not objecting more strenuously to the use of the phrase "turn him loose," is without merit.  White has failed to establish deficient performance for each of the reasons stated above, and as noted by the Kentucky Supreme Court he has not shown any prejudice as a result of the limited use of the phrase before two jurors.  Counsel's decision to assert or withhold a particular objection is precisely the sort of ordinary matter of trial strategy that falls within the wide discretion afforded to counsel.  Cf. *Bryant v. Brown*, 873 F. 3d 988, 996 (7th Cir. 2017).  Especially when his ineffective assistance claim is viewed through the doubly-deferential lens required for evaluating claims under *Strickland* on federal habeas review, *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), White states no plausible basis for relief.

In his third sub-claim White asserts that the judge violated his rights under the Eighth Amendment when he told the jury that its decision regarding the death penalty was only a recommendation and that he would decide the defendant's sentence.  [R. 14-1 at 119, ¶23]  See item (k) above.  In support, White relies upon the Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), where the Court held that under the Eighth Amendment "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."

This claim falters on factual and legal grounds.  First, after the judge made the statement to which White objects, during his closing argument White's defense counsel stated:

> Don't be mislead in any way by the wording the Court has used in these instructions
> that says that you merely giving the court a recommendation, because to me, if I were
> on a jury and not really experienced in these matters, I would feel like that let me off
> the hook, your say wasn't the final one.  I have practiced in the 39th District before

> Doug Graham for ten years.  I know that historically, while he does have the final say, the verdict of the jury of the citizens of this community is just about final. ... He takes extremely serious the recommendation of a group of people who made the decision and there is no escaping the responsibility of that recommendation.[175]

This statement underscored the jury's responsibility in the sentencing determination.  Second, the governing Kentucky statute in effect at the time directed the jury to hear evidence during the penalty phase, to determine whether mitigating or aggravating circumstances exist, and then to "recommend" a sentence for the defendant.  Ky. Rev. Stat. 532.025(1)(b) (1976).  At the time he made it in 1980, the judge's statement that the jury would "recommend" a sentence was consistent with the express wording of the statute and was considered acceptable under Kentucky law.  Courts in the state did not conclude that use of the term "recommend" was improper until 1984, four years after White's trial had concluded.  *See Tamme v. Commonwealth*, 759 S.W.2d 51, 52-53 (Ky. 1988).  The statements were thus consistent with the statutory phrasing itself and in accord with Kentucky law at the time.  The statements were therefore not improper.  *See Kordenbrock v. Scroggy*, 919 F. 2d 1091, 1101 (6th Cir. 1990) (*en banc*) (rejecting similar claim).  Finally, White's reliance upon *Caldwell* is misplaced because that decision was handed down in 1985, *after* the Kentucky Supreme Court had already rejected White's prosecutorial misconduct claim on direct appeal.  The Kentucky Supreme Court's decision was therefore not contrary to clearly-established federal law as defined by then-existing Supreme Court precedent.  *Harrington*, 562 U.S. at 103.

White next complains that the judge's statement to the jury that he and the prosecutor would be returning in a few hours from a meeting both pressured the jury to reach a verdict before they returned and implied a "close relationship" with the prosecutor.  [R. 14-1 at 128, ¶24]  See item (t) above.  In support, White cites only to a decision of the Fifth Circuit noting that it is improper for the judge to pressure the jury to reach a verdict quickly.  *United States v. Diharce-Estrada*, 526 F. 2d 637, 638 (5th Cir. 1976).  Here, the judge stated that "[m]aybe by the time we come back you might have a verdict.  If you don't, we may have to hold you another night."  The judge also advised the sequestered jurors how to obtain dinner; cautioned them against discussing the case outside of formal deliberations; and told them that the case would continue the next day if further

---

[175] [Trial at 2135]

deliberations were needed to reach a verdict.  Nothing in the judge's passing comments can be fairly read as pressuring the jury to reach a judgment before his return.  *Cf. United States v. Fozo*, 904 F. 2d 1166, 1171 (7th Cir. 1990); *United States v. Murvine*, 743 F. 2d 511, 515-16 (7th Cir. 1984).  Nor did the mere mention of a "meeting" at which both the judge and prosecutor were participants suggest a close affiliation; joint attendance at a bar association meeting or charitable event would not have so indicated.  Accord *Getsy v. Mitchell*, 495 F. 3d 295, 311 (6th Cir. 2007) (noting that "*ex parte* contact does not, in itself, evidence any kind of bias.") (quoting *Alley v. Bell*, 307 F. 3d 380, 388 (6th Cir. 2002)).  White does not point to any Supreme Court decision establishing the correctness of his claim, and the Kentucky Supreme Court did not unreasonably apply federal law in concluding that he had failed to establish that his trial was rendered unfair as a result of the conduct complained of.

White's fifth sub-claim complains non-specifically of "comments in-chambers" to defense counsel.  [R. 14-1 at 128, ¶25]  White offers no indication to which comments he is referring, but the Court's own review of the record reveals that of the items described above, only the competency hearing was conducted in chambers.[176]  This suggests that White is referring to the judge's comments regarding the competency hearing and the efforts of defense counsel to obtain a further delay of the trial.  See item (l) above.  White offers neither argument nor authority explaining how his constitutional rights were infringed, providing only a citation to the Second Circuit's decision in *United States v. Robinson*, 635 F. 2d 981 (2nd Cir. 1980).  While *Robinson* indicated that a judge's comments to an attorney outside of the jury's presence could be "unnerving" to defense counsel, to determine whether the defendant was denied a fair trial the Second Circuit examined what effect, if any, those comments had upon the defendant's ability to present his case while in the jury's presence, including the questioning of witnesses on direct and cross examination and the introduction of evidence.  *Id*. at 986.  White points to no such prejudice, and the record reveals none.  To the contrary, shortly after the judge's comments, defense counsel told the judge that he was seeking a writ of prohibition from the Kentucky Court of Appeals to prevent the case from moving forward, and later in the trial he did not hesitate to again request another continuance from

---

[176]  [Trial at 732]

the judge.[177]  The record rebuts any notion that the judge's comments had any deterrent effect upon counsel's vigorous representation of his client.[178]  The Kentucky Supreme Court's rejection of this claim did not run afoul of clearly established Supreme Court precedent.

White's sixth and final sub-claim contends that the trial judge's question to prospective juror Smith during re-*voir dire* constituted an effort to "rehabilitate" him, conduct he characterizes as advocacy on behalf of the prosecution.  [R. 14-1 at 129, ¶26]  See item (o) above.  The question posed by the trial judge following the venireman's expressed skepticism of the insanity defense – "Mr. Smith, if you were convinced that a man is actually insane and the law is that if a man is actually insane and doesn't know the consequences of his act, doesn't know what he's doing, then he can't commit a crime.  Could you go by the law on that?" – does not involve advocacy or suggest partiality.  Rather, throughout the *voir dire* the judge and the parties alike routinely asked such follow up questions about various topics (including the burdens associated with jury service, prejudice from pretrial publicity, skepticism of the insanity defense, or moral objection to the imposition of the death penalty) to draw a more complete picture of the juror's attitude on the subject.  A review of the *voir dire* fails to support White's assertion that the judge acted in a partisan manner.  White points to no authority from the Supreme Court which should have clearly indicated to the Kentucky Supreme Court in 1984 that the judge's questions, considered individually and collectively, rendered his trial fundamentally unfair, and the Court did not unreasonably apply federal law in concluding that it did not.

## H.    Claim C(5) – White Has Not Demonstrated that the Trial Judge was Biased Against Him.

White points to five facts that he contends establish that trial judge Doug Graham was biased against him.  First, in 1963 Ossie White (White's uncle) was charged with the murder of Karue Neace (White's father).  Petitioner Karu Gene White was five years old at the time, and witnessed the murder of his father first hand.  At that time Graham was the prosecutor in the county where Ossie White was charged.[179]  White contends that Judge Graham, far from being sympathetic to him

---

[177] [Trial at 923-928, 2021]

[178] *See* [RCr 11.42 at 553 ("I wasn't afraid to argue with Judge Graham.")]

[179] [RCr 11.42 at 1087-1088, 1114-1116, 1137-1138, 1405-1408]

because he had witnessed the murder of his father when he was five years old, was instead prejudiced against White during his capital prosecution in 1980.  This is so, White alleges, because Graham "must have" obtained unspecified knowledge about White's family during the 1963 prosecution that caused him to be prejudiced against him some 17 years later.

Second, in 1999 Charters testified that Judge Graham "was a former Commonwealth Attorney and may have been involved in prosecuting [Kitty Neace, White's mother] at some point in time. I think she had been charged a couple of times for bootlegging."  For her part, during the RCr 11.42 hearing Neace categorically denied ever committing such a crime.  And once the post-conviction hearing neared conclusion, White introduced a lengthy catalogue of documents dating back to 1959 charging members of his family (including Kitty Neace) with various crimes, but this offense was not among them.[180]   Third, in 1999 Charters testified that during White's trial Kitty Neace asked him to approach Judge Graham to test his interest in a bribe.  Charters passed along the conversation to Judge Graham, who "just laughed it off.  He said, 'That is Kitty.'"[181]   White contends that these two events, though they involved only White's mother, prejudiced Judge Graham against his whole family including White himself.

Fourth, in 1984 Gail Robinson, an attorney who worked for the Department of Public Advocacy, spoke with Judge Graham over the telephone about White's case.  Some 15 years later during collateral review proceedings in 1999, Robinson testified over hearsay objection that Judge Graham (who had since passed away and was hence unavailable for examination) had told her in 1984 that White was a hardened criminal and that his family were bad people.[182]

Fifth, during White's sentencing hearing, Judge Graham stated:

This is one of the most difficult things that any Judge is required to do.  I have seriously considered this case.  This man's history from the time he was born until the present time, I've considered that, too.  I think his downfall came by reason of the fact that his family followed them to the courthouse when he got in trouble and

---

[180]   [RCr 11.42 at 887-888, 1134, 1319-1322]

[181]   [RCr 11.42 at 964]

[182]   At the time of her testimony, Robinson was married to Kevin McNally, who served as White's post-conviction counsel for 35 years, from 1980 through 2015.  [RCr 11.42 at 1273-77, 1280]

that he was shielded from punishment.[183]  I think he started out with the intention of living by committing crime and I don't feel he cared too much about how we did it.  He killed his best friends, people who had cared for him and granted him favors all his life.

In a post-judgment report, Judge Graham indicated that in imposing sentence he had considered both aggravating and mitigating circumstances based upon the evidence presented at trial, including White's relative youth and lack of a significant prior criminal history.[184]

In his petition, White contends that Judge Graham was biased because he "excluded potentially mitigating circumstances presented by the defense on the basis of non-record knowledge."  Nowhere in his petition does White identify what evidence was excluded or what "non-record" evidence the judge allegedly possessed that purportedly caused him to exclude it.  White also contends that his counsel was ineffective for not filing a motion to recuse the judge.  [R. 14-1 at 129-133]  The Kentucky Supreme Court rejected these claims on direct appeal in the RCr 11.42 proceedings:

Defense counsel were not ineffective because they did not seek the removal of the trial judge from the case.  White has failed to demonstrate that there was any legally sufficient reason for his defense counsel to ask the trial judge to disqualify himself.  As noted in *Brand v Commonwealth*, Ky. App., 939 S.W.2d 358, it must be shown that the trial judge is prejudiced to a degree that the judge cannot be impartial.  See also *Woods v Commonwealth*, Ky., 793 S.W.3d 809 (1990).  Such is not the case here.

\*\*\*

The allegation that the trial judge should have recused himself was raised and rejected on direct appeal.  The failure to recuse despite extrajudicial knowledge of the White family did not violate due process.

*White*, 1994-SC-0326-MR at 10, 16.

The Kentucky Supreme Court did not unreasonably apply federal law in rejecting these claims.  The Due Process Clause requires a trial before a judge who does not labor under an actual

---

[183]  Judge Graham appears to have been referring to the testimony from Nancy Bowling that from a very early age White acted out, got into fights, deceived teachers and doctors to get out of school, and that when White was older family members would help him avoid prosecution when he committed minor thefts.  [Trial at 1566-1576]

[184]  [Trial record (RCr 11.42, second appeal) at 154-165, 178]

bias. *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."). The Supreme Court has identified only three circumstances where the *appearance* of bias alone is sufficient to implicate due process concerns. *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 886 (2009); *Railey v. Webb*, 540 F. 3d 393, 399-401 (6th Cir. 2008); *Johnson v. Skipper*, 2019 WL 1531517, at *2 (6th Cir. Mar. 19, 2019). First, even without actual bias a judge violates a defendant's due process rights by presiding over a matter in which he or she has a direct and substantial financial interest. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). Second, a judge may not constitutionally preside over criminal contempt proceedings initiated by the defendant's personal invective directed at the presiding judge. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971). Third, the Due Process Clause forbids a judge from presiding over a case where he or she had "significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Williams v. Pennsylvania*, 136 1899, 1905 (2016); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). None of these circumstances apply here.

Outside of these three identified categories, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *FTC v. Cement Institute*, 333 U.S. 683, 702 (1948). Thus, "matters of kinship, personal bias, state policy, [and] remoteness" by the presiding judge do not offend the Due Process Clause. *Tumey*, 273 U.S. at 523. Nor is a judge's contravention of state ethics rules or statutes regarding bias or prejudice necessarily enough; the Due Process Clause requires recusal only "in the most extreme of cases" of bias or prejudice. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 820, 821-23 (1986).

The Kentucky Supreme Court did not err in concluding that White's vague speculation did not meet that high standard. White offers no plausible explanation as to why Judge Graham's participation in the prosecution of his father's murderer would have prejudiced the judge *against* him decades later. This circumstance provided no basis for recusal. *Cf. Williams v. Anderson*, 460 F. 3d 789, 813-15 (6th Cir. 2006) (judge not required to recuse merely because in prior role as prosecutor he had received reports about possible criminal activity by organization with which defendant was then affiliated). When Kitty Neace explored possible bribery of Judge Graham, White's counsel did not testify that he was upset or offended; instead, the judge "just laughed it off." And Judge Graham's alleged post-trial statement in 1984 that White's family were bad people hardly

demonstrates improper consideration of extrajudicial knowledge.  Indeed, *during the trial*, White himself presented extensive testimony from a handful of relatives about dysfunction, violence, and criminal acts committed by various family members while White was growing up.[185]  And "[e]ven exposure to bad facts and formation of an opinion based on them are not enough to establish bias." *Coley v. Bagley*, 706 F. 3d 741, 750 (6th Cir. 2013).  The Supreme Court has made clear that "[t]he judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person.  But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." *Liteky v. United States*, 510 U.S. 540, 550-51 (1994).  White has failed to demonstrate bias at all, let alone bias so "extreme" as to indicate not merely contravention of state rules on disqualification, but the Due Process Clause.  He also points to no Supreme Court decision that clearly established the correctness of his claim of judicial bias, and the Kentucky Supreme Court did not err in rejecting it as without foundation.

White's claim that his counsel was ineffective for not moving for recusal fares no better.  In its opinion the Kentucky Supreme Court held that, as a matter of Kentucky law, a motion to recuse for bias would necessarily have failed under *Brand v Commonwealth*, Ky. App., 939 S.W.2d 358 (1997), and therefore counsel was not constitutionally ineffective for choosing not to file it.  That determination is not contrary to or an unreasonably application of federal law.  The Court has already concluded that White failed to demonstrate that judge was biased so as to deprive him of a fair trial under the Due Process Clause.  Accordingly, "... *Strickland* prejudice is not presumed but must be proven."  A trial is not fundamentally unfair or its result unreliable where the defendant has failed to establish "an unconstitutionally high probability of actual bias," and hence White cannot establish the prejudice necessary to state a viable claim under *Strickland*.  *Coley*, 706 F. 3d at 752.  This claim is without merit.

I.    **Claim F(1) – White Fails to Establish a Viable Claim of Prosecutorial Misconduct.**

---

[185]  [Trial at 1519-2019]

In his petition, White sets forth at length several dozen statements made and questions posed by the prosecutor in support of his claim that the prosecution engaged in misconduct which rendered his trial fundamentally unfair. These include statements made by the prosecutor that White contends misstated the law, misstated the facts, were argumentative, or were prejudicial, as well as questions by the prosecutor that he claims were leading, hypothetical, based upon facts not in evidence, or argumentative. White asserts a claim of prosecutorial misconduct under the Fourteenth Amendment, but separately contends that "[t]he prosecutor's conduct also violated Petitioner's Sixth Amendment rights to an impartial jury and to the assistance of counsel ..." In the heading to this claim, White suggests a different species of his ineffective assistance claim when he asserts that "... TO THE EXTENT THAT PETITIONER'S ATTORNEY FAILED TO OBJECT TO THE MISCONDUCT, HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL." [R. 14-1 at 179-194]

The Commonwealth responds that White has mischaracterized many of the prosecution's statements by taking them out of context; that the statements were not improper or flagrant and White points to no then-existing Supreme Court precedent which indicates otherwise; that the Kentucky Supreme Court's determination did not contravene or unreasonably apply Supreme Court precedent; and that White's ineffective assistance claim in this regard is procedurally defaulted. [R. 84 at 135-142] White's reply offers no further argument in support of this claim. [R. 90 at 221]

White procedurally defaulted his ineffective assistance of counsel claim insofar as he contends that *his attorney* was ineffective for failing to object to each and every instance of alleged misconduct by the prosecutor. White asserted this claim for the first time in 2001 during his second appeal in the RCr 11.42 proceedings, arguing in a single paragraph that his "[c]ounsel's failure to object to some of the repeated and prolonged [instances of prosecutorial] misconduct deprived White of the effective assistance of counsel." White did not identify a single such instance in his brief to the Kentucky Supreme Court, stating only that "because of this Court's page limitations, [they] cannot be set forth in full." Instead, White purported to incorporate by reference a post-hearing motion that he had previously filed in the trial court.[186] The Commonwealth did not address the merits of this claim, instead objecting to the claim on three procedural grounds: (1)

---

[186] *See* [Brief of Appellant (second RCr 11.42 appeal) at 63-64]

White failed to provide or explain any factual basis for this claim, rendering it insufficiently raised; (2) Kentucky's Civil Rule 76.12 did not permit the wholesale incorporation of other documents in a brief; and (3) Kentucky law did not permit White to assert this claim in a collateral review appeal because it was or could have been raised and addressed on direct appeal.[187]

> In its 2002 opinion, the Kentucky Supreme Court rejected this claim on procedural grounds:
>
> White complains about the failure to object to repeated prosecutorial misconduct. He claims these instances cannot be set forth in full because of page limitations for his brief. He attempts to incorporate by reference pages of what he claims to be a postevidentiary hearing brief. Such a strategy is clearly in violation of CR 76.12, which does not contemplate any kind of action to avoid the page limitation. A simple motion would suffice to extend page limitations. We find this argument to be very speculative and unsupportable by anything in the record.

*White v. Kentucky*, 1994-SC-0326-MR (Ky. May 16, 2002) at 12 (unpublished). Where a habeas petitioner defaults "his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Here, the Kentucky Supreme Court rejected this claim based upon White's violation of Kentucky's Civil Rule 76.12, an adequate and independent state law rule, rendering this claim procedurally defaulted. *Id.* White has never argued cause and prejudice to excuse the default, and the claim is thus barred.[188]

---

[187] [Brief of Appellee (second RCr 11.42 appeal) at 45-46]

[188] The Kentucky Supreme Court's last sentence – "[w]e find this argument to be very speculative and unsupportable by anything in the record[,]" – could be read either (1) as merely a concluding statement regarding White's failure to supply a factual basis in the record or in his brief to support this claim, or (2) as a denial of the claim on the merits. This Court finds the first reading more likely given the context in which the statement was made, namely in the midst of rejecting the claim for White's failure to brief the factual basis for the claim. If the second reading were followed, it may be questioned whether the Kentucky Supreme Court actually enforced its procedural rule as required to conclude that the claim is procedurally defaulted. See *Gerth v. Warden, Allen Oakwood Correctional Institution*, 938 F. 3d 821, 830 (6th Cir. 2019) (citing *Maupin v. Smith*, 785 F. 2d 135, 138 (6th Cir. 1986)). Regardless, any substantive rejection of the claim by that Court would not be an unreasonable determination of federal law. Throughout his petition, White himself points out that his attorney repeatedly objected to the prosecution's statements and questions and filed four separate motions for a mistrial; the fact that he chose not to object to each and every utterance that White now deems improper suggests precisely the kind of exercise of professional judgment that the Supreme Court has cautioned should not be second-guessed.

White asserts a second and distinct species of his ineffective assistance of counsel claim, contending that *the prosecution*'s actions somehow denied him an impartial jury and deprived him of the effective assistance of counsel. [R. 14-1 at 192-93 (citing *Griffin v. California*, 380 U.S. 609 (1965))] White made this argument in passing on direct appeal.[189]  The Kentucky Supreme Court did not specifically reference this claim, but concluded that "[a] review of the entire record convinces us that no reversible error was committed during the guilt or innocence phase of the trial." *White*, 671 S.W.2d at 246.  Deference under § 2254(d) therefore applies. *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) ("This claim was rejected on the merits by the Kentucky Supreme Court (albeit without analysis) and therefore receives deferential review under the AEDPA standard.").

In *Griffin*, the Supreme Court held that a prosecutor's comments on the defendant's failure to testify could violate his or her right against self-incrimination under the Fifth Amendment. *Griffin*, 380 U.S. at 612-14.  On direct appeal White briefly made such an argument as part of his prosecutorial misconduct claim, contending that "the prosecutor's conduct also violated [White's] 5th Amendment right not to testify by speculation that [White] would present evidence in the sentencing phase."[190]  White plainly cited *Griffin* to the Kentucky Supreme Court solely in support of the Fifth Amendment self-incrimination claim he made before that Court.  But White makes no such argument here, and *Griffin* does not have any bearing upon an ineffective assistance claim under the Sixth Amendment.  On direct appeal White did not point the Kentucky Supreme Court to any clearly established law in support of his claim, nor does he now direct this Court's attention to any such precedent from the United States Supreme Court.  After all, the constitutional promise of effective assistance of counsel guaranteed under the Sixth Amendment is focused upon the actions of the defendant's attorney, not his adversary. *Strickland*, 466 U.S. at 687-88.  And White points to no authority at all, let alone then-existing Supreme Court authority, in support of his contention otherwise.  This aspect of White's claim under the Sixth Amendment also fails.

That leaves only White's traditional claim of prosecutorial misconduct.  To warrant federal habeas relief, the petitioner must demonstrate that the prosecutor's comments "so infected the trial

---

[189]  [Brief for Appellant (direct appeal) at 163 (citing *Griffin*)]

[190]  [Brief for Appellant (direct appeal) at 162-63]

with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  While the prosecutor's statements must be reviewed, the ultimate focus must remain on "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  And there the petitioner's burden is quite high: the mere presence of prosecutorial misconduct is not enough, "[r]eversal is required only if the prosecutor's misconduct is 'so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant.'" *Lundgren v. Mitchell*, 440 F. 3d 754, 778 (6th Cir. 2006).

A defendant's due process rights are only violated where the prosecutor's statements were both improper and flagrant.  The Court must first determine whether the prosecutor's statements were improper.  *Moore v. Mitchell*, 708 F. 3d 760, 799 (6th Cir. 2013).  For example, it is improper for a prosecutor to assert the existence of certain facts during closing arguments that were not placed in evidence during the trial, *United States v. Wiedyk*, 71 F. 3d 602, 610 (6th Cir. 1995), or to offer as evidence their own personal opinion on the credibility of a witness, *Byrd v. Collins*, 209 F. 3d 486, 537 (6th Cir. 2000).

White has not carried his burden of demonstrating that the prosecutor's comments were improper.  First, White has failed to set forth an adequate factual foundation for his claim.  In his petition White catalogues approximately 40 statements or arguments made by the prosecution that he characterizes as improper or as wrong as a matter of fact or law.  [R. 14-1 at 188-200]  But he makes almost no effort at all to explain *why* any of them are, as he contends, misstatements of fact, misstatements of law, or otherwise improper.  Instead, he simply attaches that label to prosecution statements without pointing to either any *evidence* in the state court record to support his characterization of that statement as false or improper, or to any statute, rule, or state court decision that indicates that the statement of law was incorrect.  The absence of any effort to fully present both the factual and legal basis for this claim is underscored by the fact that much of White's 2003 federal habeas petition (and this claim in particular) was copied nearly word-for-word from the brief he filed with the Kentucky Supreme Court on direct appeal in 1982.[191]

---

[191]  *See* [Brief for Appellant (direct appeal) at 146-166]

White's abdication of his responsibility to present a reasonably cohesive and complete argument in support of his claim in his petition is sufficiently egregious to conclude that he has forfeited it entirely before this Court. *Cf. United States v. Warshak*, 631 F. 3d 266, 319 n.60 (6th Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")[192] (citing *United States v. Zannino*, 895 F. 2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.")). See *Wagner v. Smith*, 581 F. 3d 410, 416 (6th Cir. 2009) (stating that a petitioner "fails entirely to state a factual basis for the claim" if all he offers are "[g]eneral references to 'pervasive misconduct' and 'irrelevant and prejudicial evidence.'").

Even if White's meager presentation does not rise to the level of a forfeiture of the claim, it does attempt to impermissibly shift the obligation to assert a viable argument in support of this claim from counsel to the Court. But "[a] court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F. 3d 809, 817-18 (7th Cir. 2004); see also *Herman v. City of Chicago*, 870 F. 2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."). One particular concern with the Court undertaking the task abandoned by counsel is that it forces the Court to take on the roles of both investigator and advocate for White, not only by searching the whole record to find facts supporting his narrative that the prosecution's statements were false, but also to argue on his behalf why such statements, if and when found, would be improper or prejudicial. That is unacceptable. Accord *Nali v. Ekman*, 355 F. App'x 909, 912 (6th Cir. 2009) (Sutton, J., dissenting) ("[W]hen the litigant offers ... nothing more than an invitation to rummage through the district court pleadings to identify any mistake loosely connected with a broadly defined issue (viz., "Should I have lost below?"), he is not asking us to overlook the

---

[192] While courts have sometimes characterized such an omission as a waiver, the failure to present a claim is more in the nature of a forfeiture. *Kontrick v. Ryan*, 540 U.S. 443, 458 (2004). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quotation marks omitted). While "jurists often use the words interchangeably," *Kontrick*, 540 U.S. at 458 n.13, they "are not really the same, although our cases have so often used them interchangeably that it may be too late to introduce precision." *Freytag v. C.I.R.*, 501 U.S. 868, 895 n.2 (1991) (Scalia, J., concurring in part).

understandable mistake of a lay-person advocate. He is asking us to be a judge and advocate in the case, a division of responsibilities we should try to preserve rather than blur.  What is more, when a pro se litigant asks us to identify any potentially winning arguments in his lower court pleadings, he is asking us to create, not correct, potential disparities in the legal system. Excusing a complete lack of appellate briefing does not level the playing field between an uncounselled litigant and his adversary; it gives the pro se litigant a distinct advantage.").

This shortcoming is further compounded because in his petition White often mischaracterizes the prosecution's statements, in some instances simply misquoting the record. Many of the statements set forth by White in his petition are taken entirely out of context, and when properly viewed in context are not improper.  For instance, White complains that the prosecutor told the jury that "the Court won't let you hear what is not competent ... evidence ... ," which he contends implies "that other evidence existed indicating Petitioner's guilt which the judge wouldn't permit the jury to hear."  [R. 14-1 at 179-180]  First, even the heavily excerpted statement White sets forth in his petition does not remotely carry the implication he proposes.  Second, the prosecution's actual statement was merely part of a benign line of inquiry regarding a prospective juror's view of the probative value of circumstantial evidence: "I don't want to disqualify you .... The Court will rule on what is competent evidence and what is not, and the Court won't let you hear what is not competent.  The evidence will all be circumstantial evidence.  You will decide from that and that alone the conclusions of fact.  Would the absence of an eye witness in that evidence put you in a position to where you could not convict regardless of what the other evidence was?"[193]

The prosecution statements at issue were not improper for many of the reasons set forth by the Commonwealth in its brief on direct appeal.[194]  While White contends that many statements

---

[193]  [Trial at 101]  There are numerous other examples.  First, White misquotes the record regarding the prosecution's statement during *voir dire* as to the meaning of insanity for purposes of the defense.  [Trial at 882]  Second, contrary to White's assertion [R. 14-1 at 181], there was evidence that while in jail White told Fisher to keep quiet until they talked to a lawyer.  [Trial at 1385]  Third, White contends that the prosecution lacked an evidentiary basis to ask Chuck Fisher if "[y]ou all didn't have a plan to catch one of them there?" [R. 14-1 at 185]  But that contention is refuted by Fisher's earlier testimony to precisely that effect.  [Trial at 1435]  Donna Jones had also testified earlier that White expressed a desire to rob the store when only one of the shopkeepers was around.  [Trial at 1065-66]

[194]  *See* [R. 84-1 at 136 (citing Brief of Appellee (direct appeal) at 121-135)]

were improper, they were supported by at least some evidence in the record or were based upon an inference drawn therefrom.  While the Court will not repeat that discussion point-for-point here, certain matters warrant brief explanation.

First, White contends that the prosecution mis-stated the definition of insanity.  [R. 14-1 at 185]  The prosecutor stated:

> Just to acquaint you with the legal definition of insanity at this time: That he didn't know what he was doing, could not think a normal thought process in order to control himself; just irresponsible, out of control acting ... The second part is if he knew the nature of his acts, he didn't know they were wrong, not legally wrong."[195]

In response to defense objection, the prosecution responded:

> Well, I could read the lengthy definition. There is two phases of it. Number one, do you know the nature and extent of your acts? Number two, do you know they are wrong.[196]

These statements roughly paraphrase Kentucky's statutory definition in effect at the time.  Ky. Rev. Stat. 504.020(1) (1974) ("A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental illness or retardation, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.").  And even if a prosecutor does misstate the law, a jury is presumed to follow the law as embodied in the jury instructions given by the court, not as stated by counsel.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Hansen v. Woodford*, 229 F. App'x 608, 609 (9th Cir. 2007) (prosecutor's misstatement of the law during closing argument did not deprive petitioner of due process when trial court correctly instructed jury on the law).

Second, White contends that the prosecutor misstated the law during *voir dire* when he explained to a prospective juror that "should you find the defendant not guilty by reason of insanity, I ... would file a civil petition against him in this Court and commit him to a mental hospital for a

---

[195] [Trial at 1565-66]

[196] [Trial at 1566]

maximum of three hundred and sixty days." [R. 14-1 at 180] White contends without explanation that this was wrong, but in fact it was not contrary to Kentucky law in effect at the time.[197]

Third, White complains that the prosecutor improperly compared the jury's role in setting White's sentence "to the report of a probation officer." [R. 14-1 at 191 (citing Trial at 2124)] This, he contends, may have lead the jury to believe that the decision to impose the death penalty rested not with them but with the judge. [R. 14-1 at 194-95 (citing *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985)] This claim is functionally identical to the one he made in Claim C(4) based upon similar comments by Judge Graham. White's claim here regarding the prosecutor's comments fails for the same reasons set forth at length above, and the Court will therefore not repeat them here.

Even where a prosecutor's statements are deemed improper, to show that the trial was rendered fundamentally unfair the petitioner must also show that they were flagrant. *United States v. Carter*, 236 F. 3d 777, 783 (6th Cir. 2001). In deciding that question, the court considers "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Amos v. Renico*, 683 F. 3d 720, 730 (6th Cir. 2012). As noted above, the statements about which White complains were not incorrect, misleading, or improper. While White complains that certain statements or lines of inquiry were prejudicial, the nature of the comments was due primarily to the offenses and the gruesome nature of some of the evidence, and the prosecutor did not act improperly merely because he inquired about it or made comments upon the evidence. As to the second factor, White points to times when the prosecutor was argumentative or asked a leading question, but those instances were isolated; this case does not present the kind of pervasive misconduct symptomatic of a fundamentally unfair trial. *Donnelly*, 416 U.S. at 643-45. Finally, the evidence against White with respect to both guilt and culpability was very strong.

Even if the Court were reviewing this claim without the deference afforded under § 2254(d), it would conclude that White has failed to carry his heavy burden to show that the actions of the prosecutor were not merely improper, but so flagrant as to render his entire trial fundamentally

---

[197] Kentucky's provision for involuntary commitment proceedings is set forth at Ky. Rev. Stat. 202A.051 (1982) (formerly Ky. Rev. Stat. 202A.080).

unfair.  But the Kentucky Supreme Court denied this claim on the merits, rending § 2254(d) deference appropriate.  When viewed through that deferential lens, and keeping in mind the Supreme Court's admonition that "the *Darden* standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations,'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012), this Court cannot conclude that the Kentucky Supreme Court's rejection of this claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103.

**J.      Claim F(2) – The Prosecution Did Not Engage in Misconduct by Presenting Differing Arguments Regarding White's and Bowling's Comparative Culpability During their Respective Trials.**

On the second direct appeal from the denial of relief under RCr 11.42, White made a one-page argument to the Kentucky Supreme Court that the prosecution had "presented 2 contradictory theories of prosecution and relative culpability at the separate trials of White and Bowling."  The specific factual basis for that claim was that during closing arguments in White's trial, the prosecution argued to the jury that "[White] had personally killed all three of the victims."  White noted that during Bowling's separate trial held several months later, the prosecution said that "[t]he evidence now persuades the Commonwealth that Tommy Bowling was more brutal in the commission of these murders and this robbery than was Karu Gene White" and "specifically den[ied] that White's participation was greater than Bowling."[198]

What White withheld from the Kentucky Supreme Court (and this Court) in his briefs is that these prosecution statements from Bowling's trial were not made before the jury.  Immediately prior to the beginning of Bowling's trial, his counsel filed a motion to exclude the death penalty as a possible punishment, predicated upon his contention that Bowling was no more culpable than Fisher and/or less so than White.  This motion was heard by the trial judge in chambers and outside of the presence of the jury.  In response, the prosecution – again outside of the jury's presence – rejected that factual premise and asserted that Bowling was more culpable than Fisher, and that the forensic evidence regarding the blows inflicted upon the victims and the manner in which the robbery was subsequently carried out "now persuades the Commonwealth that Tommy Bowling was

---

[198] [Brief of Appellant (RCr 11.42 second direct appeal) at 65; R. 14-1 at 195-96]

111

more brutal in the commission of these murders and this robbery than was Karu Gene White ..."
The trial judge overruled Bowling's motion in chambers.[199]

Apparently unsatisfied with the narrow factual predicate that he had actually presented to
the Kentucky Supreme Court to support this claim, in his federal habeas petition White asserts
additional facts as the basis for this claim for the first time.  White notes that during closing
argument before the jury during Bowling's subsequent trial, the prosecution asserted that it was clear
from the forensic evidence that it was the blows struck by Bowling that had killed Lula; that the
evidence would support the conclusion that either Bowling or White could have struck the blows
that killed Sam; and it was open to question as to which of the blows killed Charlie.[200]  In his reply
brief in further support of his petition, White casts a still broader net, arguing for the first time that
the prosecution's pretrial efforts to try each of the defendants separately was actually a sinister ploy
to cast each of the defendants as the most culpable offender before separate juries, and that the
prosecution malignly intended this effect all along.  [R. 90 at 214-15, 219-20]  White's new theory is
pure conjecture by counsel; he does not point to or support it with any evidence in the record.
Indeed, in his original petition White pointed directly to evidence which he himself had developed
during the RCr 11.42 proceedings that undermines this new narrative:  that testimony indicates that
it was only *after* White's trial – not before or during it – that the prosecutor "had become [convinced]
that Tommy [Bowling] was as equally guilty as Karu [White]."  [R. 14-1 at 197]

As he did before the Kentucky Supreme Court, in his petition White contends that the
prosecution's assertedly inconsistent positions violated his rights to a fair trial, to due process, and
to equal protection of the law.[201]  The Kentucky Supreme Court rejected this claim, noting that
"[t]he proof showed that the victims were hit by both White and Bowling, either of which could
have killed the victims," and concluding that "[i]t is not prosecutorial misconduct to argue
reasonable inferences based on the evidence."

---

[199]  [Bowling trial transcript, Vol. 1 at 10-16]

[200]  [Bowling trial transcript, Vol. 5 at 174-179; R. 14-1 at 197-98]

[201]  [Brief of Appellant (RCr 11.42 second direct appeal) at 65; R. 14-1 at 207-211]

As a preliminary matter, to the extent that White asserts a markedly different factual basis for this claim than the one he presented to the Kentucky Supreme Court, that aspect of his claim is procedurally defaulted. To "fairly present" a claim to the state courts, the petitioner must have provided the state courts with both the legal and the factual bases supporting the claim. *Hanna v. Ishee*, 694 F. 3d 596, 609 (6th Cir. 2012) (citing *Williams v. Taylor*, 529 U.S. 420, 437 (2000)). Before the Kentucky Supreme Court, White relied solely upon the prosecution's in-chambers statements during Bowling's trial to show inconsistency; he made no mention of the prosecution's closing arguments in Bowling's trial or his recent and unsupported allegation that the prosecutor formed his intent to assert an inconsistent position during White's, not Bowling's, trial. Failure to do so deprived the Kentucky Supreme Court of a "full and fair opportunity" to address the substance of the claim he presents here, rendering those aspects of the claim procedurally defaulted. *Williams v. Anderson*, 460 F. 3d 789, 806 (6th Cir. 2006); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

The claim is without merit regardless. White is only entitled to habeas relief if he can demonstrate that the Kentucky Supreme Court's rejection of his claim was contrary to a Supreme Court rule that was clearly established at the time of its decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). On appeal in the collateral review proceedings, White referred the Kentucky Supreme Court only to two lower court decisions, as well as to a statement made in one Supreme Court case regarding the denial of *certiorari*. *Jacobs v. Scott*, 315 U.S. 1067, 1068 (1995) (Stevens, J., respecting the denial of the petition for a writ of *certiorari*). Notably, the Fifth Circuit's underlying opinion in *Jacobs* held that "[a]lthough we agree that the state's brief on direct appeal appears to contradict its statements to the jury during the Hogan trial, we have found no authority, and Jacobs has cited none, that the state's contradictory statements amount to federal constitutional error." *Jacobs v. Scott*, 31 F. 3d 1319, 1326 (5th Cir. 1994).[202] Justice Stevens likewise pointed to no Supreme Court authority prior to 1995 clearly establishing the unconstitutionality of the conduct complained of, nor does White point to any decision prior to 2002 so holding.

---

[202] See also *Garcia v. Director, TDCJ-CID*, 73 F. Supp. 2d 693, 790-92 (E.D. Tex. 2014) (holding that counsel did not render ineffective assistance by failing to object to prosecution's diverse positions regarding identity of shooter in murder trial in absence of clear prior rule establishing its impropriety).

Indeed, in a 2005 case the Supreme Court reversed the Sixth Circuit's grant of habeas relief and held that a defendant's guilty plea was not rendered unknowing, involuntary, or unintelligent simply because the prosecutor first asserted that the defendant shot and killed the victim, but then in the trial of his co-defendant asserted that the co-defendant was the shooter. *Bradshaw v. Stumpf*, 545 U.S. 175 (2005). In their concurring opinion, Justices Thomas and Scalia noted that "[The Supreme] Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." *Id.* at 190 (Thomas, J., concurring). Since then, the Supreme Court has not still suggested, let alone held, that due process concerns prohibit prosecutors from taking alternative or inconsistent positions. *Littlejohn v. Trammell*, 704 F. 3d 817, 852-53 (10th Cir. 2013).[203]

In *Bradshaw* the Supreme Court held that inconsistent positions taken by the prosecution did not provide a basis to challenge the defendant's *conviction*, but it "express[ed] no opinion on whether the prosecutor's actions amounted to a due process violation, or whether any such violation would have been prejudicial" with respect to the defendant's *sentence*, and therefore remanded the case to the Sixth Circuit to consider the question. *Bradshaw*, 545 U.S. at 187-88. On remand the Sixth Circuit concluded that the prosecution's contention that the defendant was the "triggerman" had an effect upon the death sentence imposed upon him, and that "[t]o allow a prosecutor to advance irreconcilable theories without adequate explanation undermines confidence in the fairness and reliability of the trial and the punishment imposed and thus infringes upon the petitioner's right to due process." The panel thus granted habeas relief over a dissent. *Stumpf v. Houk*, 653 F. 3d 426 , 436 (6th Cir. 2011). However, the Sixth Circuit granted rehearing *en banc* and vacated the panel decision, holding that "[a]ll that the prosecution did was to argue for two different inferences

---

[203] Contrary to White's suggestion, cases like *Berger v. United States*, 295 U.S. 78 (1935), cannot supply the necessary "clearly established federal law" in this context. *Berger* articulated a rule against prosecutorial conduct that is "unjust" or "unfair," but that broad proscription is entirely too nonspecific to be plainly applicable to White's "inconsistent positions" claim. *Littlejohn*, 704 F. 3d at 853. As the Supreme Court has explained, "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error. Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White v. Woodall*, 572 U.S. 415, 426-27 (2014).

from the same, unquestionably complete, evidentiary record. It left the factfinder in Wesley's trial and the factfinders in Stumpf's post-sentencing proceedings to find the facts. This, without more, does not offend the Due Process Clause." *Stumpf v. Robinson*, 722 F. 3d 739, 749 (6th Cir. 2013), *cert. denied*, 571 U.S. 571 U.S. 1133 (2014). Thus, not only was there no clearly established law to support White's "inconsistent positions" claim when the Kentucky Supreme Court denied it in 2002, since then the United States Supreme Court has rejected such a claim as a basis to challenge a conviction and the Sixth Circuit has rejected it as a basis to challenge a sentence, both under circumstances analogous to those present here.

## K.   Claim G(1) – Prosecution Statements Characterizing the Victims as Hardworking and Modest Did Not Render the Trial Fundamentally Unfair.

At several points during the trial, the prosecution solicited testimony from family and friends of the murder victims, each of whom described the life that the three victims had led and characterized them as hardworking, honest, conservative, good, and modest people. The prosecution repeated this characterization several times, including in opening and closing statements in the guilt and penalty phases. White objected to much of this testimony as not relevant, but the trial court overruled most of his objections. White himself also testified that the victims were nice, honest, and hardworking people. On direct appeal White argued that evidence regarding the character of the victims was not relevant and rendered his trial fundamentally unfair, a contention he repeats here. [R. 14-1 at 218-222] The Kentucky Supreme Court did not specifically describe this claim in its opinion, but it was denied through its omnibus conclusion that "[a] review of the entire record convinces us that no reversible error was committed during the guilt or innocence phase of the trial." *White*, 671 S.W.2d at 246. Deference under § 2254(d) therefore applies. *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) ("This claim was rejected on the merits by the Kentucky Supreme Court (albeit without analysis) and therefore receives deferential review under the AEDPA standard.").

White's due process claim fails for two reasons.[204] First, there was no United States Supreme Court decision that had been issued by the time the Kentucky Supreme Court entered its decision

---

[204] White also procedurally defaulted this claim. On direct appeal, White did not point to any Supreme Court decision to support his claim, instead referencing only Kentucky decisions. But fair presentation of a federal constitutional claim requires the petitioner to make the federal basis of the claim explicit to the state

in 1984 that would have made plain that his due process claim was viable, let alone correct.  White must show either that the United States Supreme Court had granted relief in an earlier case on a set of indistinguishable facts or that no fairminded jurist could find the Kentucky Supreme Court's holding was consistent with Supreme Court precedent.  White cannot meet either standard.  It was not until 1987, several years after the Kentucky Supreme Court issued its decision, that the United States Supreme Court squarely addressed the appropriateness of victim impact evidence in *Booth v. Maryland*, 482 U.S. 496 (1987).[205]  See *Kelly v. California*, 555 U.S. 1020 (2008) (Stevens, J., on the denial of the petitions for writs of *certiorari*) ("Victim impact evidence made its first appearance in this Court's jurisprudence in 1987.") (citing *Booth*).

Second, the Kentucky Supreme Court did not unreasonably apply federal law clearly established by the Supreme Court.  The Supreme Court's pre-1984 jurisprudence held that a prosecutor must give "special care" to avoid having his or her conduct or statements infringe a specific right of a criminal defendant, such as the right to confront adverse witnesses or to avoid compulsory self-incrimination.  *Griffin v. California*, 380 U.S. 609 (1965).  If no such specific right is at issue, a prosecutor's conduct may still "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  But to satisfy that standard, it is not enough that the prosecutor's statements were improper, "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A reviewing court may consider any relevant factors in evaluating whether the statements rendered the whole trial

---

court, either by citing to federal law or to the decisions of federal courts.  *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.").  Having failed to do so, this claim is defaulted.

[205]  In *Booth*, the Supreme Court held that the introduction of testimony regarding the impact that the crime had upon its victims was *per se* unacceptable because it "creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner."  *Id.* at 505.  The Supreme Court reversed course a mere four years later and overruled *Booth*, noting that "the assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and in determining the appropriate punishment."  *Payne v. Tennessee*, 501 U.S. 808, 819 (1991).  Of course, "[e]vidence about the victim and survivors, and any jury argument predicated on it, can of course be so inflammatory as to risk a verdict impermissibly based on passion, not deliberation."  *Id.* at 832 (Souter, concurring).

unfair, including whether the statements were invited to respond to comments made by the defense and whether the argument likely affected the jury's determination of guilt in light of other strong evidence of the defendant's guilt. *Id.* at 182. For instance where, as here, a defendant acknowledges his role in the commission of the crimes, it may be difficult or impossible to show prejudice in the guilt phase of the trial.

The only directly-pertinent Supreme Court decision handed down before White's direct appeal concluded is *Donnelly*. That case involved facts wholly different than those presented by White: in closing arguments, the prosecutor in *Donnelly* invited the jury to speculate about the defendant's expectations at trial through his choice to not plead guilty as was done by his co-defendant. The Supreme Court evaluated this specific conduct and related events during the trial to conclude that the defendant's trial was not rendered fundamentally unfair. *Donnelly*, 416 U.S. at 642-45. White fails to establish that the Kentucky Supreme Court's decision was contrary to or an unreasonable application of the Supreme Court's specific holding in that or any other case. The Supreme Court has directed federal courts applying § 2254(d)'s deferential standard to afford state court judgments more latitude when the constitutional principle at issue is general, rather than specific, in nature:

> ... the range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The Supreme Court has expressly identified the *Donnelly/Darden* line of cases as warranting this extra latitude. *Parker v. Matthews*, 567 U.S. 37, 48 (2012) ("Particularly because the *Darden* standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations,' the Sixth Circuit had no warrant to set aside the Kentucky Supreme Court's conclusion.") (citing *Yarbrough*). Here, the question of the trial's fairness is inherently fact-driven and calls for the application of judgment. Section 2254(d) requires deference to the state court's decision in the absence of clear error as made clear by pre-existing Supreme Court precedent. White points to none, and this Court has been unable to find any

Supreme Court decision finding a due process violation under the same or similar facts.  Habeas relief is therefore not warranted.[206]

**L.      Claim H(4) – The Judge's Statements Regarding White's Involvement in a Fight at the Jail Did Not Deny Him a Fair Trial.**

During a weekend recess in the trial, another inmate at the jail where White was being held hit him in the face and head with a stick of wood.  Thus when White was set to resume his testimony on the following Monday, it was readily apparent to the jury that he had been injured. Before White's testimony resumed his attorney stated: "For the record, during the weekend a prisoner from one of the penitentiaries was incarcerated in jail took a two by four to my client's head."  The trial judge sustained the prosecutor's objection, stating: "The jury will not consider that, some fight that he had in jail. It doesn't have anything to do with this case."  On direct appeal to the Supreme Court and in his habeas petition, White contends that the trial court's statement that he was involved in a fight, rather than stating that he was assaulted, was false[207] and "invited the jurors to draw the erroneous inference that [White] was an aggressive and belligerent troublemaker [and] that he intended to kill Charlie, Lula, and Sam …"  [R. 14-1 at 224-226]  Though the Kentucky Supreme Court addressed this claim only through its omnibus conclusion that "[a] review of the entire record convinces us that no reversible error was committed during the guilt or innocence phase of the trial[,]" *White*, 671 S.W.2d at 246, it is still entitled to § 2254(d) deference, *Parker*, 567 U.S. at 48-49.

While White argues that the trial judge's ruling was incorrect, he points to no pre-existing Supreme Court decision establishing that the trial judge's ruling or statement was wrong, let alone wrong and so prejudicial that it rendered his entire trial fundamentally unfair.  It is well-established

---

[206]   White also suggests that the prosecutor's comments deprived him of a reliable sentencing process as required by *Caldwell v. Mississippi*, 472 U.S. 320 (1985).  But the Supreme Court rejected this argument outright in *Darden*, holding that "*Caldwell* is relevant only to certain types of comment – those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision."  *Darden*, 477 U.S. at 183 n.15.  The prosecution statements at issue in this claim are not of this kind, rendering this argument without merit.

[207]   White asserts that the judge's statement that he was involved in a "fight" was wrong because White did not initiate the conflict and did not fight back.  [R. 14-1 at 226; R. 90 at 245, 248]  But White points to no evidence in the state court record, including the trial transcript, to support his characterization about what transpired at the jail.

that "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.   White points to no such authority, instead referencing only cases that set forth the general proposition that a trial court must take steps to ensure that the jury's decision is governed by proper evidence and accurate standards of law, not impermissible collateral matters.  Cf. *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976) (noting that a defendant who is forced to attend trial wearing prison clothes may be denied a fair trial in some circumstances).  As noted above, *Estelle* and similar cases set forth only a broad standard for state courts to apply, rendering deference to their determinations particularly appropriate under § 2254(d) in the absence of clear error.  *Parker*, 567 U.S. at 48.

Further, White's claim of prejudice resulting from the trial court's ruling is based upon unwarranted and unreasonable speculation.  The jury would have already been aware from White's appearance alone that he had been involved in some kind of physical altercation, and his counsel stated that another inmate hit him with a wooden board.  The trial judge's characterization of the altercation as a "fight" need not have radically altered the jury's perception of White: the trial judge in no way stated or suggested that White had started the fight, as opposed to merely reacting defensively to the other inmate's aggression.  And nothing about a defendant's involvement in a fight would have, by itself, caused members of the jury to believe that a criminal defendant was therefore "an aggressive and belligerent troublemaker" who therefore necessarily intentionally murdered his three victims.  Even were this Court evaluating this claim *de novo*, without affording the Kentucky Supreme Court the deference to which it is due, White has made no plausible showing that the trial judge's conduct prejudiced him at all, let alone so severely as to render his entire trial unfair.

## M.   Claim D(3) – The Kentucky Supreme Court Did Not Clearly Err When it Concluded that White's Counsel was Not Ineffective During the Penalty Phase.

When Early and Charters were first retained as counsel, White, Bowling, and Fisher all told the attorneys that they had no role in the crimes and wished to assert their innocence.  Accordingly, the defense began to work on an alibi defense contending that the young men had not committed

the crimes, and that the evidence against them was purely circumstantial and insufficient to prove that they were involved.[208]

Before trial, Charters had a long discussion with Kitty Neace, White's grandmother who had raised him since he was an infant.  Charters asked at length about White's background because the alibi defense was based, in part, on the notion that it was not in White's character to commit this kind of crime.  Long before Fisher turned state's evidence, over the course of a dozen hours Charters asked Kitty and other family members if he had behavioral problems growing up.  They responded unequivocally "no," that there had not been any violence "and got pretty much the description of him just being a good little boy."  Charters would later testify that he did not take their responses at face value, but found no reason at that point to suspect that the family was not presenting a fair picture of White's upbringing.[209]  Charters asked if White had displayed any concerning behavior or had a criminal record and was told that he did not.  He recalled specifically that "[w]hen I talked to the defendants and to their families, and to friends and people who knew them, I was given no indication by anyone, at any time, that [White's] conduct during this life had been erratic at all.  He had been described to me as a – possibly an underachiever, not great in school and that sort of thing.  But, none of the conduct that was later described to me, and the erratic behavior that was described to me, was ever told to me prior to the time that Fisher turned State's evidence."[210]

Because counsel were preparing a defense that White was not involved in the crimes, they anticipated that should the jury nonetheless convict White, during the sentencing phase arguments would be presented which would be consistent with the alibi defense that would be presented during the guilt phase.  Namely, that White had a normal upbringing and that if he did commit the crimes, that conduct was entirely out of character.  Such an argument would have played upon any residual doubt the jury had about whether White had actually committed the crimes in the hope that the jury would impose a lighter sentence as a hedge against an unwarranted conviction.  Charters would later explain that during the sentencing phase "… there would have been evidence.  But, the evidence

---

[208] [December 12, 1979 hearing at 72-73]

[209] [RCr 11.42 at 900-03, 980-81]

[210] [RCr 11.42 at 899-900]

would have been – that is my very point – the evidence would have been that this type of conduct was totally, utterly out of character from them because of their history."[211]   For example, during "[t]he penalty phase; you know, we were going to put on family, friends and neighbors. ... [t]o say all the things that you say in a penalty phase, that the penalty should not be an extreme one because, you know, their lack of their history of this, their age, their background."[212]

The defense strategy necessarily shifted once Fisher agreed to testify for the prosecution that the three boys had committed the robbery and murders.   Having chosen to pursue a new defense of insanity and/or intoxication, counsel returned to the family to get a clearer and more accurate understanding of White's background.   Early interviewed White for several hours to learn every aspect of his entire life story, and for each detail that White recounted to him, he conducted follow up interviews with numerous family members in an effort to corroborate what he had been told.[213] Counsel likewise told White's family to relate to them anything about White's childhood history and background that could be of value in presenting an intoxication or insanity defense.   Charters stated "the family was now telling me a great deal more than I had learned before."[214]   White's family and friends did not provide the attorneys with merely one or two anecdotes, but instead with an abundance of stories and events of interest.   The family told defense counsel that when he was growing up White had nightmares; at times had behaved in bizarre or violent ways; had been physically abusive towards animals and pets; had nightmares; wet the bed until an advanced age; had attempted to engage in bestiality; and had behaved in sexually inappropriate ways towards his sisters. These stories were the only ones the family told Early and Charters in 1980; it would not be until nearly twenty years later that these family members and friends would recount for the first time new stories involving reckless driving, car accidents, repeated seizures, sexual abuse, and severe beatings.[215]

---

[211]   [RCr 11.42 at 898-99]

[212]   [RCr 11.42 at 920]

[213]   [RCr 11.42 at 615-16]

[214]   [RCr 11.42 at 917-18]

[215]   White suggests that defense counsel did not uncover any of this evidence, but some of it was in fact presented during trial proceedings.   Kitty Neace and Henry Bowling testified that White had wrecked a

Once counsel challenged White's competency to stand trial, Judge Graham scheduled a hearing for the following week. The same day, February 14, 1980, Judge Graham also appointed Dr. Robert Granacher to evaluate White and to report back to the court concerning his competency.[216] As Dr. Granacher was appointed by the court rather than retained by the defense, he did not communicate with defense counsel prior to his evaluation.[217] Defense counsel did not convey any information about White's background or family history to Dr. Granacher in the two days between his appointment by the court and the evaluation.[218]

Granacher administered that competency test on February 16, 1980. The test merely "requires the defendant to complete 22 sentences which focus on the defendant's understanding of the trial process and his ability to consult with his lawyer."[219] Based on White's responses, Granacher wrote a brief one-page handwritten note to Judge Graham advising that in his professional opinion White was competent to stand trial and to assist his counsel in presenting a defense.[220] Granacher also volunteered that White's statements during the test led him to believe that he might have been under the influence of drugs or alcohol when the crimes were committed, and suggested to Judge Graham that White be evaluated by a forensic psychiatrist to determine his sanity at the time.[221]

Two decades later, Granacher provided an affidavit stating that if he had been told that White had been in several car accidents and suffered seizures, he would have also recommended to

---

scooter, two cars and a truck a few years earlier, and had been thrown through a window during one accident and had suffered a head injury in another. [Trial at 530-32; 639-40] Kitty admitted to spanking White as a child, and Henry indicated that Nancy Bowling had disciplined him with a belt and a "switch." [Trial at 641-43] Kitty also acknowledged that she had given White cigarettes when he was fourteen years old, but denied ever giving him alcohol at that age, or that White would steal from others. [RCr 11.42 at 1102, 1130-33]

[216] [Granacher Depo. (June 1, 1999); Exh. #2 (Feb. 16, 1980 report)]

[217] [Granacher Depo. (June 1, 1999) at 8, 12-13]

[218] Dr. Granacher stated that such information would not have been relevant to the limited question of competence to stand trial, the only issue he was asked to evaluate for the court. [Granacher Depo. (June 1, 1999) at 50-52, 66-67]

[219] [RCr 11.42 Supp. at 1183]

[220] [Granacher Depo. (June 1, 1999); Exh. #3 (Feb. 16, 1980 report)]

[221] [RCr 11.42 Supp. Record at 1184]

the judge that White be examined by a neurological expert to assess his criminal responsibility for the crimes: "The new information I now have before me constitute even more compelling reason to recommend as I did in 1980 that Mr. White needed to have a complete mental health examination, including a physical examination and neurological examination, as well as the necessary psychological and psychiatric evaluations." Dr. Grancher declined, however, White's invitation to offer a different or more favorable psychiatric assessment of him with respect to either his sanity at the time he committed the crimes or for purposes of mitigation.[222]

Whereas Dr. Grancher had been appointed by the Court, Dr. Paul Evensen was hired by defense counsel to evaluate White. Counsel asked Dr. Evensen to evaluate White's mental state for purposes of both his criminal responsibility for the robbery and murders and to provide an assessment of his rehabilitative potential for possible use during the penalty phase. By that point, counsel had gathered considerable background information about White from his family, and conveyed this information to Dr. Evensen.[223] On February 23, 1980, Evensen performed an assessment called the Minnesota Multiphasic Personality Inventory ("MMPI") as well as a "fairly detailed clinical interview."[224]

Three days later Dr. Evensen provided a detailed written report to Early. Unfortunately, it was not helpful to the defense. The report noted the many facts of White's difficult childhood, including witnessing the killing of his father, as well as resulting behavioral problems including "extensive thrill-seeking behavior." Evensen also relayed that during the interview White expressed both "a sense of shame and guilt" about having murdered his three victims, but also that he feared the possible criminal consequences he faced for his actions.[225]

Evensen concluded that White suffered from an antisocial personality disorder; however, there was no evidence that he suffered from a "mental disease or defect that would undermine his

---

[222] [RCr 11.42 Supp. Record at 1183-90; Grancher Depo. (June 1, 1999) at 39-41].

[223] [RCr 11.42 Supp. Record at 1120-26; Evensen Depo. (June 8, 1999) at 10-11, 17-20]

[224] [Evensen Depo. (June 8, 1999) at 9-10]

[225] [Evensen Depo. (June 8, 1999), Exh. #2 (Feb. 26, 1980 report) at 1]

123

capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."  He explained that:

> [White] seeks to protect himself from what he sees as self-centered motives of others by actively pursuing immediate personal need satisfaction with minimal regard for the rights and feelings of others.  His basic style is to decide what he wants and then take it first, through superficial charm, but if it is not immediately forthcoming, through power and intimidation. ... If people do not meet his self centered needs immediately, he becomes very angry with only minimal control that most of us develop through appreciation and concern for the positive or negative effects our behavior has on other people.
>
> ** ** **
>
> ... [White's] intoxicated state would have impaired his judgment and control over the degree of anger expressed at the scene when he was threatened with possible identification.  In a panic over fear of being caught ... he could well have "snapped" and reacted in a self-protective over-aggressive fashion.  This series of events is more probable than a cold, calculated premeditated plan to commit murder for while he is almost totally self-centered, murder is an ego alien behavior for which he can feel true remorse.[226]

In sum, Evensen opined that White was not insane when he committed the robbery and murders.  Instead, Evensen believed that when Fisher called out White's name during the robbery, White - faced with identification by the shopkeepers who had known him for years – "snapped" and murdered them to prevent himself from being caught for the robbery.

Evensen also provided counsel with his opinion regarding White's prospects for rehabilitation in prison to present to the jury during the penalty phase as an alternative to the death penalty.  Evensen indicated that if White was placed in the structured environment of prison, he could learn to control his hostility towards others; to understand the impact of his conduct on other people; and would benefit from educational and vocational training programs.[227]

As he did with Dr. Granacher, twenty years after his conviction White's habeas counsel presented Dr. Evensen with additional information about his childhood and background.  During collateral review proceedings Dr. Evensen testified during his deposition that in 1980 he was already

---

[226] [Evensen Depo. (June 8, 1999), Exh. #2 (Feb. 26, 1980 report) at 1-2]

[227] [Evensen Depo. (June 8, 1999), Exh. #2 (Feb. 26, 1980 report) at 2]

aware that violence was a part of White's upbringing.  However, he did state that the additional information indicated that it was more persistent than he had previously been aware.  That said, Evensen stated that it would not have changed his opinion or testimony regarding White's criminal responsibility for the crimes; instead, it merely confirmed his opinion that White had not planned to kill his victims, but did so only once he feared they could identify him.[228]

Given the reports provided by Drs. Granacher and Evensen in 1980, defense counsel chose not to call either of them to provide expert testimony during either the guilt or penalty phase.  Neither professional was prepared to testify that White was insane, and certain statements and conclusions in Dr. Evensen's report would have been damaging if offered during the penalty phase.

In his petition, White contends that defense counsel provided ineffective assistance during the penalty phase in essentially five respects.  White alleges that Early and Charters did not ask his family any questions about his background until just before the trial began.  He also complains that counsel did not uncover all of the events that occurred during his childhood and upbringing, and thus did not provide Drs. Granacher and Evensen with the entirety of the evidence they needed to inform their professional judgments.  White argues that counsel were ineffective when they decided against calling Dr. Evensen as a witness during the penalty phase.  White further asserts that counsel should have placed more emphasis on the positive aspects of his life and character during the penalty phase, and should have argued that he was relatively less culpable than Fisher and Bowling for his role in the crimes.  [R. 14-1 at 148-63][229]

The Kentucky Supreme Court addressed White's ineffective assistance claim as follows:

---

[228]  [RCr 11.42 Supp. Record at 1120-26; Evensen Depo. (June 8, 1999) at 21-22, 35]

[229]  In his reply brief, White sets forth at great length and for the first time all of the testimony about his childhood and past which he now contends that counsel should have investigated, discovered, and presented. [R. 90 at 190-202]  But none of these facts were detailed or presented to the Kentucky Supreme Court on direct appeal or during collateral review proceedings, and they were not detailed or presented to this Court in White's habeas petition.  For the same reasons set forth in the Court's discussion of White's new arguments regarding counsel's performance during the guilt phase in Claim D(2), the former fact renders these grounds procedurally defaulted, *Hanna v. Ishee*, 694 F. 3d 596, 609 (6th Cir. 2012), and the latter fact renders these grounds forfeited, *United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Fowler*, 819 F. 3d 298, 309 (6th Cir. 2016).  *See also Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (citations omitted).  Regardless, White's claim with respect to them is substantively without merit for the reasons discussed below.

IA. Ineffective Assistance Standard

White mounts a comprehensive and vigorous attack on the performance of his defense counsel in both the guilt and penalty phases of the trial. The seminal case for measuring ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is always a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland, supra.* "Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland.* A reviewing court in an ineffective assistance claim must consider the totality of the evidence before the judge or jury. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland.* The critical question is whether the conduct of counsel "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland; see also Sanborn v. Commonwealth*, Ky., 975 S.W.2d 905 (1998).

We are persuaded by the view expressed in *Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995), a death penalty case, that the mere fact that counsel might have presented additional information about the defendant as mitigating evidence does not establish ineffective assistance. *See also Brecheen v. Reynolds*, 41 F.3d 1343 (10th Cir. 1994). Even in a death penalty case, "where the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigating evidence." *Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995). White received effective assistance of counsel during both the guilt and penalty phases of his trial.

B.

We are not convinced that counsel was ineffective simply because they did not pursue every conceivable strategy in preparation for the penalty phase. *Cf. Moore v. Commonwealth*, Ky., 983 S.W.2d 479 (1998). In regard to the penalty phase, we find that defense counsel's representation was not ineffective. The arguments now presented by White are little more than a lengthy legal essay on how the case could have been handled with the benefit of hindsight. RCr 11.42 motions attempting to denigrate the conscientious efforts of defense counsel on the basis that someone else could have handled the case differently or better will be accorded short shrift in this Court. *See Penn v. Commonwealth*, Ky., 427 S.W.2d 808 (1968). We find no reason to evaluate the performance of defense counsel through the clear prism of hindsight. *Cf. Waters, supra.* The complaints presented about the penalty performance do not meet the standards set out in *Strickland* for ineffective assistance.

Trial Counsel's Performance

126

White complains about a number of aspects of the performance of defense counsel beginning with their failure to investigate all possible defenses. We find that the performance of trial counsel was not deficient. An investigation must be reasonable under all the circumstances. *See Stevens v. Zant*, 968 F.2d 1076 (11th Cir. 1992). White originally denied involvement in the crime and consequently, the defense preparation was geared to a noninvolvement theory. The reasonableness of counsel's action may be determined by the defendant's own statements or actions. *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Trial counsel Early and Charters both testified at the RCr 11.42 evidentiary hearing and each stated that he thought the three defendants were innocent until learning that Fisher wanted to testify. The evaluation of the case by defense counsel was not clearly unreasonable or unprofessional under all the circumstances. Counsel discharged their duty to make a reasonable investigation. Because the defendants originally claimed they were not guilty, there was no reason to investigate White's background or his physical or mental health.

After there was a change in the defense strategy because of the testimony of Fisher, White was examined by two mental health professionals. At the time of the 1980 trial, a defense attorney had no duty to discover and provide information about every aspect of White's entire life or an account of several generations of his extended family. *See Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995).

White contends that defense counsel should have called Dr. Evensen as an expert during the penalty phase. An examination of the Evensen report provides a reasonable justification for the decision not to call him. The report includes statements that White suffered from an antisocial personality disorder with explosive features, drug dependence, lack of empathy, self-centeredness, thrill-seeking, unjustified anger and minimal controls. Although White maintains that this is mitigating evidence, it can just as easily be considered as detrimental to his case.

White's reliance on *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), is misplaced. That case is distinguishable and not controlling here. This case, unlike *Williams, supra*, does not involve a total failure to inquire into White's life or family background and the evidence omitted in this case was cumulative. Here, defense counsel presented mitigating evidence regarding White's background during the guilt phase. Any more evidence would have been cumulative and perhaps counter productive.

The argument by White that his defense counsel did not present any evidence about his positive qualities is without merit. The record indicates that defense counsel Charters argued such matters vigorously during the penalty phase closing argument. Defense counsel has no absolute duty to present all mitigating evidence. *Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998). The decisions made by defense counsel not

127

to call Dr. Evensen, not to recall family members and not to present evidence which conflicted with the mitigation theory were professionally reasonable.

Even if all the testimony White suggests had been introduced during the penalty phase it would not have been sufficient to counter or explain the brutalities of the three murders. *See Nguyen v. Reynolds*, 131 F.3d 1340 (10th Cir. 1997). Some of the evidence could have been detrimental to his case. As noted in *Haight v. Commonwealth*, Ky., 41 S.W.3d 436 (2001), "the critical issue is not whether counsel made errors, but whether counsel was so thoroughly ineffective that defeat was snatched from the hands of probable victory." There is no possible or reasonable chance that the omitted testimony would have had such an unquestionably favorable impact that it would have changed the sentence of the jury.

*White v. Kentucky*, 1994-SC-0326-MR (Ky. May 16, 2002) (slip opinion at 3-6) (unpublished).

A defendant who contends that trial counsel failed to provide the effective assistance required by the Sixth Amendment must establish both deficient performance by counsel and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Counsel's strategic choices must have been objectively unreasonable. *Railey v. Webb*, 540 F. 3d 393, 415 (6th Cir. 2008). A reviewing court must evaluate strategic decisions in light of the information that was available to counsel at the time, *Strickland*, 466 U.S. at 687, and acknowledge that a wide range of different or even conflicting strategic decisions will qualify as providing effective assistance, *Woods v. Donald*, 575 U.S. 312, 315 (2015). *Strickland* itself requires deference to counsel's strategic decisions on direct review; because Section 2254(d) adds a second layer of deference when reviewing a state court's adjudication of an ineffective assistance claim, this Court asks only "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

When a defendant contends that his counsel was ineffective during the penalty phase, the Court must "determine whether counsel reasonably investigated the defendant's background and presented mitigating evidence to the jury." *Landrum v. Mitchell*, 625 F.3d 905, 929 (6th Cir. 2010) (*citing Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003)); *Phillips v. White*, 851 F. 3d 567, 576-77 (6th Cir. 2017) (holding that a failure by defense counsel "to investigate or present mitigating evidence at capital sentencing may constitute deficient performance."). Counsel's investigation should seek evidence to present in the event of a conviction, such as "... the defendant's background, education, employment record, mental and emotional stability, family relationships, and [] mitigating

circumstances surrounding the commission of the offense itself." *Powell v. Collins*, 332 F. 3d 376, 399 (6th Cir. 2003) (citation omitted). This information "is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

Counsel's decisions regarding both the breadth and the depth of the investigation on a particular matter must be reasonable. In determining reasonableness, the Court considers what information was already known to counsel and whether counsel pursued leads to additional information likely to be of assistance. *Jackson v. Bradshaw*, 681 F.3d 753, 768 (6th Cir. 2012). On the one hand, counsel may not abandon investigation of mitigating factors before they are able to make an informed decision regarding sentencing strategy. *Jackson*, 681 F.3d at 768. On the other, a particular line of inquiry may be unnecessary or limited in scope depending upon counsel's reasonable professional judgments about the facts of the case or decisions about trial strategy. *Strickland*, 466 U.S. at 690-91 (strategic decisions made after a "less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Thus, "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

If the Court finds deficient performance by counsel, it must then determine whether the defendant suffered prejudice as a result. In doing so,

> ... the reviewing court must reweigh the evidence in aggravation against the total available mitigating evidence, adduced at trial and in post-conviction proceedings to determine whether there is a "reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." The petitioner must present new evidence that differs both in strength and subject matter from the evidence actually presented at sentencing, not just cumulative mitigation evidence.

*Landrum*, 625 F.3d at 930 (*quoting Strickland*, 466 U.S. at 695, and *citing Broom v. Mitchell*, 441 F. 3d 392, 410 (6th Cir. 2006); *Clark v. Mitchell*, 425 F. 3d 270, 286 (6th Cir. 2005)). And "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 694.

With these principles at hand, the Court assesses White's individual contentions in turn. He first argues that Early and Charters provided ineffective assistance because they waited too long before they asked White's family and friends questions about his upbringing to gather background information for the penalty phase.  As a result, he argues, counsel did not uncover additional evidence about violence in the family, substance abuse, car accidents and injuries, as well as positive facts including his success at running track in middle school, his success at Riverside high school, and favorable assessments about his performance at several jobs.

Before the Kentucky Supreme Court, White argued that counsel should have been asking White and his family questions about any injuries, violence or sexual abuse in his past well in advance of trial.[230]   The Court rejected the contention that counsel was ineffective, noting that "White originally denied involvement in the crime and consequently, the defense preparation was geared to a noninvolvement theory. ... Because the defendants originally claimed they were not guilty, there was no reason to investigate White's background or his physical or mental health." *White*, 1994-SC-0326-MR (slip opinion at 4-5).

White points to no law clearly established by the United States Supreme Court indicating that the Kentucky Supreme Court unreasonably applied its precedent.  Early in the case Charters did, in fact, interview White's grandmother and other family members about White's past.  Counsel indicated that he did so because, even when presenting an alibi defense, in the event of a conviction he intended to argue that White had a normal upbringing and it would have been entirely out of character for him to have committed such crimes.  Despite his inquiries, White's family told counsel nothing that gave him reason to believe that White had had a troubled childhood.[231]   Given the broad denials from White's immediate family, counsel did not act unreasonably in deciding not to pursue the matter further with more distant relatives and friends.  *Cf. Thomas v. Gilmore*, 144 F. 3d 513, 514-15 (7th Cir. 1998) ("It is reasonable for a lawyer to place a certain reliance on his client, so that if the client and his family and friends throw the lawyer off the scent ... by denying the existence of psychological problems that might have provided an alternative theory of mitigation, the lawyer

---

[230]  [Brief of Appellant RCr 11.42 (second appeal) at 15]

[231]  [RCr 11.42 at 898-900; 920]

cannot be faulted for failing to go down the path thus closed off."); *Drummond v. Houk*, 797 F. 3d 400, 405 (6th Cir. 2019) ("A defense lawyer need not interview every member of a defendant's family when gathering mitigation evidence.  Instead, there 'comes a point at which evidence … can reasonably be expected to be only cumulative, and the search for it distractive from [the attorney's] more important duties.'") (*quoting Bobby v. Van Hook*, 558 U.S. 4, 11 (2009)).

In addition, much of the evidence that White contends his counsel should have found earlier was revealed by the family only after Fisher turned state's evidence.  At that point White's family disclosed for the first time that when he was growing up White had nightmares; had periodically engaged in bizarre or violent ways; had made sexual advances towards his sisters; had been severely disciplined and abused by his birth mother; had driven recklessly and had been injured in several bad accidents.  Counsel presented this testimony at trial.[232]

Twenty years after White's conviction, family and friends added previously-undisclosed stories of a similar vein.[233]  But in 1980 counsel, having asked for and received abundant background information of precisely this nature, had no reason to believe that the family was holding anything back or would not have told them everything that they knew.  White's counsel were not ineffective for failing to investigate through the obfuscation and lack of wholehearted cooperation of their client and his family.  And by this point, to pay for the costs of the defense Kitty Neace had already taken out a loan from the bank and Henry Bowling had sold his home.[234]  Counsel, faced with significant limitations on both their time and the funds available from White's family to dig deeper still, did not act unreasonably.  *Thomas*, 144 F. 3d at 515 ("A reasonable investigation is not, however, the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct.").  Because counsel were pursuing an alibi defense and the family gave them no reason to suspect a troubled upbringing in response to direct inquiries, the Court cannot conclude that the Kentucky Supreme

---

[232]  [Trial at 530-32; 639-43]

[233]  As noted above, two of White's sisters would later admit to giving false testimony at trial in an effort to bolster his defense.  *See* note 52.

[234]  [RCr 11.42 at 1099]

Court failed to adhere to Supreme Court precedent when it determined that defense counsel's investigation did not constitute ineffective assistance.

Building upon his first argument, White next complains that because defense counsel did not discover his entire history of car accidents, head injuries, and family history of mental health problems at the outset of the case, this information was not provided to Drs. Granacher and Evensen and thus prevented them from reaching a fully-informed assessment of his mental health at the time of the robbery and murders. The Kentucky Supreme Court disagreed, noting that "[a]t the time of the 1980 trial, a defense attorney had no duty to discover and provide information about every aspect of White's entire life or an account of several generations of his extended family."

White's claim founders because it disregards essential facts in the case and ignores context. Fisher did not turn state's evidence until the case had already been pending for nine months. Until that point defense counsel's preparations were focused upon presenting evidence during the penalty phase consistent with the alibi defense that they had long been working on, emphasizing White's positive characteristics and arguing that it was not in his character to commit this type of crime. Because of both the nature of the alibi defense and the denials by White and his family that his childhood had been troubled, counsel had little reason to disregard what their own client was telling them and seek out evidence of violence, abuse, or injury.

Then, Fisher's unexpected change of heart caused Early and Charters to shift strategy. Settling upon a defense of intoxication and/or insanity, counsel promptly began gathering evidence in support of that defense. White complains that counsel should have given that evidence (including all that they found and that which they did not), to Dr. Granacher prior to his evaluation. But Granacher was hired by the trial court, not defense counsel, and his evaluation was limited to determining White's competency at the time of trial, not his mental state at the time the crimes were committed. Granacher also performed his evaluation on a Monday, only three days after Fisher turned state's evidence. It is manifestly unreasonable for White to assert that his counsel should have investigated and obtained an in-depth family history over the weekend to provide to Dr. Granacher on Monday.

Nor does White point to any actual evidence establishing that such information, had it been provided, would have made a difference. He now argues that the additional information "would have been helpful on a myriad of issues, including extreme emotional disturbance and post-traumatic

stress disorder." But Dr. Granacher's testimony offers no support for that far-reaching assessment. Rather, Dr. Granacher would only say that the new information would have reinforced his belief, already expressed to Judge Graham in 1980, that White should undergo further testing and evaluation. What that further testing might have led to, if anything, White leaves to unabashed speculation. Indeed Dr. Granacher has not, in the forty years since White's conviction, ever reached or given a professional opinion as to either White's sanity at the time the crimes were committed or with respect to matters pertinent to mitigation, even with all of the additional information.[235] Nor has White provided such an opinion from any other expert psychiatrist during that expanse.

White makes the same argument with respect to Dr. Evensen, who was hired by defense counsel in the hope of providing useful expert testimony during both the guilt and penalty phases. However, White's position suffers from many of the same difficulties as those discussed above. Dr. Evensen conducted his evaluation one week after Fisher turned state's evidence, and by that point counsel had discovered much from White's family. The information that counsel had obtained from White's family was provided to Evensen, who gained additional information from White himself during his interview. But counsel could not convey to their expert information – first revealed during collateral review proceedings in 1999 – that White's family and friends had inexplicably chosen to withhold from them in 1980. And like Dr. Granacher, Evensen did not indicate that the new information would have resulted in an expert psychiatric assessment more favorable to White's defense.[236] White therefore fails to show either deficient performance or resulting prejudice. *Cf. Hughbanks v. Hudson*, 2 F. 4th 527, 546-48 (6th Cir. 2021) (notwithstanding counsel's unreasonable failure to discover and present additional evidence of childhood abuse and mental health concerns, affirming denial of habeas relief for lack of prejudice where experts did not testify that missing information would have affected their psychiatric assessment of the defendant).

With respect to Evensen, defense counsel certainly had an obligation to investigate for information relevant to his task as a retained psychological expert and to provide it for his review without having to be asked for it. *Wallace v. Stewart*, 184 F. 3d 1112, 1116 (9th Cir. 1999); *Wilson*

---

[235] [RCr 11.42 Supp. Record at 1183-90; Granacher Depo. (June 1, 1999) at 36-41].

[236] [RCr 11.42 Supp. Record at 1120-26; Evensen Depo. (June 8, 1999) at 21-22, 35]

133

*v. Sirmons*, 536 F. 3d 1064, 1089 (10th Cir. 2008).  On the other hand, "the expert will know better than counsel what evidence is pertinent to mental health diagnoses and will be more equipped to determine what avenues of investigation are likely to result in fruitful information.  To a degree, counsel should be able to rely on that expert to determine what evidence is necessary to an effective evaluation, and what additional evidence the expert needs to complete testing."  *Id.* (*citing Hendricks v. Calderon*, 70 F. 3d 1032, 1038-39 (9th Cir. 1995)).  As the Ninth Circuit explained,

> An integral part of an expert's specialized skill at analyzing information is an understanding of what information is relevant to reaching a conclusion.  Experts are valuable to an attorney's investigation, then, not only because they have special abilities to process the information gathered by the attorney, but because they also are able to guide the attorney's efforts toward collecting relevant evidence.  To require an attorney, without interdisciplinary guidance, to provide a psychiatric expert with all information necessary to reach a mental health diagnosis demands that an attorney already be possessed of the skill and knowledge of the expert.

*Hendricks*, 70 F.3d at 1038–39.  Here, Evensen was provided with considerable information about White's background from defense counsel.  Evensen did not indicate to the defense, either before or after his evaluation, that additional information was needed.  Nor, apparently, did White himself give Evensen this information during his interview.  Under such circumstances, an attorney's performance is not deficient merely because additional information about the defendant's background is not located and provided to the expert absent a specific request stating that more is needed.  *Cf. Lewis v. Alexander*, 11 F. 3d 1349, 1353 (6th Cir. 1993); *Card v. Dugger*, 911 F. 2d 1494, 1511-12 (11th Cir. 1990) (an attorney is "not obligated to track down every record that might possibly relate to [the defendant's] mental health and could affect a diagnosis.").  The Kentucky Supreme Court's holding that counsel was not ineffective with respect to the information provided to Drs. Granacher and Evensen was neither contrary to nor an unreasonable application of clearly established law.

In his third argument, White contends that counsel should have called Dr. Evensen during the penalty phase to testify that White did not plan to murder his victims, showed remorse for doing so, and would have prospered in the structured environment of prison.  The Kentucky Supreme Court, noting that Evensen's report contained both helpful and damaging information, held that counsel's decision not to call him was therefore a matter of strategic judgment and was not constitutionally ineffective.  The Court stated that "[a]n examination of the Evensen report provides

a reasonable justification for the decision not to call him.  The report includes statements that White suffered from an antisocial personality disorder with explosive features, drug dependence, lack of empathy, self-centeredness, thrill-seeking, unjustified anger and minimal controls.  Although White maintains that this is mitigating evidence, it can just as easily be considered as detrimental to his case. ... The decisions made by defense counsel not to call Dr. Evensen, not to recall family members and not to present evidence which conflicted with the mitigation theory were professionally reasonable."  *White*, 1994-SC-0326-MR (slip opinion at 5-6).

The Kentucky Supreme Court did not unreasonably apply *Strickland* when it held that White failed to rebut the presumption of reasonableness afforded to his attorneys' decision not to call Dr. Evensen during the penalty phase.  It is true that Dr. Evensen's report could have been helpful to White in certain regards.  For instance, in it Evensen described White's troubled upbringing as well as his conclusion that White's decision to kill his three victims was a spontaneous rather than a premeditated one.  Further, Evensen noted that White had displayed remorse for the murders during his interview.  Evensen also concluded that through rehabilitative programs in prison White could come to understand and value the rights of other persons and thus better control his behavior.[237]

But Evensen's report was also damning in several respects.  The report rejected the notion that White was criminally insane, which would have both validated the jury's decision to convict him while also undermining counsel's credibility.  It also presented White as "totally self-centered" and violent, hardly a viewpoint that counsel wanted to emphasize during the penalty phase.  Dr. Evensen stated that White's nature was to "pursu[e] immediate personal need satisfaction with minimal regard for the rights and feelings of others.  His basic style is to decide what he wants and then take it first, through superficial charm, but if it is not immediately forthcoming, through power and intimidation."  This assessment would have provided the prosecution with an even more powerful argument in support of its request for the death penalty, especially coming from White's

---

[237] [Evensen Depo. (June 8, 1999), Exh. #2 (Feb. 26, 1980 report)]

own expert witness.  And while Evensen indicated that White had expressed remorse, he had also expressed concern that he faced criminal consequences for murdering three people.[238]

Under circumstances such as these – where the evidence in question is at best a double-edged sword, both helpful and harmful – counsel's strategic decision whether to present it is not unreasonable so long as the decision is informed and reasoned.  *Laws v. Armontrout*, 863 F. 2d 1377, 1382, 1382-83 (8th Cir. 1988) (*en banc*) ("[T]he decision not to present evidence at the penalty phase is well within the range of practical choices that are not to be second-guessed, as long as they are based on informed and reasoned judgment."), *cert. denied*, 490 U.S. 1040 (1989).  Here, counsel knew that Dr. Evensen would have been cross-examined at length by the prosecution regarding his report, which would have powerfully emphasized White's self-centered and violent tendencies to the jury.  "Counsel can reasonably decide not to present potentially helpful mitigating evidence – including the testimony of mental experts – if such evidence would result in the introduction of damaging evidence."  *Preston v. Delo*, 100 F. 3d 596, 603 (8th Cir. 1996) (*citing, inter alia, Burger v. Kemp*, 483 U.S. 776, 792 (1987) and *Darden v. Wainwright*, 477 U.S. 168, 186-87 (1986) (holding that it was not unreasonable for defense counsel to decide against offering psychiatric testimony favoring the defendant because it would have permitted the prosecution to show the jury damaging and previously-unintroduced evidence of the defendant's prior convictions and expert testimony that the defendant could have acted impulsively to commit the murders)).  *See also Hartman v. Bagley*, 492 F.3d 347, 359-61 (6th Cir. 2007) (holding that counsel chose reasonably in declining to present expert's testimony where his report "identifie[d] mitigating factors and contains some sympathetic commentary [but] other aspects of it paint a decidedly unsympathetic portrait."); *Sanchez v. Davis*, 994 F. 3d 1129, 1148 (9th Cir. 2021) (holding that counsel was not ineffective for declining to call two experts who would be subject to cross-examination regarding their reports which concluded that the defendant was not mentally impaired); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035-36 (9th Cir.

---

[238]  White makes much of the fact that in 1999, Evensen executed an affidavit stating that in 1980 it was his professional opinion that White suffered from Attention Deficit Disorder and/or a Learning Disability.  But Evensen's 1980 report does not mention either of these diagnoses by name or list any facts suggesting that they might be present.  Even taking Dr. Evensen's belated assessments at face value, his testimony and the report itself make plain that he never communicated them to defense counsel.  [Evensen Depo. (June 8, 1999), Exh. #3 (May 6, 1999 affidavit)]

1997) (describing evidence of a defendant's antisocial personality disorder – the diagnosis of White given by Dr. Evensen – as "a basket of cobras" and noting the "obvious countervailing tactical dangers" to a defendant of presenting such evidence to a jury).  Because counsel could reasonably conclude that the inevitable harm coming from disclosing Dr. Evensen's report outweighed any benefits from his testimony, White fails to establish ineffective assistance from counsel.

In his fourth sub-claim, White argues that defense counsel should have placed more emphasis on the positive aspects of his life and character during the penalty phase.  Specifically, he asserts that counsel should have pointed out that when he was about fourteen years old White ran with the track team and performed very well; studied the Bible and was prospering academically at the Riverside school; and he was considered a good and reliable worker at several jobs he held after he left high school.

However, at trial White did testify about his time at the Riverside school.  He stated that he particularly enjoyed a class about the Bible, and also testified that he had played basketball and run with the cross country team, and had been successful at both.  But White also stated that later he smoked marijuana and sniffed gas with other kids at school, and had stolen from others.  As for his work history, White stated that he enjoyed work.  However, he had also lost some jobs and stated that he sometimes did not come into work, either because he didn't feel like it or had stayed out late the night before and called in sick.[239]  The Kentucky Supreme Court rejected this sub-claim, stating that "[t]he argument by White that his defense counsel did not present any evidence about his positive qualities is without merit.  The record indicates that defense counsel Charters argued such matters vigorously during the penalty phase closing argument. ... There is no possible or reasonable chance that the omitted testimony would have had such an unquestionably favorable impact that it would have changed the sentence of the jury."

The Kentucky Supreme Court correctly concluded that White failed to establish either deficient performance by counsel or resulting prejudice.  White does not contend that there was no evidence put forward of his positive qualities, only that counsel did not emphasize it more.  But counsel cannot emphasize everything, and decisions as to which facts and arguments should be stressed at the expense of others are precisely the sorts of judgment calls made by counsel which

---

[239]  [RCr 11.42 at 263, 1034; Trial at 1576, 1818-20; 1833-38, 1904-10]

generally do not support an ineffective assistance claim. *United States v. Gordon*, 641 F. App'x 2, 4 (D.C. Cir. 2016) (*citing United States v. Mullins*, 315 F. 3d 449, 453 (5th Cir. 2002)). And counsel's decision not to belabor these facts is amply supported by the record. White's passing interest in the Bible and his accomplishments running track occurred when he was 14-15 years old, more than five years before he committed the robbery and murders. Nor was the evidence as uniformly positive as he asserts: during this period White also stole from his classmates and took drugs, and later when he was employed, he would not always show up for work. This is not to say that evidence that White had, at times, behaved in a constructive or helpful way did not have value to his defense. However, in light of the other evidence regarding his other conduct and the gruesome nature of the murders, there no reason to believe that it would have made a meaningful difference to the jury's sentencing decision. Thus, even assuming that incrementally more emphasis on these points could have been helpful, White offers only speculation that he suffered prejudice as a result. This sub-claim is therefore without merit. *Cf. Smith v. Spisak*, 558 U.S. 139, 149-55 (2010) (finding no prejudice from penalty phase presentation assumed to be deficient in light of heinous nature of crimes and weakness of mitigating factors).

White's last sub-claim repeats his guilt-phase contention that defense counsel should have argued that he was less culpable than his co-defendants because his conduct was less egregious than that of Fisher or Bowling. This argument fails for the same reason as its first incarnation: the facts did not support it. On direct examination, White claimed that he entered the store only after Fisher and Bowling had gone inside; that Lula, Charlie and Sam had already been beaten to death; and that it was snowing inside the store.[240] On the other hand, three acquaintances testified that White came up with the idea to rob the store, had tried to recruit them for the effort for months, and later admitted to them that he was involved. Fisher also testified that White devised the plan to execute the robbery, and that it was White who had struck the blows that likely killed Charlie and Sam. Defense counsel assessed Fisher as a solid and believable witness, and thus did not try to point the blame at him because "it was going to be difficult to get the jury to view Fisher in an equal sense, because he was not only sixteen, but he looked like he was about fourteen. He didn't look like the

---

[240]  [Trial at 1893-94]

planner or the prime mover.  I didn't think that would set at all."[241]  Counsel was not ineffective for choosing not to pursue a theory of the case that was supported only by White's self-serving testimony and which was undermined, both quantitatively and qualitatively, by the other evidence in the case.

Finally, the Kentucky Supreme Court held that White failed to show prejudice from the failure to present all of the evidence and argument which he now contends should have been presented during the penalty phase.  The Court stated that "[e]ven if all the testimony White suggests had been introduced during the penalty phase it would not have been sufficient to counter or explain the brutalities of the three murders.  Some of the evidence could have been detrimental to his case. ...  There is no possible or reasonable chance that the omitted testimony would have had such an unquestionably favorable impact that it would have changed the sentence of the jury."  *White*, 1994-SC-0326-MR (slip opinion at 6).

The Court concludes that the determination that White failed to demonstrate prejudice does not contradict or unreasonably apply precedent from the United States Supreme Court.  Unlike the guilt phase, the purpose of the penalty phase is not to put forward evidence showing that the defendant is not legally responsible for the crime.  *Stewart v. Gramley*, 74 F. 3d 132, 136 (7th Cir. 1996) ("... since it obviously is not the theory of capital punishment that murderers are compelled to murder by their past and therefore should not be punished, it cannot be right that anything brought out at a death-penalty hearing is certain or even likely to help the defendant to save his life.  What is brought out that will help him is what goes to show that he is not as 'bad' a person as one might have thought from the evidence in the guilt phase of the proceeding.  What is brought out that will hurt him is what goes to show that he is, indeed, as bad a person, or worse, than one might have thought from just the evidence concerning the crime.").  In this case, while White claims that counsel should have discovered more evidence regarding his past, neither Dr. Granacher nor Dr. Evensen would testify that they would have given more helpful testimony if they had been provided with it.  Had defense counsel chosen to have Dr. Evensen testify during the penalty phase that White felt sorry for killing three elderly shopkeepers, the prosecution would doubtless have read Evensen's report to the jury, including his assessment that White was ready and willing to take what he wanted "through power and intimidation" if necessary.  There was positive evidence about White's

---

[241]  [RCr 11.42 at 958-59]

accomplishments in junior high-school sports and at work, but that too was moderated by less-than-complementary facts about drugs and absenteeism.  The mitigation evidence which White contends should have been included was modest at best.

Where the evidence of guilt or moral culpability is equivocal, even a minor omission might have made the difference between a harsh sentence and a lighter one.  Conversely, "where the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence."  *Bonin v. Calderon*, 59 F. 3d 815, 836 (9th Cir. 1995).  Particularly after Fisher agreed to testify for the prosecution, the evidence overwhelmingly showed that White was the animating force behind the crimes, including planning the robberies, recruiting participants, murdering the victims once his identity was at risk of being revealed, and subsequently trying to cover up their role in the offenses.  Given that state of affairs, the Kentucky Supreme Court faithfully applied Supreme Court precedent when it concluded that the absence of any marginally-beneficial evidence would not have made a difference in the mind of a reasonable juror.  *Cf. Dixon v. Houk*, 737 F. 3d 1003, 1009 (6th Cir. 2013) (holding that in light of compelling evidence that the defendant attacked his victim with a hammer, buried him alive, stole his car and then sold it, defendant could not demonstrate prejudice from counsel's failure to cross-examine certain witnesses more fully or present additional evidence).[242]

## N.      Claim L – White's RCr 11.42 Proceedings were Not Rendered Inadequate Because the Trial Court Declined his Motions for Funds to Retain Expert Witnesses.

During collateral review proceedings pursuant to RCr 11.42, White filed several motions requesting state funds so that he could retain expert witnesses and explore various avenues for relief.  All told, White asked the Kentucky court to give him funds to develop his claims in a dozen areas, including psychiatry, neuropsychology, psychopharmacology, clinical social work, statistics, verbal comprehension, pathology, crime scene reconstruction, hair comparison, legal ethics, the standard of practice for capital defense counsel, social science in relation to young people as a distinct cognizable group, the composition of the grand and petit juries, and mitigation.  The Kentucky court

---

[242] The Court has reviewed each of White's claimed instances of ineffective assistance individually and found each to be without merit.  The Court has also separately considered whether defense counsel's conduct, considered in its totality, indicates ineffective assistance.  *See Mackey v. Russell*, 148 F. App'x 355, 367 (6th Cir. 2005).  The Court concludes that it does not for the reasons identified above.

granted White's motion for funds for a mitigation specialist and approved $12,500 in compensation, but denied the balance of his requests.  On appeal, the Kentucky Supreme Court found that White had failed to establish that his other funding requests were reasonably necessary to assert his claims. It therefore rejected his argument that the failure to provide all of the funding he requested denied him a full and fair hearing in his collateral review proceedings, noting that "[t]here is no constitutional right to expert assistance in this type of proceeding."[243]  Before this Court, White contends that the denial of funding during state collateral review proceedings violated his "rights to due process, equal protection, and to be free from cruel and unusual punishment."  [R. 14-1 at 271-74]

The Supreme Court long ago noted that it "ha[s] never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions." *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).  In doing so, it repeated that "the equal protection guarantee of the Fourteenth Amendment does not require the appointment of an attorney for an indigent appellant just because an affluent defendant may retain one," and that "[t]hese considerations apply with even more force to postconviction review."  *Id.* at 556 (citing *Ross v. Moffitt*, 417 U.S. 600, 616 (1974)).  After *Finley* was decided, several inmates in Virginia contended that the Constitution required the state to provide them with counsel during their collateral review proceedings because they faced a sentence of death.  In *Murray v. Giarratano*, 492 U.S. 1 (1989), the Supreme Court rejected the notion that the fact that the defendants had been condemned to death required a different result.  *Id.* at 8-10.  The Supreme Court still follows this approach, noting that "there is no due process right to collateral review at all."  *Ryan v. Gonzales*, 568 U.S. 696, 704 (2013).

These cases hold that the state is not required to pay for state-provided counsel, but they do not directly address – one way or the other – the constitutional necessity for funding investigative or expert services.  Nonetheless, "[i]t makes no sense to say that the state need not provide counsel at all, but that if the state opts to provide counsel, the state must fund counsel adequately or face the possibility of excusing procedural defaults."  *Kennedy v. Herring*, 54 F. 3d 678, 684 (11th Cir. 1995).  The United States Supreme Court has never held that states are required to provide funding

---

[243]  White's contention in his reply that the Kentucky Supreme Court rejected his claim solely on Kentucky law grounds [R. 90 at 263-64] is therefore factually incorrect.

for investigations, experts, or other services in state collateral review proceedings. The federal courts have thus consistently rejected claims that state supreme courts act contrary to established federal law when they uphold the denial of such funds. Cf. *Faulk v. Long*, No. C-13-5410-EMC (pr), 2015 WL 433578, at *6-8 (N.D. Cal. Feb. 2, 2015) (finding no clearly established law from the Supreme Court for a federal constitutional right to investigative funds in state collateral review proceedings); *Simpson v. Warden, Lebanon Corr. Inst.*, No. 3:17-CV-298, 2018 WL 1241482, at *8-9 (S.D. Ohio March 9, 2018) ("The Supreme Court has yet to recognize a constitutional right to the effective assistance of counsel in post-conviction, much less the right to expert assistance in those proceedings."); *James v. Culliver*, No. 10-CV-S-2929-S, 2014 WL 4926178, at *138 (N.D. Ala. Sept. 30, 2014); *Hart v. MCI Concord Super.*, 36 F. Supp. 3d 186, 200-01 (D. Mass. 2014); *Bannister v. Delo*, 100 F. 3d 610, 624 (8th Cir. 1996). The Supreme Court of Kentucky did not rule in a manner contrary to clearly established federal law when it upheld the trial court's denial of White's requests for more funding in his collateral review proceedings.

O.    **Claim J(2) – Different Sentences Imposed upon Bowling and Fisher Do Not Render White's Sentence of Death Arbitrary, Disproportionate, or Cruel and Unusual.**

In his petition and before the Kentucky courts, White argued that the death penalty imposed upon him violates his rights under the Eighth and Fourteenth Amendments because, he contends, that sentence is grossly disproportionate to sentences imposed in other, unidentified cases, as well as to those received by Bowling (who received seven concurrent 20-year sentences) and Fisher (who received no sentence) even though they, too, had planned the robbery and hit the victims multiple times. [R. 14-1 at 244-47][244]   In his reply White undertakes a wholly different argument: that the Kentucky Supreme Court's proportionality review, required by Ky. Rev. Stat. § 532.075, violated the Eighth and Fourteenth Amendments because it did not consider cases where the death penalty

---

[244]  The Commonwealth countered that Bowling and Fisher were not similarly-situated to White. White was 20 years old when he committed the robbery and murders, had long solicited partners to commit the robbery, tried to cover it up afterward, and there was evidence that he may have struck some of the most severe blows upon the victims. In comparison, Fisher was only 15 years old, admitted his guilt, cooperated with the prosecution, and testified against White and Bowling. Bowling was 17 years old when he participated in the crime and received an effective sentence of 20 years imprisonment. [R. 84 at 183-87; Brief for Appellee, Direct Appeal at 204-208]

was not imposed. [R. 90 at 251-68] The Kentucky Supreme Court rejected White's proportionality arguments each time they were presented. Cf. *White v. Commonwealth*, 671 S. W. 2d 241, 247 (Ky. 1984).

The Eighth Amendment requires a death sentence to be proportional to the crime the defendant committed. *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). But White's arguments directly under the Eighth and Fourteenth Amendments *simpliciter* fail as a matter of law because the Constitution itself requires no proportionality *review* at all. *Pulley v. Harris*, 465 U.S. 37, 45 (1984); *Getsy v. Mitchell*, 495 F. 3d 295, 305 (6th Cir. 2007) (*en banc*) (noting that the proportionality required by the Eighth Amendment invites comparison "of the sentence in relation to the particular characteristics of the crime and the criminal at issue," but not "to sentences received by other, similarly situated defendants"). In addition, Kentucky's proportionality review statute was modeled after Georgia's comparative review statute, *Ice v. Commonwealth*, 667 S.W.2d 671, 679 (1984), which the Supreme Court found to comport with the requirements of the Eighth Amendment in *Gregg v. Georgia*, 428 U.S. 153 (1976). In White's appeal the Kentucky Supreme Court conducted the analysis required by § 532.075, and the United States Supreme Court has never held that the Constitution requires or defines a particular class of cases against which the sentence must be compared. *See Getsy*, 495 F. 3d at 306 ("Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison; therefore limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed falls within this wide latitude.").

Finally, White's assertion that he has a due process right under the Fourteenth Amendment to consideration of a broader class of comparatives that he deems more relevant is without merit. Kentucky's proportionality statute does not create any liberty interest under the Due Process clause because "[it] only explains what the Kentucky Supreme Court needs to consider - similar cases, the crime, and the defendant - it does not tell that court how to make this decision." *Bowling v. Parker*, 344 F. 3d 487, 521-22 (6th Cir. 2003); *Bowling v. Parker*, No. 03-28-ART, 2012 WL 2415167, at *9 (E.D. Ky. June 26, 2012); *Thompson v. Parker*, No.5:11-CV-31-R, 2012 WL 6201203, at *34 (W.D. Ky. Dec. 10, 2013). This Court and the Sixth Circuit have therefore consistently rejected the arguments made by White here. Cf. *Caudill v. Conover*, No. 5: 10-84-DCR, 2014 WL 349300, at *69

143

(E.D. Ky. Jan. 31, 2014), *aff'd*, 881 F. 3d 454 (6th Cir. 2018).  The Kentucky Supreme Court's rejection of White's proportionality claim was not contrary to or an unreasonable application of federal law and affords no basis for habeas relief.

**P.     Claim J(3) – Delay in Carrying Out White's Death Sentence Does Not Offend the Constitution.**

White further contends that the Eighth Amendment forbids his execution at this point because too much time has passed since his death sentence was imposed in 1980.  [R. 14-1 at 247-256][245]  The Kentucky Supreme Court denied this claim when affirming the denial of relief under RCr 11.42 in 2002.  In support of this claim White points only to the decisions and writings of various international tribunals, but no decision of the United States Supreme Court supports this view, let alone established precedent binding the Supreme Court of Kentucky.  The best he can muster is Justice Breyer's view, expressed in a dissent from the denial of *certiorari*, that 27 years of delays (caused by repeated errors by the state courts) raised a *question* under the Eighth Amendment. *Knight v. Florida*, 537 U.S. 990 (2002) (Breyer, J., dissenting from the denial of *certiorari*).  In an earlier proceeding in that case, Justice Thomas noted that:

> I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed. Indeed, were there any such support in our own jurisprudence, it would be unnecessary for proponents of the claim to rely on the European Court of Human Rights, the Supreme Court of Zimbabwe, the Supreme Court of India, or the Privy Council.

*Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in the denial of *certiorari*).  And, as Justice Thomas recently pointed out, lengthy delays in carrying out a death sentence are often caused, in significant part, by the condemned's own efforts to forestall execution:

> It makes "a mockery of our system of justice for a convicted murderer, who, through his own interminable efforts of delay has secured the almost-indefinite postponement of his sentence, to then claim that the almost-indefinite postponement renders his sentence unconstitutional."

---

[245]  It is not clear that this claim is cognizable on federal habeas review at all because it does not challenge the validity of White's death sentence *ab initio*.  It may, like challenges to methods of execution, be one that should or must instead be asserted in a civil rights proceeding as a challenge to the execution of that sentence. Cf. *Wilkinson v. Dotson*, 544 U.S. 74 (2005).

144

*Reynolds v. Florida*, 139 S. Ct. 27 (2018) (Thomas, J., concurring in the denial of *certiorari*) (quoting *Turner v. Jabe*, 58 F. 3d 924, 933 (4th Cir. 1995) (Luttig, J., concurring)).   White points to no authority from the United States Supreme Court establishing that delay in carrying out a death sentence, regardless of how caused, violates the Constitution, and thus the Kentucky Supreme Court's rejection of this claim did not unreasonably apply federal law.

**Q.    Claim M – Claims of Cumulative Error Are Not Cognizable in Federal Habeas.**

Finally, White contends that even if none of the claimed errors standing alone warrant habeas relief, their cumulative effect was to deny him a fair trial in violation of his right to due process.   [R. 14-1 at 274]   But "Post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Hoffner v. Bradshaw*, 622 F. 3d 487, 513 (6th Cir. 2010) (quoting *Moore v. Parker*, 425 F. 3d 250, 256 (6th Cir. 2005)). The Sixth Circuit and the other courts of appeal have thus rejected this line of reasoning, noting that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Hodge v. Phillips*, 2019 WL 5571491, at *5 (6th Cir. Oct. 24, 2019) (quoting *Lorraine v. Coyle*, 291 F. 3d 416, 447, *opinion corrected upon denial of rehearing*, 307 F. 3d 459  (6th Cir. 2002)).

Notwithstanding *Lorraine*, White contends that the Sixth Circuit has conducted a cumulative error analysis in two instances.   [R. 90 at 266 n.1039]   But a cursory review of those decisions makes plain that it did nothing of the kind.   In both cases, the Sixth Circuit merely considered whether alleged instances of deficient performance by counsel, when considered in the aggregate as required by *Strickland*, constituted ineffective assistance of counsel.   *Tinsley v. Million*, 399 F. 3d 796, 816 (6th Cir. 2005) ("Even assuming deficient performance in failing to question certain evidence at trial and failing to hire an independent blood-spatter expert, any possible harm from these claims, even when combined, is insufficient to undermine confidence in the outcome of this verdict"); *Mackey v. Russell*, 148 F. App'x 355, 367 (6th Cir. 2005) ("In contrast to the state appellate court's opinion, however, and in accord with the clear precedent of *Strickland*, we will evaluate the cumulative effect of all of Luskin's errors below instead of considering each individually.").

And White's assertion that the Supreme Court endorsed federal habeas review of claimed constitutional errors in the aggregate in *Chambers v. Mississippi*, 410 U.S. 284 (1973) is wholly without merit.   *Chambers*, in a fashion similar to *Strickland*, merely indicated that certain *evidentiary* errors

145

related to the cross-examination of adverse witnesses should be considered in the aggregate to determine whether a defendant was denied a fair trial.  *Id.* at 298; *United States v. Adams*, 722 F. 3d 788, 819 (6th Cir. 2013).  Nothing in *Chambers*, whether directly or by implication, supports the notion that a disparate array of claimed constitutional errors (some committed by the trial court, some by the prosecution, others by counsel, and some by the appellate courts) can somehow coalesce into a single but undefined and amorphous claim of "cumulative error."  Because the Supreme Court of Kentucky's denial of White's claim of cumulative error was not an unreasonable application of clearly established federal law, his claim affords no basis for federal habeas relief.

### III

In sum, the Court concludes that none of the claims presented in White's petition warrant habeas relief, and his petition must be denied.  The Supreme Court has repeatedly offered insight into the benefits and burdens of the authority vested in the federal courts to issue writs of habeas corpus.  The petition before this Court challenges a conviction and sentence obtained forty years ago.  In such circumstances, the insights of former Justice Sandra Day O'Connor are worthy of repetition here:

> The writ of habeas corpus indisputably holds an honored position in our jurisprudence.  Tracing its roots deep into English common law, it claims a place in Art. I of our Constitution.  Today, as in prior centuries, the writ is a bulwark against convictions that violate "fundamental fairness."

> We have always recognized, however, that the Great Writ entails significant costs. Collateral review of a conviction extends the ordeal of trial for both society and the accused.  As Justice Harlan once observed, "[b]oth the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community."  By frustrating these interests, the writ undermines the usual principles of finality of litigation.

> Liberal allowance of the writ, moreover, degrades the prominence of the trial itself. A criminal trial concentrates society's resources at one "time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence." Our Constitution and laws surround the trial with a multitude of protections for the accused.  Rather than enhancing these safeguards, ready availability of habeas corpus may diminish their sanctity by suggesting to the trial participants that there may be no need to adhere to those safeguards during the trial itself.

> We must also acknowledge that writs of habeas corpus frequently cost society the right to punish admitted offenders. Passage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible. While a habeas writ may, in theory, entitle the defendant only to retrial, in practice it may reward the accused with complete freedom from prosecution.
>
> Finally, the Great Writ imposes special costs on our federal system. The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 126-28 (1982) (citations omitted).

Of course, it cannot be gainsaid that federal habeas relief should and must be readily available where the record unequivocally demonstrates constitutional error. But here the fundamental fairness of the trial has been extensively tested through state appeals, evidentiary hearings, and collateral review proceedings. Decades later, White presents claims to the Court where the pertinent facts are equivocal, or based upon factual allegations contradicted (in part or in whole) by the record. And where many of the legal claims rely upon only the broadest of Supreme Court precedent, deference to the Kentucky Supreme Court's determination that they are without merit is especially appropriate. 28 U.S.C. § 2254(d); *Yarborough v. Alvarado*, 541 U.S. 652, 663-64 (2004).

Accordingly, the Court **ORDERS** as follows:

1. Karu White's petition for a writ of habeas corpus [R. 14] is **DENIED**.

2. The Court will enter a corresponding judgment.

3. This matter is **STRICKEN** from the docket.

Dated September 16, 2021

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY

147